**QUINTON & PETIX**
Michael E. Quinton, Bar No. 051370
402 West Broadway, Suite 400
San Diego CA 92101
Telephone: ( 619)234-1113
Fax: (619)595-3147
quinton@quintonpetix.com

Attorneys for Defendants,
TIMOTHY LICHTY and
SHERYL LEE LICHTY
CO-TRUSTEES

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Civil No. 07 CV 00886-W (NLS) |
| ) | |
| Plaintiff, ) | |
| ) | NOTICE OF MOTION AND |
| v. ) | MOTION TO STRIKE |
| ) | PLAINTIFF'S EXPERT |
| ) | REPORTS AND EXCLUDE |
| 14.30 ACRES OF LAND, more or less, situated in San) | RELATED TESTIMONY |
| Diego County, State of California; TIMOTHY LICHTY) | |
| and SHERYL LEE LICHTY CO-TRUSTEES OF THE) | Date: August 5, 2008 |
| TIM AND SHERRY LICHTY FAMILY TRUST DATED) | Time: 11:00 a.m. |
| OCTOBER 24, 1991; AND OTHER INTERESTED) | Court: Hon. Nita L. Stormes |
| PARTIES, ) | Room: F |
| ) | |
| Defendants. ) | |

TO: PLAINTIFF UNITED STATES OF AMERICA, AND ITS ATTORNEYS OF

RECORD, KAREN P. HEWITT, UNITED STATES ATTORNEY, by TOM STAHL,

ASSISTANT UNITED STATES ATTORNEY, CHIEF, CIVIL DIVISION, AND CHRISTOPHER

LATHAM, ASSISTANT U.S. ATTORNEY:

PLEASE TAKE NOTICE that on August 5, 2008, at 11:00 a.m., before the Hon. Nita L.

Stormes, United States Magistrate Judge, in courtroom F of the above-entitled Court, located at

940 Front Street, San Diego, California 92101, the Defendants, TIMOTHY LICHTY and

SHERYL LEE LICHTY CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY

TRUST, etc, by and through their counsel, QUINTON & PETIX, by Michael E. Quinton, Esq. will

1   and hereby do move the Court for an order excluding the admission into evidence of certain expert

2   witness reports, records and testimony related to those documents in the above-entitled case.  This

3   motion is based on the files and records of this case, on the attached Declaration of Michael E.

4   Quinton, Esq., and on the attached Memorandum of Points and Authorities.

5

6           Based upon all of the foregoing facts and applicable law, this motion should be granted and

7   the court should find that the untimely disclosure of the expert reports and documents which

8   purport to be the bases of expert opinions discussed herein, constitutes a violation of Rule

9   26(a)(2)(C), Fed.R.Civ.P., and of this court's Case Management Conference Order of November 7,

10  2007, and should enter an order that said reports and documents, and any expert testimony related

11  thereto, should be excluded from evidence, pursuant to Rule 37 (c), Fed.R.Civ.P.

                                         Respectfully submitted,

12

13  DATED: July 11, 2008.                **QUINTON & PETIX**

14

15

16                                       MICHAEL E. QUINTON
                                         Attorneys for Defendants,
17                                       TIMOTHY LICHTY and
                                         SHERYL LEE LICHTY CO-TRUSTEES

18

19

20

21

22

23

24

25

26

27

28

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113  FAX 619/595-3147

1

**QUINTON & PETIX**
Michael E. Quinton, Bar No. 051370

2   402 West Broadway, Suite 400
San Diego CA 92101

3   Telephone: ( 619)234-1113
Fax: (619)595-3147

4   quinton@quintonpetix.com

5   Attorneys for Defendants,
TIMOTHY LICHTY and

6   SHERYL LEE LICHTY
CO-TRUSTEES

7

8

9                         **UNITED STATES DISTRICT COURT**

10                         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   UNITED STATES OF AMERICA,                  )    Civil No. 07 CV 00886-W (NLS)
                                                )
13                            Plaintiff, )
                                                )    MEMORANDUM OF POINTS &
14                    v.                         )    AUTHORITIES IN SUPPORT
                                                )    OF DEFENDANTS' MOTION
15   14.30 ACRES OF LAND, more or less, situated in San )    TO STRIKE PLAINTIFF'S
     Diego County, State of California; TIMOTHY LICHTY )    EXPERTS' REPORTS AND
16   and SHERYL LEE LICHTY CO-TRUSTEES OF THE )    EXCLUDE RELATED
     TIM AND SHERRY LICHTY FAMILY TRUST DATED )    TESTIMONY
17   OCTOBER 24, 1991; AND OTHER INTERESTED )
     PARTIES,                                   )    Date: August 5, 2008
18                                              )    Time: 11:00 a.m.
                              Defendants. )    Court: Hon. Nita L. Stormes
19   ———————————————————————— )    Room: F

20

21

22

23

24

25

26

27

28

Memo of Ps and As re: Motion to Strike                              7-cv-00886

1

**TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES ................................................................................................. ii

4    I.  INTRODUCTION ... .................................................................................................... 2

5    II. STATEMENT OF FACTS ............. ............................................................................. 2

6       A.  Reports by Ms. Nancy Lucast ................................................................................ 3

7       B.  Reports by Mr. Norman Arndt ............................................................................... 8

8          1.) The "Declaration" of R. D. Medan ...................................................................... 8

9          2.) The June 20, 2008, report re: electrical line extension ........................................ 10

10         3.) The June 27, 2008, SUPPLEMENTAL REPORT # 1. ...................................... 12

11      III.  ARGUMENT ............................................................................................................12

12      A.   The Late Submission of Expert Witness Reports and Related Documents Violates
             this Court's Case Management Conference Order and the Federal Rules of Civil
13           Procedure It Was Designed to Implement ............................................................12

14          1.) The "Supplemental" Report of Nancy Lucast, dated June 11, 2008.................. 13

15          2.) The June 20, 2008, Late Report by  Norman Arndt re: Electrical Line
             Extension ............................................................................................................16
16
            3.) Norman Arndt's June 27, 2008, SUPPLEMENTAL REPORT # 1.................... 16
17
      B.    The "Declaration" of R.D. Medan Submitted by Norman Arndt on June 20, 2008,
18           Should Be Excluded from Evidence as Inherently Irrelevant, Untimely Disclosed,
             and as an Improper Effort to Rehabilitate an Unsupported Expert Opinion with
19           Newly Created Facts ........................................................................................... 18

20
      IV.  CONCLUSION .................................................................................................... 20
21
22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Akeva L.L.C. v. Mizuno Corp.,* 212 F.R.D. 306 (M.D.N.C. 2002)
.................................................................. 17

*Beller ex rel. Beller v. United States ,*221 FRD 696, 701–702 (D. New  Mex. 2003)
.......................................................... 14, 15,16, 17, 19

*Council 31 AFL-CIO v. Ward,* 1995 WL 549022 (N.D.Ill. Sept.12, 1995)
.................................................................. 15

*Keener v. United States,* 181 FRD 639, 642 (D. Mont. 1998)
.................................................................. 14

*Lindner v. Meadow Gold Dairies, Inc.,* --- F.R.D.—, 2008 WL 763236 (D.Hawaii 2008)
.......................................................... 14, 15, 18, 19

*Metro Ford Truck Sales, Inc. v. Ford Motor Co.* (5th Cir. 1998) 145 F3d 320, 324
.................................................................. 14

## RULES

Rule 1, Fed.R.Civ.P.  ...................................................... 12

Rule 26, Fed. R. Civ. P.  .................................................. 15, 17, 19

Rule 26(a)(2), Fed. R. Civ. P. ............................................ 3, 6, 12

Rule 26(a)(2)(B)(i), Fed. R. Civ. P. .................................... 6, 7, 8

Rule 26(a)(2)(C), Fed. R. Civ. P. ....................................... 3, 8, 13, 20

Rule 26(a)(2)(D), Fed. R. Civ. P.  ...................................... 4, 6, 15

Rule 26(e) , Fed. R. Civ. P.  ............................................. 14,16, 17

Rule 37 (c), Fed.R.Civ.P. ................................................. 20

Rule 37, Fed.R.Civ. P.  ................................................... 2, 13

Rule 403, Fed.R.Evid.  ................................................... 19

## TREATISE

The Rutter Group: Federal Civil Procedure Before Trial, ¶ 11:441 (Westlaw, 2008).......... 14

# I

## INTRODUCTION

This motion to strike and exclude testimony concerns expert reports, documents which purport to be the bases of expert opinions, and expert opinion testimony related thereto.  The expert reports and documents which purport to be the bases of expert opinions have all been produced after the court-imposed deadline of April 30, 2008, for disclosure of Plaintiff's expert reports, established in the Court's Case Management Conference Order of November 7, 2007.

# II

## STATEMENT OF FACTS

On November 7, 2007, Magistrate Judge Adler filed the CASE MANAGEMENT CONFERENCE ORDER REGULATING DISCOVERY AND OTHER PRETRIAL PROCEEDINGS in this case.  (The Defendants ask the Court to take judicial notice of this CASE MANAGEMENT CONFERENCE ORDER.)  Paragraph 3 of the CASE MANAGEMENT CONFERENCE ORDER set out the schedule for expert disclosures.  This schedule called for Defendants' expert disclosures to be served on or before January 31, 2008, for the Plaintiff's disclosures to be made on or before April 30, 2008, and for "any contradictory or rebuttal information" to be disclosed on or before May 30, 2008.  Paragraph 3 of the CASE MANAGEMENT CONFERENCE ORDER further states:

> Please be advised that failure to comply with this section or any other discovery order of the Court may result in the sanctions provided for in Fed. R. Civ. P. 37, including a prohibition on the introduction of experts or other designated matters in evidence.

A copy of the CASE MANAGEMENT CONFERENCE ORDER is attached as Exhibit A to the attached Declaration of Michael E. Quinton.

1   By this Motion the Defendants ask the Court to apply Rule 26(a)(2)(C) of the Federal Rules of

2   Civil Procedure and enforce this Order.[1]

3   **A. REPORTS BY MS. NANCY LUCAST.**

4       The Defendants produced the reports of their three experts designated pursuant to Rule

5   26(a)(2) to counsel for the Government on January 29, 2008. The Government produced reports

6   of their six experts on April 30, 2008. One of the Government's expert reports served on the

7   Defendants on April 30, 2008, was a report by Ms. Nancy Lucast. The stated purpose of this report

8   was:

9           You have asked me to evaluate the development potential, in view of the
            jurisdiction of the California Coastal Commission, of the Lichty property in the Tijuana
10          River Valley community of San Diego, California.

11   Page 1 of Lucast April 28, 2008, report.

12   A true copy of Ms. Lucast's April 28, 2008, report is attached to the Declaration of Michael E.

13   Quinton as Exhibit B.

14       In her report, Ms. Lucast states:

15          IMPORTANT NOTE: The City-adopted CDP appeal maps (C-730.1) indicate that
            the property is subject to an area of "deferred certification" and to "Coastal Commission
16          Appeal Jurisdiction." However, it is important to note that these maps have never been
            adopted by the Coastal Commission, and that they are famously frequently wrong. In
17          checking with the San Diego District Coastal Commission staff, it was determined that: (1)
            the designation of "deferred certification" has been repealed in this area; and (2) the entire
18          Lichty parcel is designated "original jurisdiction," or an area where coastal development
            permit jurisdiction is permanently retained by the State Coastal Commission. This makes
19          sense as to the lowlands, but not as to the uplands, so I have requested a clarifying opinion
            from the Coastal Commissions's mapping unit. I could modify my conclusions depending
20          on the outcome of the investigation by the CCC mapping unit.

21   Exhibit B to the Declaration of Michael E. Quinton, Lucast April 28, 2008, report, Footnote 1,

22   pages 2 and 3.

23       Ms. Lucast further stated in her report:

24          Pending the final outcome of an investigation of the true CDP permit status of the
            Lichty property, it has been assumed that the entire property lies within the retained
25          ("original") permit jurisdiction of the Coastal Commission as interpreted by the Coastal
            Commission staff.
26

27   ————————————
     [1] Rule 26(a)(2)(C) states, in pertinent part:
28   C) Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that
     the court orders.

Exhibit B to the Declaration of Michael E. Quinton, Lucast April 28, 2008, report, page 6.

Ms. Lucast concludes:

> My conclusions are based on the Coastal Commission staff's current interpretation of the City of San Diego CDP jurisdiction maps. I have asked for a clarification of that interpretation. Such clarification is pending. If the interpretation changes, my conclusions are, likewise, subject to change. (See footnote 1, page one, [sic] herein.)

Exhibit B to the Declaration of Michael E. Quinton, Lucast April 28, 2008, report, page 10.

On May 6, 2008, the undersigned counsel for the Defendants wrote to Mr. Stahl, counsel for the Government, regarding the Government's expert disclosures and advised him, inter alia:

> 5.) Nancy A. Lucast: It appears that this report is not complete inasmuch as it does not state the witness' final opinion but leave [sic] open the possibility that her opinion could change if she receives information she did not have at the time she prepared the report. (See, Footnote 1 and the first paragraph on page 10 of her report.) We need to have the witness' "final answer."

A true copy of this letter is attached to the Declaration of Michael E. Quinton as Exhibit C.

On May 8, 2008, Mr. Stahl responded to the May 6, 2008, letter and stated:

> 5. <u>Nancy A. Lucast</u>  I disagree with your characterization of the statement contained in Footnote 1 of her report. Her ten-page report includes four pages of discussion and opinions based upon the information she enumerates in the first six pages. The footnote contains an analysis and discussion of an apparent discrepancy regarding the extent of the California Coastal Commission's original jurisdiction over the subject property. Ms. Lucast has requested clarification and correctly acknowledges that the CCC's response has the potential to impact her conclusions on that topic. At the time she prepared her report, the CCC had not responded. She is aware of the requirement to supplement her report if warranted by the facts. See Fed.R.Civ.P. 26(a)(2)(D).

A true copy of this letter is attached to the Declaration of Michael E. Quinton as Exhibit D.

In the absence of any information on the subject from the Government's designated expert on the subject, counsel for the Defendants scheduled a meeting with Coastal Commission staff on May 16, 2008. Following this meeting, on May 21, 2008, counsel for the Defendants wrote a letter to Mr. Stahl setting out the facts about the status of the property vis-a-vis the California Coastal Commission. In this letter counsel for the Defendants point out that Ms. Lucast had met with the Coastal Commission staff on the morning of May 16, 2008.  In the May 16, 2008, afternoon meeting with counsel for the Defendants, and others, the Coastal Commission had stated that Ms. Lucast was simply wrong in her April 28, 2008, report. The Coastal Commission staff said the

following about the status of the property, all of which was pointed out in the May 21, 2008, letter to Mr. Stahl:

> Based on the information given to us on Friday afternoon, [May 16, 2008] it appears that the opinions expressed in Ms. Lucast's April 28, 2008, report regarding the subject property are mostly invalid. Specifically, the Coastal Commission staff determined, and so advised us:

1.  The property is not within any California Coastal Commission retained coastal development permit jurisdiction.

2.  The property lies entirely within the City of San Diego's Tijuana River Valley Land Use Plan (LUP), as approved by the Coastal Commission, and, therefore, the City has full permit jurisdiction. No coastal development permit approval is required by the Coastal Commission.

3.  Since the Coastal Commission has approved the City of San Diego Implementation Plan (IP) for the City of San Diego's Tijuana River Valley Land Use Plan (LUP), the City's MSCP Subarea Multi-Habitat Plan is incorporated in the Land Use Plan. The Land Use Plan, in conjunction with the Implementation Plan, allow for the full development of 25% to 30% of the least sensitive area of the subject property, without further mitigation. The Coastal Commission has no authority to decrease the development area.

4.  The jurisdiction of the Coastal Commission is limited to appellate jurisdiction. On appeal, the jurisdiction of the Coastal Commission is limited to a determination of compliance with the City's Land Use Plan (LUP) and Implementation Plan (IP). The Coastal Commission has no jurisdiction on appeal to impose any conditions beyond those within the approved City of San Diego plans.

> In view of these positions of the Coastal Commission, as expressed to us, it appears that if Ms. Lucast is to offer any opinions at all in this matter, her report will have to be revised. It also appears that Ms. Lucast's opinions are relied upon in the reports of most of your other experts.

> We do not have any interest in embarrassing anyone in this matter. If you wish to withdraw Ms. Lucast, you may do so. If you wish to have her revise her report, you may do that. If you would like to give the rest of your experts an opportunity to revise their reports to factor in this change of circumstances, you may do that. If you would like for Mr. Roach to revise his appraisal report to factor in the change in circumstances, you may do that too.

> The only thing we will insist on is that no delay is caused by whatever you choose to do and that our rebuttal expert reports should be kept under seal until after your revised reports are completed. Needless to say, you will need to make a decision on this before we submit our rebuttal expert reports on May 30, 2008. To that end, we suggest that we meet after Mr. Lichty's deposition on Thursday, May 22, 2008, to discuss how you wish to proceed due to this change of circumstances.

A true copy of this letter is attached to the Declaration of Michael E. Quinton as Exhibit E.

At the meeting of counsel following Mr. Lichty's deposition of May 22, 2008, counsel for the Government reiterated their position, as stated in Mr. Stahl's May 8, 2008, letter that they had a

1    right to "supplement" Ms. Lucast's report under Rule 26(a)(2)(D) at any time up to the time of the

2    pretrial and that if they chose to supplement her report, it would be at a time of their choosing.  No

3    written response was received to Exhibit E.

4         As of May 30, 2008, the date on which the rebuttal information was due, the Government

5    had not filed a supplement or correction to Ms. Lucast's April 28, 2008, report. On May 30, 2008,

6    the Defendants served the reports of their rebuttal experts on the Government.  The Defendants

7    did not designate a rebuttal expert or have a report prepared on issues relating to the California

8    Coastal Commission because it was not possible to determine what the Government's position was

9    regarding the issues relating to the Coastal Commission.  In the meantime, depositions were

10   scheduled to begin on June 24, 2008, and to conclude on July 24, 2008, one week before the

11   discovery cut-off in this case.

12        On June 18, 2008, counsel for the Defendants received by mail a document authored by

13   Ms. Lucast, dated June 11, 2008, and mailed by Government counsel on June 16, 2008.  This

14   document states: "NOTE: This letter supplements and corrects my April 28, 2008, opinion and

15   presents my final opinion."  In this report, Ms. Lucast acknowledges that she was wrong in stating

16   that the subject property is in an area of "original jurisdiction" for the California Coastal

17   Commission but finds new reasons to conclude that the property would be severely and adversely

18   impacted by the Coastal Commission.

19   A true copy of this report is attached  to the Declaration of Michael E. Quinton as Exhibit F.

20        The Defendants submit that the June 18, 2008, report is untimely, that the April 28, 2008,

21   report does not comply with Rule 26(a)(2) because it does not state Ms. Lucast's opinions and the

22   reasons therefor, as required by Rule 26(a)(2)(B)(i), and Ms. Lucast's testimony should be barred

23   in this case.

24        The Government has never offered any reason for Ms. Lucast's inability to submit a report

25   by the April 30, 2008, deadline.  In fact, the reason is simple; they did not start soon enough.  The

26   Defendants provided their reports to the Government on January 29, 2008.  The Government had

27   until April 30, 2008, to submit their reports.  If this had not been sufficient time, presumably the

28   Government could have asked for more time; the Government did not ask for more time.

1    Documents produced to the Defendants show that Ms. Lucast's first involvement with this

2    matter was approximately Tuesday, April 22, 2008, eighty-four days after the Government received

3    the Defendants' reports, and eight days before the Government's reports were due to be produced

4    to the Defendants. On that same day, Ms. Lucast sent an e-mail to Mr. Norman Arndt and Mr.

5    Dann Mallec, two of the Government's other retained experts in this matter. In this e-mail

6    message, Ms. Lucast asks for some technical information from Mr. Arndt and Mr. Mallec and

7    concludes:

8         As usual, I am being brought in at the last minute, so these guys want my report

9         yesterday. Anything you can get to me ASAP would be appreciated.

10   A true copy of this message is attached to the Declaration of Michael E. Quinton as Exhibit G.

11   Not surprisingly, Ms. Lucast was not able to get the information she needed to complete an

12   expert report that would comply with Rule 26(a)(2)(B)(i) in the eight days between Tuesday, April

13   22, 2008, the date she began her work, and Wednesday, April 30, 2008, the deadline for producing

14   her report. On Friday, April 25, 2008, at 2:25 pm, Ms. Lucast wrote an e-mail message to Mr.

15   Stahl, entitled "Confusing Maps" in which she states that (in the three days she has been working

16   on the matter) she has not been able to determine the extent of the Coastal Commission's

17   jurisdiction over the subject property. She concludes: "So I have asked CCC staff to make an

18   inquiry of their mapping division in San Francisco. I don't know when I'll hear back." Mr. Stahl

19   responded to this e-mail message from Ms. Lucast with an e-mail message on Friday, April 25,

20   2008, at 2:47 pm in which he stated:

21        Thank you for the update. In view of our April 30 deadline, I just ask that you move
          forward based upon the information that is available to you now. You can certainly note in
22        your report that there is this issue regarding the mapping and that you intend to get further
          clarification from the CCC. We will have the opportunity later to file supplemental reports
23        and this could certainly be the topic of such a supplementation.

24   A true copy of this e-mail message is attached to the Declaration of Michael E. Quinton as

25   Exhibit H.

26   The Defendants submit that the procedure followed by the Government in retaining Ms.

27   Lucast "at the last minute," having her submit an incomplete report on April 28, 2008, and then

28   producing Ms. Lucast's "final" report to the Defendants on June 18, 2008, forty-nine days after the

---

1   Government's reports were due, nineteen days after the Defendants' rebuttal reports were due, and

2   43 days before discovery cut-off violates the Court's November 7, 2008, CASE MANAGEMENT

3   ORDER and that the reports and her testimony should be barred from this case in their entirety.

4        The Government had three full months (from January 29, 2008, to April 30, 2008) to

5   produce its expert reports. If the Government had hired Ms. Lucast to start working on this case

6   anytime in the first month after having received the Defendants' expert reports, and if Ms. Lucast

7   had taken the same amount of time she ultimately required to produce an expert report, (eight

8   weeks, from April 22, 2008, through June 18, 2008), Ms. Lucast would have had sufficient time to

9   do the work necessary to produce a report that complied with Fed.R.Civ.P. Rule 26(a)(2)(B)(i).

10  The fact that the Government did not retain Ms. Lucast in time to allow her to complete her report

11  in the time allowed by the Court does not excuse the failure to timely submit a report that complied

12  with Fed.R.Civ.P. Rule 26(a)(2)(B)(i) and with Rule 26(a)(2)(C), the Court-ordered disclosure

13  schedule.

14        **B. REPORTS BY MR. NORMAN ARNDT.**

15             **1.) The "Declaration" of R.D. Medan.**

16        Among the experts designated and for whom they submitted reports on April 30, 2008, was

17  Mr. Norman Arndt. Mr. Arndt's report was dated April 25, 2008, and was based entirely on Fire

18  Department/Fire Code requirements. Mr. Arndt opined in his report that, in order to build a single

19  family residence on the subject property, an owner of the property would have to improve the

20  existing access road and install a 10 inch water line at a cost to the owner of between $5,135,130

21  and $4,744,575.

22  A true copy of this report, minus the maps and resume, is attached to the Declaration of Michael

23  E. Quinton as Exhibit I.

24        After the Government had made its expert disclosures on April 30, 2008, the Defendants

25  submitted their rebuttal reports. Among the Defendants' rebuttal expert reports was a report by a

26  fire protection engineer which pointed out the policy of the City of San Diego that the Fire Access

27  Roadway requirements on which Mr. Arndt's report was based did not apply to the construction of

28

Memo of Ps and As re: Motion to Strike        8                7-cv-00886

1    a single family residence, *i.e.*, an owner who wanted to build a single family residence would not
2    be required to build a fire access road.
3    A true copy of this report is attached to the Declaration of Michael E. Quinton as Exhibit J.
4           Following receipt of this report from the Defendants, counsel for the Government, Mr.
5    Christopher Latham, directed Mr. Arndt to obtain a "DECLARATION OF FIRE DEPARTMENT
6    REQUIREMENTS FOR THE LICHTY PARCEL, APN 663-020-02" from the Deputy Fire
7    Marshall R.D. Medan, the Deputy Fire Marshall for Development, with the San Diego Fire
8    Department. Mr. Arndt was able to persuade Mr. Medan to sign off on his Declaration letter on
9    June 20, 2008. A copy of this document is attached as Exhibit K to the Declaration of Michael E.
10   Quinton.

11          In his deposition, taken on July 1, 2008, Mr. Arndt testified that Government counsel, Mr.
12   Christopher Latham, told him to get the Declaration from Mr. R.D. Medan. The obvious purpose
13   for this was to overcome the report by the Defendants' fire protection engineer, Mr. Palenske, who
14   had pointed out that it would not be necessary to build the $4 million road which Mr. Arndt had
15   opined would be necessary.

16          In his July 1, 2008, deposition, Mr. Arndt testified that he wrote a draft of the
17   DECLARATION for Mr. Medan and presented it to Mr. Latham. He then had Mr. Medan put the
18   DECLARATION on City letterhead and sign it. This DECLARATION, prepared by the
19   government's retained expert after having had the benefit of the Defendants' fire protection
20   engineer's report, and unwittingly signed by Mr. Medan, amounts to a retroactive change of the
21   San Diego Fire Department policy regarding Fire Access Roadways as it applies to the subject
22   property. It should not be considered for any purpose in this case.

23          At the time he prepared his April 28, 2008, report, Mr. Arndt clearly did not know about
24   the exception to the San Diego Fire Department's fire access road requirements that was afforded
25   to single-family residences. In the Defendant's rebuttal report by the Defendants' expert in fire
26   protection engineering, Mr. Garner Palenske, Mr. Palenske pointed out the policy of exempting
27   single family residences from the fire access road requirements of the fire code. In the
28   memorandum which states the exemption, single family residences are referred to as Group R-3

1   occupancies. After he had seen the report of the Defendants' fire protection engineer, Mr. Garner

2   Palenske, Mr. Arndt queried another of the Government's retained experts, Mr. Dann Mallec, in an

3   e-mail on June 9, 2008, and asked: "Dann, do you know what Group M occupancies ... or Group

4   R-3 occupancies are?"

5   A true copy of this document is attached as Exhibit L to the Declaration of Michael E. Quinton.

6       The only known reference to Group R-3 occupancies in this case is in the San Diego Fire

7   Department Memorandum, FHPS Policy A-00-1, which was including in Mr. Palenske's report

8   (Exhibit J), regarding Fire Access Roadways. Mr. Arndt would have received Mr. Palenske's

9   report from Government counsel after it was produced on May 30, 2008.

10      Exhibit J, the report of Mr. Garner Palenske, the Defendants' fire protection engineering

11  expert completely negated the necessity for an owner of the subject property who wished to build

12  an single family residence on the property to build a fire access roadway, as contended by Mr.

13  Arndt, the Government's expert engineer. After he read Mr. Palenske's report, Mr. Latham and

14  Mr. Arndt decided to change the facts. They had Deputy Fire Marshall Medan sign off on a

15  "Declaration" written by Mr. Arndt at Mr. Latham's request, and dated June 20, 2008, 51 days

16  after the Government's expert reports were due, that stated, inter alia, that the exception for single

17  family occupancies that exempted them from the requirement to build a Fire Access Road would

18  not apply. Specifically, the "DECLARATION" states: "1) Exception D. Is not authorized, ie.

19  circumstances warrant that a fire access roadway is required."

20  A true copy of this DECLARATION is attached to the Declaration of Michael E. Quinton as

21  Exhibit K .

22      This "Declaration" dated June 20, 2008, has now become the basis for Mr. Arndt's opinion,

23  as stated in his April 25, 2008, report, that a fire access roadway is required for the construction of

24  a single family residence on the subject property.

25              **2.) The June 20, 2008, report re electrical line extension.**

26      On June 20, 2008, seven weeks after the Government's expert reports were due, counsel

27  for the Defendants received a report authored by Mr. Arndt and dated June 20, 2008, in which Mr.

28  Arndt gave the opinion that in order to provide adequate fire-fighting capability at the subject

1  property, it would be necessary to extend a 3 phase electrical line to the property at an additional
2  cost of approximately $120,000.
3  A true copy of this document, minus the exhibits, is attached to the Declaration of Michael E.
4  Quinton as Exhibit M.
5        In his deposition testimony, Mr. Arndt stated that the only reason for not completing this
6  report within the April 30, 2008, deadline was that he did not have enough time to complete it
7  before the April 30, 2008, deadline. In his July 1, 2008, deposition, Mr. Arndt testified as follows:
8        11        Is there any reason why as of April 25, 2008,
9        12   you could not have given those cost figures in your
10       13   April 25 report?
11       14     A.  I simply could not get them contracted and
12       15   signed up to do the study in time for the report.  So I
13       16   don't know who was pushing the buttons whether it came
14       17   from your side or the Department of Justice side, but
15       18   there -- I entered into draft contract with them, and it
16       19   came down that I had to have a report done by the
17       20   certain date.  There simply wasn't time of to go through
18       21   the gymnastics of getting the attorneys happy with the
19       22   agreement.
20       23     Q.  Well, did you understand that the April 30th,
21       24   2008, date was a court-imposed deadline?
22       25     A.  No.
23  Draft transcript of Deposition of Norman Arndt, July 1, 2008, page 103 of draft transcript.
24        The report of June 20, 2008, is untimely, it constitutes a new report on a new subject and if
25  found admissible, it will necessitate additional delay, costly discovery and the retention of
26  additional experts, all to the Defendants' great prejudice..
27
28

### 3.) The June 27, 2008, SUPPLEMENTAL REPORT # 1.

On June 27, 2008, eight weeks after the Government's expert reports were due, counsel for the Defendants received a third report authored by Mr. Arndt and dated June 27, 2008.  This report is entitled "SUPPLEMENTAL REPORT #1" and purports to state various additional reasons, absent the requirement for access for firefighting, for requiring the owner of the subject property to improve the access road at a cost of $4.5 million.

A true copy of this document, minus the exhibits, is attached to the Declaration of Michael E. Quinton as Exhibit N.

The June 27, 2008, "SUPPLEMENTAL REPORT #1" is untimely, it constitutes a new report on various new subjects and, if found admissible, it will necessitate additional delay, costly discovery and the retention of additional experts, all to the Defendants' great prejudice.

### III

### ARGUMENT

**A.    The Late Submission of Expert Witness Reports and Related Documents Violates  this Court's Case Management Conference Order and the Federal Rules of Civil Procedure It Was Designed to Implement.**

It goes without saying that a land condemnation case is a quintessential example of litigation that cannot be properly conducted without the assistance of qualified experts.  It is therefore no secret that when the Government first decides to file a condemnation action, it will no doubt need to identify qualified experts to support its valuation of the property condemned. Indeed, prior to making its deposit of funds deemed to be "just compensation" for the property taken, the Government must already have obtained the services of a land appraiser to provide assistance in determining the appropriate amount to deposit.

And it is further no mystery as to how and when the disclosure of the Government's experts will be required.  For that we have the Federal Rules of Civil Procedure, that "govern the procedure in all civil actions and proceedings in the United States district courts." Rule 1, Fed.R.Civ.P. More specifically with respect to expert testimony disclosures, we can look to Rule 26(a)(2), Fed.R.Civ.P., as implemented by the court's own Case Management Conference Order Regulating

1    Discovery and Other Pretrial Proceedings (CMC Order), filed herein November 7, 2007, pursuant
2    to Rule 26(a)(2)(C), Fed.R.Civ.P., which provides as follows:

3         (C)    *Time to Disclose Expert Testimony.* A party *must* make these disclosures *at the*
4                *times* and in the sequence that the court orders. (Emphasis supplied.)

5         The question to be determined here is whether the Federal Rules, together with this court's
6    own CMC Order, mean what they say, or whether the Government shall be allowed to ignore them
7    with impunity. The Defendants submit that the Rules, as supplemented by the court's CMC Order,
8    set firm deadlines by which the Government's expert disclosures should have been made, and that
9    the Government's violation of these deadlines, without good excuse, should subject it to the
10   sanctions provided in Rule 37, Fed.R.Civ. P., namely the exclusion of certain experts' reports,
11   documents, and related testimony. The particular objects of this motion will be discussed seriatim
12   below.

13              **1.      The "Supplemental" Report of Nancy Lucast, dated June 11, 2008.**
14        As set forth in detail in the foregoing Statement of Facts, Defendants' counsel gave fair and
15   timely warning of the Defendants' position in this matter with respect to the incomplete report by
16   Ms. Nancy Lucast, and the Defendants' need for a "final answer." [See Exhibit C to Quinton
17   Declaration, Mr. Quinton's letter of May 6, 2008.] In response, the Government's counsel took the
18   position, essentially, that Ms. Lucast could supplement her original report of April 28, 2008,
19   whenever the California Coastal Commission provided her with additional information concerning
20   its jurisdiction over the property in question. [See Exhibit D to Quinton Decl., Mr. Stahl's letter of
21   May 8, 2008.] No effort was made to explain why this information from the CCC had not been
22   obtained in a timely fashion. It later became clear in discovery that Ms. Lucast had not even been
23   retained to provide an opinion until about eight days before her report was due. As she herself
24   stated in her April 22, 2008, e-mail to Mr. Norman Arndt and Mr. Dann Mallec, two of the
25   Government's other retained experts in this matter, that "as usual" she had been brought in on this
26   case "at the last minute." [Exhibit G to Quinton Decl.] It may be kept in mind that the
27   Government had received the Defendants' designation of experts on January 29, 2008, some 92
28   days before the April 30, 2008, deadline.

1  When later confronted with the jurisdictional information from the CCC that basically

2  invalidated Ms. Lucast's original opinion concerning that topic, and given the opportunity to

3  withdraw her as an expert or have her revise her report to reflect the true facts, the Government

4  chose instead to put Ms. Lucast back to work, this time to develop new alternative theories as to

5  why the Coastal Commission might still be an obstacle to development of the Lichty parcel.

6  Asserting once more Ms. Lucast's "duty" to provide a "supplemental" report, on June 16, 2008,

7  the Government mailed another report from her, dated June 11, 2008, in which she acknowledged

8  her error concerning the jurisdiction of the CCC over the property in question, but went on to lay

9  out several new and different theories as to how the property would be severely and adversely

10  impacted by the Coastal Commission. [Exh. F to Quinton Decl.]  The goal posts were effectively

11  moved, and a simple issue of fact had turned into a complex theoretical debate about

12  hypothetical scenarios.

13  This sort of sandbagging simply should not be allowed.  As the authors of one recognized

14  treatise on federal civil procedure observed:

15  The purpose of supplementary disclosures is just that—to supplement earlier disclosures
16  regarding the designated experts. Designating a new expert *or **new opinions*** after the
   disclosure deadline (¶ 11:440) is not allowed as a "supplemental" disclosure. [*Metro Ford*
17  *Truck Sales, Inc. v. Ford Motor Co.* (5th Cir. 1998) 145 F3d 320, 324—testimony of
18  late-designated expert properly excluded; *Keener v. United States* (D MT 1998) 181 FRD
19  639, 642—expert limited to opinions expressed in initial disclosure and precluded from
   testifying on other matters set forth in "supplemental" disclosure; *Beller ex rel. Beller v.*
20  *United States* (D NM 2003) 221 FRD 696, 701–702— Rule 26(e) does not give license to
21  "sandbag" one's opponent with claims and issues that should have been included in the
22  expert witness' original report]

23  The Rutter Group, Federal Civil Procedure Before Trial, [¶ 11:441]. (Emphasis added.)

24

25  The *Beller* case referred to in the above treatise excerpt was more recently cited with

26  approval in the District of Hawaii case of *Lindner v. Meadow Gold Dairies, Inc.*, --- F.R.D.---,

27  2008 WL 763236 (D.Hawaii 2008), which similarly involved land valuation testimony by experts.

28  The court in *Meadow Gold Dairies* further offered as examples two other cases cited in the *Beller*

1  opinion in which "courts have rejected supplemental expert reports that: 1) 'were significantly

2  different' from the expert's original report and effectively altered the expert's theories; or 2)

3  attempted to 'deepen' and 'strengthen' the expert's prior reports. *See id.* [*Beller ex rel. Beller v.*

4  *United States,* 221 F.R.D. 689, 695 (D.N.M.2003)] (citing *Council 31 AFL-CIO v. Ward,* 1995 WL

5  549022 (N.D.Ill. Sept.12, 1995); *Resolution Trust Corp. v. Gregory,* D.N.M. No. CIV 94-0052)."

6  *Lindner v. Meadow Gold Dairies, Inc.,* 2008 WL 763236, at p. *13.

7      The court in *Meadow Gold Dairies* concluded its discussion on this point with the

8  following observation:

9      The court in *Beller* noted that, to allow these types of supplemental reports would create a
10   system where preliminary reports could be followed by supplementary reports and there
     would be *no finality* to expert reports, as each side, in order to buttress its case or position,
11   could "supplement" existing reports and modify opinions previously given. This practice
12   would surely *circumvent the full disclosure requirement implicit in Rule 26 and would*
13   *interfere with the Court's ability to set case management deadlines, because new reports*
     *and opinions would warrant further consultation with one's own expert and virtually*
14   *require new rounds of depositions.* That process would hinder rather than facilitate
15   settlement and the final disposition of the case. *Id.*

16
17 2008 WL 763236, at p. *13-*14 (emphasis added).

18     Based on the foregoing principles, the Government should not be permitted to circumvent

19  the purposes of Rule 26 by its submission of the newly concocted theories of Ms. Nancy Lucast.

20  The Government had the Defendants' expert disclosures on January 29, 2008, and had more than 3

21  months to identify and retain qualified experts to respond to the issues raised by the Defendants'

22  experts.  When notified of the apparent errors in Ms. Lucast's factual assumptions concerning

23  Coastal Commission original jurisdiction, the Government deliberately chose to ignore its

24  obligations and asserted a right not found in the Federal Rules, namely, a right to "supplement"

25  Ms. Lucast's report under Rule 26(a)(2)(D) at any time up to the time of the pretrial, and that if it

26  chose to supplement her report, it would be at a time of their choosing.  Thus, the May 30, 2008,

27  date for the designation of rebuttal experts was allowed to pass without a supplemental report from

28  Ms. Lucast, and the Defendants were unable to name a witness on the Coastal Commission issues.

1    without having a final opinion from Ms. Lucast. The Defendants were thereby prejudiced by the

2    Government's conduct, and the Government should not be allowed to benefit from such a tactic.

3

4         **2.    The June 20, 2008, Late Report by Norman Arndt re: Electrical Line
               Extension**

5

6         The same rationale discussed above with respect to the Nancy Lucast "Supplemental"

7    report of June 11, 2008, is also applicable to the tardy June 20, 2008, report by the Government's

8    expert engineer, Norman Arndt. [Exhibit M to Quinton Decl.]   The June 20, 2008, report clearly

9    raises a new and different expert opinion that was not contained in Mr. Arndt's original report, and

10   submitted well after the court-imposed deadlines for the submission of expert reports and for the

11   Defendant's designation of rebuttal experts. And again no good reason is given for failing to

12   comply with the court-ordered deadline. As noted in the above Statement of Facts, in his

13   deposition given on July 1, 2008, Mr. Arndt testified that he did not even understand that April 30,

14   2008, was a deadline for submitting his final report. If that is the case, the Defendants should not

15   be penalized for a failure of communication between the Government and its chosen expert. The

16   report is untimely, it constitutes a new report on a new subject and it should be excluded from

17   admission, together with any testimony on the subject matter it contains. As the court in *Beller ex*

18   *rel. Beller v. United States, supra,* concluded, Rule 26(e) (requiring a party to "supplement or

19   correct" a disclosure upon information later acquired) "does not give license to sandbag one's

20   opponent with claims and issues which should have been included in the expert witness' report."

21   221 F.R.D. at 695.

22

23        **3.    Norman Arndt's June 27, 2008, SUPPLEMENTAL REPORT # 1.**

24

25        If possible, the still later June 27, 2008, SUPPLEMENTAL REPORT #1, submitted by

26   Norman Arndt is an even more egregious example of sandbagging that should not be countenanced

27   by the court, in view of the principles set forth in the cases previously discussed in this

28   memorandum. A review of this "supplemental" report demonstrates that it contains nothing in the

1  way of correcting facts, but is totally devoted to new and different claims and issues that the author

2  could easily have included in his original report, due April 30, 2008. [Exhibit N to Quinton Decl.]

3  Mr. Arndt cites various State and local code sections and policy documents which have no doubt

4  been on the books well before this case was ever filed. There is no suggestion by Mr. Arndt that

5  any of them have been recently passed or enacted, and therefore no excuse at all why he should not

6  have included a discussion of them in his original report.   SUPPLEMENTAL REPORT #1

7  constitutes a prime example of why decisions like *Beller ex rel. Beller v. United States, supra,*

8  became necessary. Another example is the case of *Akeva L.L.C. v. Mizuno Corp.,* 212 F.R.D. 306

9  (M.D.N.C. 2002), where the court granted the defendants' motions to exclude untimely expert

10 reports by holding the expert's additional report did not constitute supplementation under Rule

11 26(e)(1). *Akeva,* 212 F.R.D. at 310.  The *Akeva* Court held:

12

13      The Court cannot accept a definition of supplementation which would essentially allow for
14      the ***unlimited bolstering of expert opinions.*** Rule 26(e) envisions supplementation when a
        party's discovery disclosures happen to be defective in some way so that the disclosure was
15      incorrect or incomplete and, therefore, misleading. ***It does not cover failures of omission***
16      ***because the expert did an inadequate or incomplete preparation.*** To construe
        supplementation to apply wherever a party wants to bolster or submit additional expert
17      opinions would reek [sic] havoc in docket control and ***amount to unlimited expert opinion***
18      ***preparation.*** Therefore, [the expert's] second test and opinion was not supplementation, but
19      merely an out-of-time disclosure.

20
   *Id.* at 310 (citations omitted and emphasis added).
21

22      Allowing the Government to inject into the trial of this case all of the new issues raised by

23 Mr. Arndt in his "supplemental" report would severely prejudice the Defendants, who cannot now

24 designate additional experts to rebut all of these new claims with the passage of the deadline for

25 designating rebuttal expert testimony. Nor is it appropriate simply to extend the deadlines and the

26 discovery cutoff, since this would cede the court's control of its ability to set case management

27 deadlines to the Government, and would further send the message that there is no penalty for

28 circumventing the full disclosure requirements of Rule 26. See *Beller ex rel. Beller v. United*

1    *States, supra; accord, Lindner v. Meadow Gold Dairies, Inc.*, 2008 WL 763236, at p. *13-*14.

2    Nor should it be forgotten that in this case delay itself is harmful to the interests of the Defendants,

3    who are entitled to just compensation for property taken from them, and who will not be fully

4    compensated until this case is resolved, and perhaps not even then.  It may be recalled that at the

5    time this condemnation case was commenced, the Government deposited only $358,000 as the

6    amount of "just compensation."  However, the Government has since acknowledged through a

7    reappraisal by its own appraiser obtained in discovery that the property is worth at least $1.145

8    million. While the Defendants are entitled to nominal interest on the difference under the law

9    applicable to federal land condemnation, it will not fully compensate them for their actual loss.

10   And the Defendants will be further penalized, if the court allows the proliferation of issues that

11   would mandate additional costly discovery procedures and the retention of additional experts,

12   which expenses are not likely to be fully recovered upon judgment.

13

14   **B.      The "Declaration" of R.D. Medan Submitted by Norman Arndt on June 20,**
             **2008, Should Be Excluded from Evidence as Inherently Irrelevant, Untimely**
15           **Disclosed, and as an Improper Effort to Rehabilitate an Unsupported Expert**
             **Opinion with Newly Created Facts**
16
17           As set forth above in the Statement of Facts, on June 20, 2008, the Government's expert

18   Norman Arndt submitted for consideration a document entitled "DECLARATION OF FIRE

19   DEPARTMENT REQUIREMENTS FOR THE LICHTY PARCEL, APN 663-020-02", also

20   signed on June 20, 2008, by Deputy Fire Marshall R.D. Medan, the Deputy Fire Marshall for

21   Development, with the San Diego Fire Department. [Exhibit K to Quinton Decl.]  This document

22   was ostensibly offered in support of Mr. Arndt's opinion in his  original report, dated April 28,

23   2008, that, in order to build a single family residence on the subject property, an owner of the

24   property would have to improve the existing access road at a cost of about $4.5 million. However,

25   it was based on an after-the-fact change in Fire Department policy as to the Lichty parcel that was

26   not previously in existence and which Mr. Arndt could not possibly have relied upon when he

27   issued his original report on April 28, 2008.

28

1    Such a document is inherently irrelevant to this case, since the value of the property must

2    be determined as of the date of taking, not as of the later date of June 20, 2008. Admission of this

3    "Declaration" into evidence will mislead the jury and can only result in unnecessary confusion of

4    the issues they are to decide, to the great prejudice of the Defendants, and is therefore subject to

5    exclusion on that ground alone. Rule 403, Fed.R.Evid.

6

7    Additionally, the Defendants submit that this bootstrapping of an expert opinion based on a

8    retroactive application of an exception to a City Fire Department Policy is contrary to the expert

9    disclosure requirements of, which require that expert reports must disclose:

10

11    (B) Written Report. Unless otherwise stipulated or ordered by the court, this
      disclosure must be accompanied by a written report — prepared and signed by the
12    witness — if the witness is one retained or specially employed to provide expert
13    testimony in the case or one whose duties as the party's employee regularly involve
14    giving expert testimony. The report must contain:

15
      (i) a complete statement of all opinions the witness will express and the basis and
16    reasons for them;

17
18    (ii) the data or other information considered by the witness in forming them;

19    In this case, the Government's counsel and the Government's expert witness have

20    essentially manufactured new data on which the witness can base his opinion, after the original

21    basis for his opinion has been proven invalid. Clearly, Mr. Arndt did not rely on the June 20, 2008,

22    Declaration of Mr. Medan in preparing his report dated April 28, 2008. This bit of gamesmanship

23    should not be tolerated by the Court. The "Declaration" of Deputy Fire Marshall R.D. Medan

24    should not be considered for any purpose in this case and certainly should not be allowed as a basis

25    for Mr. Arndt's expert opinions which were, in accordance with the Court's Case Management

26    Order, due on April 30, 2008. This new "data" is untimely disclosed and should be barred as a

27    sanction for violating Rule 26 and this court's CMC Order. See *Beller ex rel. Beller v. United*

28    *States, supra; accord, Lindner v. Meadow Gold Dairies, Inc.*, 2008 WL 763236, at p. *13-*14.

1

## IV.

2

## CONCLUSION

3      Based upon all of the foregoing facts and applicable law, this motion should be granted and

4  the court should find that the untimely disclosure of the expert reports and documents which

5  purport to be the bases of expert opinions discussed herein, constitutes a violation of Rule

6  26(a)(2)(C), Fed.R.Civ.P., and of this court's CMC Order of November 7, 2007, and should enter

7  an order that said reports and documents, and any expert testimony related thereto, should be

8  stricken and/or excluded from evidence, pursuant to Rule 37 (c), Fed.R.Civ.P.

9                                                     Respectfully submitted,

10

11      DATED: July _/_/_, 2008.              **QUINTON & PETIX**

12

13                                            _Michael E. Quinton_

14                                            MICHAEL E. QUINTON
                                              Attorneys for Defendants,
15                                            TIMOTHY LICHTY and
                                              SHERYL LEE LICHTY CO-TRUSTEES
16

17

18

19

20

21

22

23

24

25

26

27

28

Memo of Ps and As re: Motion to Strike            20                    7-cv-00886

**QUINTON & PETIX**
Michael E. Quinton, Bar No. 051370
402 West Broadway, Suite 400
San Diego CA 92101
Telephone: ( 619)234-1113
Fax: (619)595-3147
quinton@quintonpetix.com

Attorneys for Defendants,
TIMOTHY LICHTY and
SHERYL LEE LICHTY
CO-TRUSTEES

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil No. 07 CV 00886-W (NLS) |
| Plaintiff, | ) ) | |
| v. | ) ) | DECLARATION OF MICHAEL E. QUINTON |
| 14.30 ACRES OF LAND, more or less, situated in San Diego County, State of California; TIMOTHY LICHTY and SHERYL LEE LICHTY CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST DATED OCTOBER 24, 1991; AND OTHER INTERESTED PARTIES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

I, MICHAEL E. QUINTON, hereby declare as follows:

1. I am counsel for the Defendants, TIMOTHY LICHTY and SHERYL LEE LICHTY, CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST, etc., in this case presently pending in the United States District Court.

2. On November 7, 2007, Magistrate Judge Adler entered a CASE MANAGEMENT CONFERENCE ORDER REGULATING DISCOVERY AND OTHER PRETRIAL PROCEEDINGS in this case. Paragraph 3 of the CASE MANAGEMENT CONFERENCE ORDER set out the schedule for expert disclosures. This schedule called for Defendants' expert disclosures to be served on or before January 31, 2008, for the Plaintiff's disclosures to be made on or before April 30, 2008.

1   and for "any contradictory or rebuttal information" to be disclosed on or before May 30, 2008.

2   Paragraph 3 of the The CASE MANAGEMENT CONFERENCE ORDER further states:

3
4   > Please be advised that failure to comply with this section or any other discovery order of the Court may result in the sanctions provided for in Fed. R. Civ. P. 37, including a prohibition on the introduction of experts or other designated matters in evidence.

5   A true copy of the CASE MANAGEMENT CONFERENCE ORDER is attached to this Declaration

6   as Exhibit A.

7       3.  The Defendants produced the reports of their three experts designated pursuant to Rule

8   26(a)(2)  to counsel for the Plaintiff on January 29, 2008. The Plaintiff produced reports of their six

9   experts on April 30, 2008.

10      4.  One of the Plaintiff's expert  reports served on the Defendants on April 30, 2008, was a

11  report by Ms. Nancy Lucast.

12  A true copy of this report is attached  to this Declaration as Exhibit B.

13  B.  The stated purpose of this report was:

14      > You have asked me to evaluate the development potential, in view of  the jurisdiction

15      > of the California Coastal Commission, of the Lichty property in the Tijuana River Valley

16      > community of San Diego, California.

17  Page 1 of Lucast April 28, 2008, report, attached as Exhibit B.

18      5.  In her report, Ms. Lucast states:

19
20
21
22
23
24  > IMPORTANT NOTE: The City-adopted CDP appeal maps (C-730.1) indicate that the property is subject to an area of "deferred certification" and to "Coastal Commission Appeal Jurisdiction." However, it is important to note that these maps have never been adopted by the Coastal Commission, and that they are famously frequently wrong. In checking with the San Diego District Coastal Commission staff, it was determined that: (1) the designation of "deferred certification" has been repealed in this area; and (2) the entire Lichty parcel is designated "original jurisdiction," or an area where coastal development permit jurisdiction is permanently retained by the State Coastal Commission. This makes sense as to the lowlands, but not as to the uplands, so I have requested a clarifying opinion from the Coastal Commissions's mapping unit. I could modify my conclusions depending on the outcome of the investigation by the CCC mapping unit.

25  Lucast April 28, 2008, report, Footnote 1, pages 2 and 3, attached as Exhibit B.

26      6.  Ms. Lucast further stated in her report:

27
28  > Pending the final outcome of an investigation of the true CDP permit status of the Lichty property, it has been assumed that the entire property lies within the retained ("original") permit jurisdiction of the Coastal Commission as interpreted by the Coastal Commission staff.

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113  FAX 619/595-3147

Declaration of Michael E. Quinton                    2                         7-cv-00886

1    Exhibit B, Lucast April 28, 2008, report, page 6.

2        7. Ms. Lucast concludes:

3            My conclusions are based on the Coastal Commission staff's current interpretation of
     the City of San Diego CDP jurisdiction maps.   I have asked for a clarification of that
4    interpretation. Such clarification is pending. If the interpretation changes, my conclusions are,
     likewise, subject to change. (See footnote 1, page one, [sic] herein.)
5
     Exhibit B, Lucast April 28, 2008, report, page 10.
6
         8. On May 6, 2008, the undersigned counsel for the Defendants wrote to Mr. Stahl, counsel
7
     for the Plaintiff, regarding the Plaintiff's expert disclosures and advised him, inter alia:
8
             5.) Nancy A. Lucast: It appears that this report is not complete inasmuch as it does not
9    state the witness' final opinion but leave [sic] open the possibility that her opinion could
     change if she receives information she did not have at the time she prepared the report. (See,
10   Footnote 1 and the first paragraph on page 10 of her report.) We need to have the witness'
     "final answer."
11
     A true copy of this letter is attached  to this Declaration as Exhibit C.
12
         9. On May 8, 2008, Mr. Stahl responded to the May 6, 2008, letter and stated:
13
             5. Nancy A. Lucast  I disagree with your characterization of the statement
14   contained in Footnote 1 of her report. Her ten-page report includes four pages of
     discussion and opinions based upon the information she enumerates in the first six
15   pages. The footnote contains an analysis and discussion of an apparent discrepancy
     regarding the extent of the California Coastal Commission's original jurisdiction
16   over the subject property. Ms. Lucast has requested clarification and correctly
     acknowledges that the CCC's response has the potential  to impact her conclusions
17   on that topic. At the time she prepared her report, the CCC had not responded. She
     is aware of the requirement to supplement her report if warranted by the facts. See
18   Fed.R.Civ.P. 26(a)(2)(D).

19
     A true copy of this letter is attached  to this Declaration as Exhibit D.
20
         10. In the absence of any information on the subject from the Plaintiff's designated expert
21
     on the subject, counsel for the Defendants scheduled a meeting with Coastal Commission staff on
22
     May 16, 2008. Following this meeting, on May 21, 2008, undersigned counsel for the Defendants
23
     wrote a letter to Mr. Stahl setting out the facts about the status of the property vis-a-vis the
24
     California Coastal Commission.. In this letter counsel for the Defendants point out that Ms. Lucast
25
     had met with the Coastal Commission staff on the morning of May 16, 2008.  In the May 16,
26
     2008, afternoon meeting with counsel for the Defendants, and others. the Coastal Commission had
27
     stated that Ms. Lucast was simply wrong in her April 28, 2008, report. The Coastal Commission
28

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113  FAX 619/595-3147

staff said the following about the status of the property, all of which was pointed out in the May 21,

2008, letter to Mr. Stahl:

> Based on the information given to us on Friday afternoon, [May 16, 2008] it
> appears that the opinions expressed in Ms. Lucast's April 28, 2008, report regarding the
> subject property are mostly invalid.  Specifically, the Coastal Commission staff
> determined, and so advised us:

1.   The property is not within any California Coastal Commission retained coastal
     development permit jurisdiction.

2.   The property lies entirely within the City of San Diego's Tijuana River Valley Land
     Use Plan (LUP), as approved by the Coastal Commission, and, therefore, the City
     has full permit jurisdiction.  No coastal development permit approval is required by
     the Coastal Commission.

3.   Since the Coastal Commission has approved the City of San Diego Implementation
     Plan (IP) for the City of San Diego's Tijuana River Valley Land Use Plan (LUP),
     the City's MSCP Subarea Multi-Habitat Plan is incorporated in the Land Use Plan.
     The Land Use Plan, in conjunction with the Implementation Plan, allow for the full
     development of 25% to 30% of the least sensitive area of the subject property,
     without further mitigation.  The Coastal Commission has no authority to decrease
     the development area.

4.   The jurisdiction of the Coastal Commission is limited to appellate jurisdiction.  On
     appeal,  the jurisdiction of the Coastal Commission is limited to a determination of
     compliance with the City's Land Use Plan (LUP) and Implementation Plan (IP).
     The Coastal Commission has no jurisdiction on appeal to impose any conditions
     beyond those within the approved City of San Diego plans.

> In view of these positions of the Coastal Commission, as expressed to us, it
> appears that if Ms. Lucast is to offer any opinions at all in this matter, her report will
> have to be revised. It also appears that Ms. Lucast's opinions are relied upon in the reports
> of most of your other experts.

> We do not have any interest in embarrassing anyone in this matter.  If you wish
> to withdraw Ms. Lucast, you may do so.  If you wish to have her revise her report, you
> may do that.  If you would like to give the rest of your experts an opportunity to revise
> their reports to factor in this change of circumstances, you may do that.  If you would
> like for Mr. Roach to revise his appraisal report to factor in the change in circumstances,
> you may do that too.

> The only thing we will insist on is that no delay is caused by whatever you choose
> to do and that our rebuttal expert reports should be kept under seal until after your
> revised reports are completed.  Needless to say, you will need  to make a decision on this
> before we submit our rebuttal expert reports on May 30, 2008.  To that end, we suggest
> that we meet after Mr. Lichty's deposition on Thursday, May 22, 2008, to discuss how you
> wish to proceed due to this change of circumstances.

A true copy of this letter is attached  to this Declaration as Exhibit E.

    11.  Counsel did meet following Mr. Lichty's deposition of May 22, 2008.  In this meeting,

counsel for the Plaintiff reiterated their position, as stated in Mr. Stahl's May 8, 2008, letter that

1   they had a right to "supplement" Ms. Lucast's report under Rule 26(a)(2)(D) at any time up to the

2   time of the pretrial and that if they chose to supplement her report, it would be at a time of their

3   choosing. Counsel for the Government did not respond in writing to the May 21, 2008, letter,

4   Exhibit E.

5       12.  As of May 30, 2008, the date on which the Defendants' rebuttal information was due,

6   the Plaintiff had not filed a supplement or correction to Ms. Lucast's April 28, 2008, report. On

7   May 30, 2008, the Defendants served the reports of their rebuttal experts on the Plaintiff. The

8   Defendants did not designate a rebuttal expert or have a report prepared on issues relating to the

9   California Coastal Commission because it was not possible to determine what the Government's

10   position was regarding the issues relating to the Coastal Commission. In the meantime,

11   depositions were scheduled to begin on June 24, 2008, and to conclude on July 24, 2008, one week

12   before the August 1, 2008, discovery cut-off in this case.

13       13.  On June 18, 2008, counsel for the Defendants received by mail a document authored by

14   Ms. Lucast, dated June 11, 2008, and mailed by Government counsel on June 16, 2008. This

15   document states: "NOTE: This letter supplements and corrects my April 28, 2008, opinion and

16   presents my final opinion." In this report, Ms. Lucast acknowledges that she was wrong in stating

17   that the subject property is in an area of "original jurisdiction" for the California Coastal

18   Commission but finds new reasons to conclude that the property would be severely and adversely

19   impacted by the Coastal Commission. A true copy of this June 11, 2008, report is attached as

20   Exhibit F.

21       14.  Counsel for the Plaintiff have never offered any reason for Ms. Lucast's inability to

22   submit a report by the April 30, 2008, deadline. In fact, the reason is simple; they did not start

23   soon enough. The Defendants provided their reports to the Government on January 29, 2008. The

24   Plaintiff had until April 30, 2008. If this had not been sufficient time, presumably the Government

25   could have asked for more time. The Government did not ask for more time.

26       15.  Documents produced to the Defendants show that Ms. Lucast's first involvement with

27   this matter was Tuesday, April 22, 2008, eighty-four days after the Government received the

28   Defendants' reports, and eight days before the Government's reports were due to be produced to

the Defendants. On that same day, Ms. Lucast sent an e-mail to Mr. Norman Arndt and Mr. Dann

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego, CA 92101
619/234-1113   FAX 619/595-3147

1    Mallec, two of the Government's other retained experts in this matter. In this e-mail message, Ms.

2    Lucast asks for some technical information from Mr. Arndt and Mr. Mallec and concludes:

3           As usual, I am being brought in at the last minute, so these guys want my report

4           yesterday. Anything you can get to me ASAP would be appreciated.

5    A true copy of this letter is attached to this Declaration as Exhibit G.

6           16. Not surprisingly, Ms. Lucast was not able to get the information she needed to

7    complete an expert report that would comply with Rule 26(a)(2)(B)(i) in the eight days between

8    Tuesday, April 22, 2008, the date she began her work, and Wednesday, April 30, 2008, the

9    deadline for producing her report.

10          17. On Friday, April 25, 2008, at 2:25 pm, Ms. Lucast wrote an e-mail message to Mr.

11   Stahl, entitled "Confusing Maps" in which she states that (in the three days she has been working

12   on the matter) she has not been able to determine the extent of the Coastal Commission's

13   jurisdiction over the subject property. She concludes: "So I have asked CCC staff to make an

14   inquiry of their mapping division in San Francisco. I don't know when I'll hear back." Mr. Stahl

15   responded to this e-mail message from Ms. Lucast with an e-mail message on Friday, April 25,

16   2008, at 2:47 pm in which he stated:

17          Thank you for the update. In view of our April 30 deadline, I just ask that you move
            forward based upon the information that is available to you now. You can certainly note in
18          your report that there is this issue regarding the mapping and that you intend to get further
            clarification from the CCC. We will have the opportunity later to file supplemental reports
19          and this could certainly be the topic of such a supplementation.

20   A true copy of this e-mail message is attached to this Declaration as Exhibit H.

21          18. It appears that the Government consciously chose the procedure of retaining Ms.

22   Lucast at the last minute, having her submit an incomplete report on April 28, 2008, and then

23   producing Ms. Lucast's "final" report to the Defendants on June 18, 2008, as a "supplement" to her

24   April 28, 2008, report. The "final" report was produced forty eight days after the Plaintiff's expert

25   reports were due, nineteen days after the Defendants' rebuttal reports were due and forty three days

26   before discovery cut-off, totally ignoring the Court's November 7, 2008, CASE MANAGEMENT

27   ORDER.

28          19. The Government had three full months (from January 29, 2008, to April 30, 2008) to

     produce its expert reports. If the Government had hired Ms. Lucast to start working on this case

QUINTON & PEIIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113 FAX 619/595-3147

1  anytime in the first month after having received the Defendants' expert reports. and if Ms. Lucast

2  had taken the same amount of time she ultimately required to produce an expert report. (eight

3  weeks, from April 22, 2008, through June 18, 2008), Ms. Lucast would have had sufficient time to

4  do the work necessary to produce a report that complied with Fed.R.Civ.P. Rule 26(a)(2)(B)(i).

5      20. Among the experts designated by the Government and for whom the Government

6  submitted reports on April 30, 2008, was Mr. Norman Arndt. Mr. Arndt's report was dated April

7  25, 2008, and was based entirely on Fire Department/Fire Code requirements. Mr. Arndt opined in

8  his report that, in order to build a single family residence on the subject property, an owner of the

9  property would have to improve the existing access road and install a 10 inch water line at a cost to

10  the owner of between $5,135,130 and $4,744,575.

11  A true copy of Mr. Arndt's report, minus the maps and his resume, is attached to this Declaration

12  as Exhibit I.

13      21. After the Plaintiff's expert disclosures on April 30, 2008, the Defendants submitted

14  their rebuttal reports, as ordered by the Court, on May 30, 2008. Among the Defendants' rebuttal

15  expert reports was a report by a fire protection engineer which pointed out the policy of the City of

16  San Diego that the Fire Access Roadway requirements relied on by Mr. Arndt, did not apply to the

17  subject property, *i.e.,* an owner who wanted to build a single family residence on the subject

18  property, would not be required to build a road for fire department access.

19  A true copy of this report is attached  to the Declaration of Michael E. Quinton as Exhibit J.

20      22. Following receipt of this report and the San Diego Fire Department Policy

21  Memorandum on which it is based, from the Defendants, counsel for the Government, Mr.

22  Christopher Latham, directed Mr. Arndt to obtain a "DECLARATION OF FIRE DEPARTMENT

23  REQUIREMENTS FOR THE LICHTY PARCEL, APN 663-020-02:" from Deputy Fire Marshall

24  R.D. Medan, the Deputy Fire Marshall for Development, with the San Diego Fire Department. Mr.

25  Arndt was able to persuade Mr. Medan to sign off on his Declaration letter on June 20. 2008. A

26  copy of this document is attached as Exhibit K.

27      23. In his deposition, taken on July 1, 2008, Mr. Arndt testified that Government counsel.

28  Mr. Christopher Latham told him to get the Declaration from Mr. R.D. Medan. The obvious

purpose for this was to overcome the report by the Defendants' fire protection engineer who had

QUINTON & PETTIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113  FAX 619/595-3147

1   pointed out that it would not be necessary to build the $4 million road which Mr. Arndt had opined

2   would be necessary.

3       24. Mr. Arndt testified in his deposition that he wrote a draft of the DECLARATION for

4   Mr. Medan and presented it to Mr. Latham. He then had Mr. Medan sign it. This

5   DECLARATION, prepared by the government's retained expert after having had the benefit of the

6   Defendants' fire protection engineer's report, and unwittingly signed by Mr. Medan, amounts to a

7   change of the San Diego Fire Department policy regarding Fire Access Roadways as it applies to

8   the subject property.

9       25. At the time he prepared his April 25, 2008, report, Mr. Arndt clearly did not know

10  about the exception to the San Diego Fire Department's fire access road requirements that was

11  afforded to single-family residences. In the Defendant's rebuttal report by the Defendants' expert

12  in fire protection engineering, Mr. Garner Palenske, Mr. Palenske pointed out the policy of

13  exempting single family residences from the fire access road requirements of the fire code. In the

14  memorandum which states the exemption, Section IV, D, single family residences are referred to as

15  Group R-3 occupancies. See, Expert Report of Garner Palenske, Exhibit J

16      26. After he had seen the report of the Defendants' fire protection engineer, Mr. Garner

17  Palenske, Mr. Arndt queried another of the Plaintiff's retained experts, Mr. Dann Mallec in an e-

18  mail on June 9, 2008, and asked: "Dann, do you know what Group M occupancies ... or Group R-3

19  occupancies are?"

20  A true copy of this document is attached as Exhibit L.

21      27. The only known reference to Group R-3 occupancies in this case is in the San Diego

22  Fire Department Memorandum, FHPS Policy A-00-1 regarding Fire Access Roadways, which was

23  appended to Mr. Palenske's report, Exhibit J.

24      28. The report of Mr. Garner Palenske, the Defendants' fire protection engineering expert

25  completely negated the necessity for an owner of the subject property who wished to build an

26  single family residence on the property to build a fire access roadway, at a cost of approximately

27  $4,500,000, as contended by Mr. Arndt, the Government's expert engineer. After he read Mr.

28  Palenske's report, and after he found out what an R-3 occupancy was, Mr. Arndt had Deputy Fire

Marshall Medan sign off on a "Declaration" written by Mr. Arndt at Mr. Latham's request, and

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego  CA  92101
619/234-1113  FAX 619/595-3147

1    dated June 20, 2008, 51 days after the Government's expert reports were due. The

2    DECLARATION, stated, inter alia, that the City's policy of exempting single family occupancies

3    from the requirement to build a Fire Access Road would not apply. Specifically, the "Declaration"

4    states: "1) Exception D. Is not authorized, ie. circumstances warrant that a fire access roadway is

5    required." See, Exhibit K, Attached.

6        29. This "Declaration" dated June 20, 2008, has now become the basis for Mr. Arndt's

7    opinion, as stated in his April 25, 2008, report, that a fire access roadway is required for the

8    construction of a single family residence on the subject property. This bootstrapping of an expert

9    opinion based on a retroactive application of an exception to a City Fire Department Policy is

10   contrary to the expert disclosure requirements of Rule 26(a)(2)(B)(i) and to Rule 26(a)(2)(C) that

11   disclosures must be made on the dates ordered by the Court.

12       30. In this case, the Government's counsel and the Government's expert witness have

13   manufactured new data on which the witness can base his opinion after the original basis for his

14   opinion has been proven invalid. Clearly, Mr. Arndt did not rely on the June 20, 2008, Declaration

15   of Mr. Medan in preparing his report dated April 25, 2008. Mr. Arndt's expert disclosures,

16   including the basis for his opinions were, in accordance with the Court's Case Management Order,

17   due on April 30, 2008.

18       31. On June 20, 2008, seven weeks after the Plaintiff's expert reports were due, counsel for

19   the Defendants received a report entitled "DRY UTILITIES INVESTIGATION FOR THE

20   LICHTY PARCEL, APN 663-020-02," authored by Mr. Arndt and dated June 20, 2008. In this

21   report Mr. Arndt gave the opinion that in order to provide adequate fire-fighting capability at the

22   subject property, it would be necessary to extend a 3 phase electrical line to the property at an

23   additional cost of approximately $120,000.

24   A true copy of this document, minus the exhibits, is attached as Exhibit M.

25       32. In his deposition testimony, Mr. Arndt stated that the only reason for not completing

26   this report within the April 30, 2008, deadline was that he did not have enough time to complete it

27   before the April 30, 2008, deadline. In his July 1, 2008, deposition, Mr. Arndt testified as follows:

28           11        Is there any reason why as of April 25, 2008,

             12   you could not have given those cost figures in your

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego  CA  92101
619/234-1113  FAX 619/595-3147

En

13  April 25 report?

14      A.  I simply could not get them contracted and

15  signed up to do the study in time for the report.  So I

16  don't know who was pushing the buttons whether it came

17  from your side or the Department of Justice side, but

18  there -- I entered into draft contract with them, and it

19  came down that I had to have a report done by the

20  certain date.  There simply wasn't time of to go through

21  the gymnastics of getting the attorneys happy with the

22  agreement.

23      Q.  Well, did you understand that the April 30th,

24  2008, date was a court-imposed deadline?

25      A.  No.

Deposition of Norman Arndt, July 1, 2008, page 103 of draft transcript.

33.  On June 27, 2008, eight weeks after the Plaintiff's expert reports were due, counsel for the Defendants received a third report authored by Mr. Arndt and dated June 27, 2008.  This report is entitled "SUPPLEMENTAL REPORT #1" and purports to state an additional reason, absent the requirement for access for firefighting, for requiring the owner of the subject property to improve the access road at a cost of $4.5 million.

A true copy of this document, minus the exhibits, is attached as Exhibit N.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 11, 2008.

_Michael E. Quinton_

MICHAEL E. QUINTON

QUINTON & PETIX
402 West Broadway, Suite 400
San Diego CA 92101
619/234-1113  FAX 619/595-3147

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   THE UNITED STATES OF AMERICA,    )   Case No. 07-CV-0886-W (JMA)
                                       )
12              Plaintiff,             )   **CASE MANAGEMENT CONFERENCE**
                                       )   **ORDER REGULATING DISCOVERY AND**
13   v.                                )   **OTHER PRETRIAL PROCEEDINGS**
                                       )
14   14.30 ACRES OF LAND, more or      )   (Fed. R. Civ. P. 16)
     less, etc., et al.,               )   (Local Rule 16.1)
15                                     )   (Fed. R. Civ. P. 26)
                Defendants.            )
16                                     )
                                       )
17   ─────────────────────────────────

18       On November 5, 2007 at 2:00 p.m., pursuant to Rule 16 of the

19   Federal Rules of Civil Procedure, the Court attempted to conduct

20   a telephonic Case Management Conference.  Counsel for Defendants

21   was unavailable to participate in the call.  After reviewing the

22   parties' Proposed Joint Discovery Plan and good cause appearing,

23       **IT IS HEREBY ORDERED:**

24       1.   Any motion to join other parties, to amend the

25   pleadings, or to file additional pleadings shall be filed on or

26   before **January 7, 2008**.

27       2.   A telephonic Case Management Conference shall be held

28   before Magistrate Judge Adler on **February 12, 2008** at **9:30 a.m.**

07cv886

**EXHIBIT A**

1 | Counsel for each party shall appear telephonically at this
2 | conference.  The Court will initiate the conference call.
3 |     3.   Defendants' expert disclosures required by Fed. R. Civ.
4 | P. 26(a)(2) shall be served on all parties on or before **January**
5 | **31, 2008**.  Plaintiff's expert disclosures required by Fed. R.
6 | Civ. P. 26(a)(2) shall be served on all parties on or before
7 | **April 30, 2008**.  Any contradictory or rebuttal information shall
8 | be disclosed on or before **May 30, 2008**.  In addition, Fed. R.
9 | Civ. P. 26(e)(1) imposes a duty on the parties to supplement the
10 | expert disclosures made pursuant to Fed. R. Civ. P. 26(a)(2)(B)
11 | by the time that pretrial disclosures are due under Fed. R. Civ.
12 | P. 26(a)(3) (discussed below).  This disclosure requirement
13 | applies to all persons retained or specially employed to provide
14 | expert testimony, <u>or</u> whose duties as an employee of the party
15 | regularly involve the giving of expert testimony.

16 |     **Please be advised that failure to comply with this section**
17 | **or any other discovery order of the Court may result in the**
18 | **sanctions provided for in Fed. R. Civ. P. 37, including a**
19 | **prohibition on the introduction of experts or other designated**
20 | **matters in evidence.**

21 |     4.   All discovery, other than expert discovery, shall be
22 | completed by all parties on or before **April 4, 2008**.  All expert
23 | discovery shall be completed by all parties on or before **August**
24 | **1, 2008**.  "Completed" means that all discovery under Rules 30
25 | through 36 of the Federal Rules of Civil Procedure must be
26 | initiated a sufficient period of time in advance of the cutoff
27 | date, so that it may be <u>completed</u> by the cutoff date, taking into
28 | account the times for service, notice, and response as set forth

1 in the Federal Rules of Civil Procedure.  **All disputes concerning**
2 **discovery shall be brought to the attention of Magistrate Judge**
3 **Adler no later than thirty (30) days following the date upon**
4 **which the event giving rise to the dispute occurred.  For oral**
5 **discovery, the event giving rise to the discovery dispute is the**
6 **completion of the transcript of the affected portion of the**
7 **deposition.  For written discovery, the event giving rise to the**
8 **discovery dispute is the service of the response.  Counsel are**
9 **required to meet and confer prior to contacting the Court**
10 **regarding all discovery disputes pursuant to the requirements of**
11 **Local Rules 16.5(k) and 26.1(a).**

12      5.    All motions, other than motions to amend or join
13 parties, or motions in limine, shall be <u>filed</u> on or before **August**
14 **25, 2008.**  Motions will not be heard or calendared unless
15 counsel for the moving party has obtained a motion hearing date
16 from the law clerk of the judge who will hear the motion.  **Be**
17 **advised that the period of time between the date you request a**
18 **motion date and the hearing date may be up to sixty (60) days.**
19 **Please plan accordingly.**  Failure of counsel to timely request a
20 motion date may result in the motion not being heard.

21      Briefs or memoranda in support of or in opposition to any
22 pending motion shall not exceed twenty-five (25) pages in length
23 without leave of the judge who will hear the motion.  No reply
24 memorandum shall exceed ten (10) pages without such leave of
25 court.

26

27      [1]Counsel should note that while historically motion cutoff
28 deadlines issued by this Court were deadlines for motion hearings, the
   motion cutoff dates now being issued establish deadlines for the
   parties to file motions.

3

07cv886

6.     Pursuant to Local Rule 7.1(f)(3)(c), **if an opposing party fails to file opposition papers in the time and manner required by Local Rule 7.1(e)(2), that failure may constitute a consent to the granting of a motion or other request for ruling by the Court.** Accordingly, all parties are ordered to abide by the terms of Local Rule 7.1(e)(2) or otherwise face the prospect of any pretrial motion being granted as an unopposed motion pursuant to Local Rule 7.1(f)(3)(c).

7.     Should either party choose to file or oppose a motion for summary judgment or partial summary judgment, no Separate Statement of Disputed or Undisputed Facts is required.

8.     A Mandatory Settlement Conference shall be conducted on **November 13, 2008** at **10:00 a.m.** in the chambers of Magistrate Judge Adler.  Counsel shall submit settlement statements **directly** to Magistrate Judge Adler's chambers no later than **November 6, 2008.**  The parties may either submit confidential settlement statements or may exchange their settlement statements.  Each party's settlement statement shall set forth the party's statement of the case, identify controlling legal issues, concisely set out issues of liability and damages, and shall set forth the party's settlement position, including the last offer or demand made by that party, and a separate statement of the offer or demand the party is prepared to make at the settlement conference.  **The settlement conference briefs shall not be filed with the Clerk of the Court.**

**All named parties, all counsel, and any other person(s) whose authority is required to negotiate and enter into settlement shall appear** in person at the conference.  **The**

4

07cv886

1  individual(s) present at the Mandatory Settlement Conference with
2  settlement authority must have the unfettered discretion and
3  authority on behalf of the party to:  1) fully explore all
4  settlement options and to agree during the Mandatory Settlement
5  Conference to any settlement terms acceptable to the party (*G.*
6  *Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648, 653
7  (7th Cir. 1989)), 2) change the settlement position of a party
8  during the course of the Mandatory Settlement Conference (*Pitman*
9  *v. Brinker Int'l, Inc.*, 216 F.R.D. 481, 485-86 (D. Ariz. 2003)),
10  and 3) negotiate a settlement without being restricted by any
11  predetermined level of authority (*Nick v. Morgan's Foods, Inc.*,
12  270 F.3d 590, 596 (8th Cir. 2001)).

13  Governmental entities may appear through litigation counsel
14  only.  As to all other parties, appearance by litigation counsel
15  only is not acceptable.  Retained outside corporate counsel shall
16  not appear on behalf of a corporation as the party who has the
17  authority to negotiate and enter into a settlement.  **The failure**
18  **of any counsel, party or authorized person to appear at the**
19  **Mandatory Settlement Conference as required will result in the**
20  **immediate imposition of sanctions.**  All conference discussions
21  will be informal, off the record, privileged, and confidential.
22  9.  If Plaintiff is incarcerated in a penal institution or
23  other facility, the Plaintiff's presence is not required at
24  conferences before Judge Adler, and the Plaintiff may appear by
25  telephone.  In that case, defense counsel is to coordinate the
26  Plaintiff's appearance by telephone.
27  10.  The parties must comply with the pretrial disclosure
28  requirements of Fed. R. Civ. P. 26(a)(3) no later than **December**

07cv886

1 | **1, 2008**.

2 |     11.   Despite the requirements of Local Rule 16.1(f), neither
3 | party is required to file Memoranda of Contentions of Fact and
4 | Law at any time.  The parties shall instead focus their efforts
5 | on complying with their pretrial disclosure requirements under
6 | Fed. R. Civ. P. 26(a)(3) and drafting and submitting a proposed
7 | pretrial order by the time and date specified in Local Rule
8 | 16.1(f)(6).

9 |     12.   Counsel shall confer and take the action required by
10 | Local Rule 16.1(f)(4) on or before **December 8, 2008**.

11 |     13.   The Proposed Final Pretrial Conference Order, including
12 | written objections, if any, to any party's Fed. R. Civ. P.
13 | 26(a)(3) pretrial disclosures, shall be prepared, served, and
14 | submitted to the Clerk's Office on or before **December 15, 2008**
15 | and shall be in the form prescribed in Local Rule 16.1(f)(6).
16 | Any objections shall comply with the requirements of Fed. R. Civ.
17 | P. 26(a)(3).  **Please be advised that the failure to file written**
18 | **objections to a party's pretrial disclosures may result in the**
19 | **waiver of such objections, with the exception of those made**
20 | **pursuant to Rules 402 (relevance) and 403 (prejudice, confusion**
21 | **or waste of time) of the Federal Rules of Evidence.**

22 |     14.   In addition to submitting the proposed final pretrial
23 | conference order, the parties are further ordered to separately
24 | submit informal letter briefs, not exceeding two single spaced
25 | pages, served on opposing counsel and received in the chambers of
26 | the Honorable Thomas J. Whelan, United States District Court
27 | Judge (and not filed with the Clerk's Office) no later than
28 | **December 15, 2008**.

07cv886

1     The letter brief should be a relatively informal and
2  straightforward document.  The letter brief should outline a
3  short, concise and objective factual summary of the party's case
4  in chief, the number of hours/days each party intends to expend
5  at trial, the approximate number of witnesses, whether certain
6  witnesses will be coming in from out of town, the number of
7  testifying expert witnesses, whether any unique demonstrative
8  exhibits may be presented, the number of proposed motions in
9  limine that may be filed, precisely when the parties would be
10  prepared to submit their in limine papers (and whether the
11  parties have met and conferred with respect to in limine issues),
12  the issue of proposed jury instructions and when the parties
13  intend to submit them before trial, and voir dire issues, either
14  party's preference as to what date(s) the trial should begin and
15  any other pertinent information that wither party may deem useful
16  to assist the Court in the execution of the pretrial conference
17  and in setting the matter for trial.

18     15.  The final Pretrial Conference is scheduled on the
19  calendar of the Honorable Thomas J. Whelan on **December 22, 2008**
20  at **10:30 a.m.**  The trial date will be assigned by Judge Whelan at
21  the pretrial conference.

22     16.  The dates and times set forth herein will not be
23  modified except for good cause shown.

24     17. Plaintiff's(s') counsel shall serve a copy of this order
25  on all parties that enter this case hereafter.

26     **IT IS SO ORDERED.**

27  DATED:   November 7, 2007

28                                          Jan M. Adler
                                            U.S. Magistrate Judge

7

07cv886



**LUCAST CONSULTING**
Coastal Land Use Planning & Advocacy
Post Office Box 8892
Rancho Santa Fe, California 92067

April 28, 2008

Thomas Stahl, Esq.
Assistant U.S. Attorney
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893

Re:    *USA v. 14.3 Acres of Land, Tijuana River Valley, San Diego, CA.*

**Opinion Regarding Allowable Development on Lichty Mesa by the
California Coastal Commission**

Dear Mr. Stahl:

You have asked me to evaluate the development potential, in view of the jurisdiction of
the California Coastal Commission, of the Lichty property in the Tijuana River Valley
community of San Diego, California. This an approximately 14.3-acre trapezoidal
property immediately adjacent to and north of the International Border between the
United States and Mexico, and immediately east of Border Field State Park. The
property lies within The Tijuana River National Estuarine Research Reserve. It is my
understanding that this is a single legal parcel.

## Initial Assumptions

- The date of valuation is May 16, 2007.
- The zoning is AR-1-1, and the allowable use by right under the city's zoning code
  is one single family residence.
- The highest and best use evaluated by the Owner's appraiser (Kauttu) is a large
  single-family equestrian estate situated on 25-30 % of the least sensitive portion
  of the site in accordance with the City's MSCP.

## Considerations

In performing my analysis, (1) I personally visited the site on April 22, 2008, in the
company of Mr. Mathew Shake and yourself; (2) I had several personal and e-mail
communications with Mr. Steve Roach, Mr. Mathew Shake, Mr. Barry Jones, Mr.
Richard Carrico, Mr. Norm Arndt; (3) I had a telephone conversation with City of San
Diego Development Services Senior Staff Planner Michelle Sokolowski and left a
message for the City's long-range planner for the Tijuana River Valley, Maxx Stalheim

**EXHIBIT B**

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 2

(that has not been returned);  (4) I had a telephone conversation and fax communication with Mr. Lee McEachern, Chief of the Regulatory Program for the California Coastal Commission's San Diego District office, and telephone call and fax communications with Federal Consistency Coordinator Larry Simon of the Commission's San Francisco office, (my attempt to meet with the Coastal Commission's Senior Planner for the subject area was thwarted because she was out of the office during the time of my analysis); and (5) I reviewed the following documents:

- The California Coastal Act (California Public Resources Code 30000 et seq)
- A Biological Resources Survey Report and Evaluation of Resource Values, August 2007. Vincent N. Scheidt.
- Feasibility Study for Lichty Mesa, 2008, (including all exhibits), TRS consultants.
- Complete appraisal Report of the Lichty Mesa Tract, January 25, 2008, Kauttu Valuation.
- Tijuana River Valley Local Coastal Program Land Use Plan, City of San Diego, as amended 6-1-1999.
- www.parks.ca.gov (pages for Border Field State Park and Tijuana River National Estuarine Research Reserve)
- City of San Diego Map no C-730.1
- Expert Report of Norman C. Arndt, PE, Opinions and Comments for use in USA v. 14.30 Acres of Land (Lichty).
- Letter from Barry Jones to Steve Roach Re:  Lichty Mesa Constraints Assessment, dated April 28, 2008.
- Findings and Opinion of Richard L. Carrico Archaeologist and Historian, dated April 27, 2008.

,

## Relevant Facts

- The subject property lies wholly within the City of San Diego and that City's local development permit jurisdiction, and within the Tijuana River National Estuarine Research Reserve.
- The subject property also lies wholly within the Coastal Zone of the State of California and within the retained coastal development permit (CDP) jurisdiction of the California Coastal Commission.[1]

---

[1] IMPORTANT NOTE: The City-adopted CDP appeal maps (C-730.1) indicate that the property is subject to an area of "deferred certification" and to "Coastal Commission Appeal Jurisdiction." However, it is important to note that these maps have never been adopted by the Coastal Commission, and that they are famously frequently wrong.  In checking with the San Diego District Coastal Commission staff, it was determined that: (1) the designation of "deferred certification" has been repealed in this area; and (2) the entire Lichty parcel is designated "original jurisdiction," or an area where coastal development permit jurisdiction is permanently retained by the State Coastal Commission. This makes sense as to the lowlands, but not as to the uplands, so I have requested a clarifying opinion from the Coastal Commission's mapping

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 3

- Any "development" (as defined in California Public Resources Code 30106) on the property must first be approved by the California Coastal Commission (CCC) after all City-required discretionary approvals are obtained (including CEQA compliance).
- The Coastal Commission has never certified the City's MSCP as part of the City's Local Coastal Program.
- As opposed to areas covered by a certified Local Coastal Program which are merely subject to Coastal Commission appeal jurisdiction, the standard of review for coastal development permits (CDPs) for projects within the Coastal Commission's area of retained permit jurisdiction is the Coastal Act itself, namely the Chapter 3 policies of the Act.

## Significant Coastal Act Policies Applicable to Site

All citations are to Sections of the California Public Resources Code (CPRC), also known as the California Coastal Act of 1976.

- Section 30230.  Marine resources shall be maintained, enhanced, and, where feasible, restored.  Special protection shall be given to areas and species of special biological or economic significance.  Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.

- Section 30231.  The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface waterflow, encouraging waste water reclamation, maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams.

- Section 30233 (a).  The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with

---

unit.  I could modify my conclusions depending on the outcome of the investigation by the CCC mapping unit.

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 4

other applicable provisions of this division, where there is no
feasible less environmentally damaging alternative, and where
feasible mitigation measures have been provided to minimize adverse
environmental effects, and shall be limited to the following:

(1) New or expanded port, energy, and coastal-dependent industrial
facilities, including commercial fishing facilities.

(2) Maintaining existing, or restoring previously dredged, depths
in existing navigational channels, turning basins, vessel berthing
and mooring areas, and boat launching ramps.

(3) In open coastal waters, other than wetlands, including
streams, estuaries, and lakes, new or expanded boating facilities and
the placement of structural pilings for public recreational piers
that provide public access and recreational opportunities.

(4) Incidental public service purposes, including, but not limited
to, burying cables and pipes or inspection of piers and maintenance
of existing intake and outfall lines.

(5) Mineral extraction, including sand for restoring beaches,
except in environmentally sensitive areas.

(6) Restoration purposes.

(7) Nature study, aquaculture, or similar resource-dependent
activities.

(b) Dredging and spoils disposal shall be planned and carried out
to avoid significant disruption to marine and wildlife habitats and
water circulation. Dredge spoils suitable for beach replenishment
should be transported for these purposes to appropriate beaches or
into suitable longshore current systems.

(c) In addition to the other provisions of this section, diking,
filling, or dredging in existing estuaries and wetlands shall
maintain or enhance the functional capacity of the wetland or
estuary. Any alteration of coastal wetlands identified by the
Department of Fish and Game, including, but not limited to, the 19
coastal wetlands identified in its report entitled, "Acquisition
Priorities for the Coastal Wetlands of California", shall be limited
to very minor incidental public facilities, restorative measures,
nature study, commercial fishing facilities in Bodega Bay, and
development in already developed parts of south San Diego Bay, if
otherwise in accordance with this division.

For the purposes of this section, "commercial fishing facilities
in Bodega Bay" means that not less than 80 percent of all boating
facilities proposed to be developed or improved, where the
improvement would create additional berths in Bodega Bay, shall be
designed and used for commercial fishing activities.

(d) Erosion control and flood control facilities constructed on

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 5

watercourses can impede the movement of sediment and nutrients that would otherwise be carried by storm runoff into coastal waters. To facilitate the continued delivery of these sediments to the littoral zone, whenever feasible, the material removed from these facilities may be placed at appropriate points on the shoreline in accordance with other applicable provisions of this division, where feasible mitigation measures have been provided to minimize adverse environmental effects. Aspects that shall be considered before issuing a coastal development permit for these purposes are the method of placement, time of year of placement, and sensitivity of the placement area.

- Section 30240. (a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas.

  (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.

- Section 30244. Where development would adversely impact archaeological or paleontological resources as identified by the State Historic Preservation Officer, reasonable mitigation measures shall be required.

- Section 30250 (a) New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources. In addition, land divisions, other than leases for agricultural uses, outside existing developed areas shall be permitted only where 50 percent of the usable parcels in the area have been developed and the created parcels would be no smaller than the average size of surrounding parcels.

- Section 30251. The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 6

> and along the ocean and scenic coastal areas, to minimize the
> alteration of natural land forms, to be visually compatible with the
> character of surrounding areas, and, where feasible, to restore and
> enhance visual quality in visually degraded areas. New development
> in highly scenic areas such as those designated in the California
> Coastline Preservation and Recreation Plan prepared by the Department
> of Parks and Recreation and by local government shall be subordinate
> to the character of its setting.

Several, unmentioned Coastal Act policies, such as those relating to geologic, flood and
fire hazards, protection of public coastal access and water quality would also apply to
potential development of the site, but their significance is dwarfed by application of those
policies mentioned.

## Principal Coastal Issues Influencing Development Potential

- Presence of wetlands on and near the subject property (CPRC 30230, 30231, 30233)
- Presence of environmentally sensitive habitat areas (ESHA) on and near the subject property (CPRC 30240)
- Coastal Act policy protection of public views to and along the sea from public areas. (CPRC 30251)
- Coastal Act policy requiring development adjacent to parks or highly scenic area to be subordinate to its setting.
- Presence of CA-SDI-4281 and significant cultural resources over all the mesa portion of the site (as noted by both Carrico and de Barros). NAHA Sacred Site designation (albeit after date of valuation).

## Discussion

- The CCC requires that all local discretionary approvals, including CEQA clearance, be obtained before application for a CDP can be made to the CCC.
- It seems likely that the City would require an MSCP boundary adjustment for, at least, the necessary off-site improvements. (This may be a discretionary action. I do not profess to be an expert in local government handling of regulatory matters.)
- Pending the final outcome of an investigation of the true CDP permit status of the Lichty property, it has been assumed that the entire property lies within the retained ("original") permit jurisdiction of the Coastal Commission, as interpreted by the Coastal Commission staff. This being the case, any proposal for

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 7

development on the Lichty site would need to be processed through the Coastal Commission before it could move forward. (See footnote 1, page one herein.)

- Upon application to the CCC, Lichty would face two hurdles: the first, temporal, the second, substantive.

- The first hurdle at the CCC is always getting one's application accepted as complete. The law gives the CCC staff virtual *carte blanche* to request additional studies beyond those normally prepared to comply with CEQA and usual application requirements. Due to on-going severe budget and staffing constraints, this "completeness" review often results in as a much as a year (or more) delay in having one's application "filed" and the clock starting to run (this is especially true in so-called problem areas where natural resource issues are present—such as the Lichty case).

- The second hurdle at the CCC is more difficult. Both Scheidt and Jones identify the low-lying portion of the Lichty property as wetlands or disturbed wetlands. Other information from the TRNERR website indicates the lowlands to the east and north, through which Monument Road passes, is wetland or disturbed wetland. The TRS Feasibility Report and the Kauttu Appraisal contemplate an access road through this wetland area. Such a road would need to meet FEMA, City Fire Department, and Corps of Engineers Requirements and will necessitate improvements incurring substantial direct wetland impacts on-site, and even greater wetland impacts off-site. Furthermore, construction of such road improvements would run afoul of the CCC's buffer requirements. (It should be noted that the CCC has already denied permission for such road improvements for access to Border Field State Park.)

- CCC practices (backed by Coastal Act policies) permit only eight enumerated uses in wetlands (whether or not disturbed) (see CPRC Section 30233, above) and then only under tightly controlled circumstances. The access components of the project described by Kauttu do not qualify as allowable uses under this Section.

- The balance of the Lichty property is described as ESHA and disturbed ESHA by both Scheidt and Jones. CPRC Section 30240 (a) allows no direct impacts to ESHA or disturbed ESHA, except for projects that are resource-dependant (such as habitat restoration). The recommended highest and best use scenario does not meet this definition.

- The highest and best use proposal suggests that impacts to ESHA can be incurred provided they can be mitigated. However, under Section 30240 (a), the impacts cannot even be incurred---if the impact cannot be incurred, the issue of how and where mitigate is moot.

- Moreover, the CCC requires "no-touch" buffers to be observed around such sensitive areas. Wetland buffers are typically a minimum of 100 feet in width. ESHA buffers are increasingly required to be 100 feet in width and can be required to be as wide as 100 meters (328 feet) (these are typically applied in the case of raptor habitat, which is not present here). The CCC requires a property to provide for buffers for off-site habitat with the typically prescribed buffer zone for

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 8

different habitat types. In this case, it can be assumed from review of habitat mapping that a 100-ft. no-touch buffer, inward from the east, north and west property lines of the Lichty property would be required by the CCC.

## Conclusions

- Assuming the City approved a project that occupied up to 4.29 acres of the site (since that is allowable under its MSCP rules), that City-approved project would then need to be submitted to the Coastal Commission for review and approval before it could be constructed.
- The Coastal Commission is not bound or constrained by the 25-30% allowed development encroachment that the MSCP permits, because the CCC never certified the MSCP. (In fact, that is one of the disagreements the CCC has with the City's MSCP.)
- The standard of review for the Coastal Commission in areas of retained jurisdiction (which is how this area is currently mapped, according to Coastal Commission staff) are the policies found in Chapter 3 of the Coastal Act, commencing at CPRC Section 30200, not the City's LCP or the MSCP.
- According to biologists Scheidt and Jones, the site is totally constrained by
    1. Wetlands
    2. Disturbed wetlands
    3. Environmentally Sensitive Habitat Area
    4. Disturbed Environmentally Sensitive Habitat Area
- All such areas are proscribed from traditional development under Coastal Act policies.
- Generally speaking, development on such highly constrained properties is limited to habitat restoration, nature study and similar resource-dependent activities. (CPRC 30233 and 30240)
- Once the application is deemed "complete" by CCC staff and is scheduled for a public hearing, I would fully expect the CCC staff to recommend denial of the application and the CCC to follow its staff's recommendation. As presently contemplated, the project simply raises too many issues for CCC staff or the Commission itself to be able to craft mitigating conditions of approval. E.g.,
    1. Siting in ESHA of a large home, equestrian facilities, tennis court and pool, along with FEMA and Fire-Department-approved access improvements (on-site and off-site) and brush management zones 1 and 2 (incompatible with ESHA in CCC's eyes) and accommodations of on-going Border Patrol activities.
    2. Direct impacts to wetlands.
    3. Destruction of ESHA
    4. Development within wetland and ESHA buffers.

April 28, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 10

My conclusions are based on the Coastal Commission staff's current interpretation of the City of San Diego CDP jurisdiction maps. I have asked for a clarification of that interpretation. Such clarification is pending. If the interpretation changes, my conclusions are, likewise, subject to change. (See footnote 1, page one, herein.)

Please feel free to call me if you have any questions regarding this evaluation.

Sincerely,

Nancy A. Lucast
Principal

Cc:  Mr. Steve Roach
    Mr. Mathew Shake
    Mr. Norm Arndt
    Mr. Dann Mallec
    Mr. Barry Jones
    Mr. Richard Carrico
    Christopher Latham, Esq.
    Ms. Tricia Lamb

# QUINTON & PETIX

Attorneys at Law

Michael E. Quinton, Esq.
Stephen V. Petix, Esq.

402 West Broadway, Suite 400
San Diego, CA  92101
www.quintonpetix.com

619/234-1113
FAX: 619/595-3147
quinton@quintonpetix.com

May 6, 2008

Tom Stahl, Esq., Assistant U.S. Attorney
Chief, Civil Division
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893

Re: United States v. 14.3 Acres of Land, etc. et. al., Civil No. 07 CV 00886 W (JMA)

Dear Tom:

I have received your expert witness designation, served on April 30, 2008. After perusing the reports submitted by your experts, it appears that additional information is required to comply with F.R.C.P. 26(a)(2). I would ask that the following information be provided:

> 1.) Steven D. Roach: A list of cases in which the witness has testified in the last four years and a statement of the compensation to be paid for the study and testimony.

> 2.) Dann L. Mallec: A list of cases in which the witness has testified in the last four years and a statement of the compensation to be paid for the study and testimony.

> 3.) Norman C. Arndt: A list of cases in which the witness has testified in the last four years. Mr. Arndt has provided, on page 3 or his report, a list of (Plaintiff)-(Defendant) names but no case number or court information.

> 4.) Barry L. Jones: A list of his publications, if any, and a list of cases in which he has testified in the last four years, if any.

> 5.) Nancy A. Lucast: It appears that this report is not complete inasmuch as it does not state the witness' final opinion but leave open the possibility that her opinion could change if she receives information she did not have at the time she prepared the report. (See, Footnote 1 and the first paragraph on page 10 of her report.) We need to have the witness' "final answer."

> 6.) Richard L. Carrico: A list of cases in which the witness has testified in the last four years and a statement of the compensation to be paid for the study and testimony.

C:\Q&P\CASES\LICHTY\CORR\lichtystahl050608.ltr.wpd

**EXHIBIT C**

Tom Stahl, Esq.
*United States v. 14.3 Acres*
May 6, 2008


Please provide the requested information as soon as possible.  Thank you for your continuing
courtesy and cooperation in this matter.

Very truly yours,

**QUINTON & PETIX**


MICHAEL E. QUINTON



**U.S. Department of Justice**

*Karen P. Hewitt*
*United States Attorney*
*Southern District of California*

TOM STAHL                                                    *(619) 557-7140*
Chief, Civil Division                                        *Fax (619) 557-5004*

*San Diego County Office*                                    *Imperial County Office*
*Federal Office Building*                                    *321 South Waterman Avenue*
*880 Front Street, Room 6293*                                *Room 204*
*San Diego, California 92101-8893*                           *El Centro, California 92243-2215*

May 8, 2008

Michael E. Quinton, Esq.
Quinton & Petix
402 West Broadway, Suite 400
San Diego CA 92101

     Re:    <u>United States of America v. 14.30 Acres of Land, et al.</u>
            Case No. 07cv886-W(JMA)

Dear Mike:

    This is in response to your first letter of May 6, 2008, dealing with your request for information that you claim was omitted from the expert reports which were personally delivered to your office on April 30, 2008. I will respond to each of your requests using the numbering system in your letter:

      1.    <u>Steven D. Roach</u> You will find his list of cases and statement of compensation on the last two pages of Exhibit B of his report. I will attempt to obtain the case numbers of the listed cases and will provide that information to you.

      2.    <u>Dann L. Mallec</u> You will find his list of cases in Paragraph 5 of Page 1 of his report. His statement of compensation is in Paragraph 6.

      3.    <u>Norman C. Arndt</u> I will attempt to obtain the case numbers of the listed cases and will provide that information to you.

      4.    <u>Barry L. Jones</u> Mr. Jones has no publications or case testimony to report.

      5.    <u>Nancy A. Lucast</u> I disagree with your characterization of the statement contained in Footnote 1 of her report. Her ten-page report includes four pages of discussion and opinions based upon the information she enumerates in the first six pages. The footnote contains an analysis and discussion of an apparent discrepancy regarding the extent of the California Coastal Commission's original jurisdiction over the subject property. Ms. Lucast has requested clarification and correctly acknowledges that the CCC's response has the potential to impact her conclusions on that topic. At the time she prepared her report, the CCC had not responded. She is aware of the requirement to supplement her report if warranted by the facts. <u>See</u> Fed.R.Civ.P. 26(a)(2)(D).

**EXHIBIT D**

Michael E. Quinton, Esq.
USA v. 14.30 Acres of Land, et al.
May 8, 2008
Page Two

      6.     Richard L. Carrico You will find his list of cases on Page 15 of his report.  His statement of compensation is on Page 1.

     If you are unable to locate the information in the places I have mentioned above, please do not hesitate to contact me.

                         Very truly yours,

                         KAREN P. HEWITT
                         United States Attorney

                         /s/ Tom Stahl

                         TOM STAHL
                         Chief, Civil Division

# QUINTON & PETIX

Michael E. Quinton, Esq.
Stephen V. Petix, Esq.

Attorneys at Law
402 West Broadway, Suite 400
San Diego, CA  92101
www.quintonpetix.com

619/234-1113
FAX: 619/595-3147
quinton@quintonpetix.com

May 21, 2008

Tom Stahl, Esq., Assistant U.S. Attorney
Chief, Civil Division
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893

Re: United States v. 14.3 Acres of Land, etc, et. al., Civil No. 07 CV 00886 W (NLS);
Deposition Schedule for Expert Witnesses

Dear Tom:

Thank you for your telephone call yesterday, May 20, 2008, in which you said that the government's expert witnesses may be deposed on the proposed schedule which was contained in my May 13, 2008, letter to you.  You have asked for a proposed schedule for the Defendants' experts and I will attempt to get that to you in the next day or so, at least insofar as it applies to the three expert witnesses listed in the designation delivered to you on January 29, 2008.

Contrary to our earlier expectation, we have determined that we will designate rebuttal experts. We will have to schedule them after we have named them at the end of the month.

That leaves the matter of Ms. Lucast.  As I have told you on at least two (2) occasions, I do not think that Ms. Lucast's April 28, 2008, report complies with Rule 26(a)(2)(B)(i) because it is subject to change.  We will have to have Ms. Lucast's opinion, based on the most recent information she has, before we can depose her.

In this regard, you should know, if you do not already know, that Ms. Lucast and Mr. Roach met with Mr. Lee McEachern, District Regulatory Supervisor, and Ms. Ellen Lirley, Coastal Planner, of the California Coastal Commission, the morning of Friday, May 16, 2008.  Mr. Stedt, Ms. Marlene Wendel, Tim Lichty and I met with the same Coastal Commission staff on Friday, May 16, 2008, in the afternoon.

C:\Q&P\CASES\LICHTY\CORR\lichtystahl052108.ltr.wpd

**EXHIBIT E**

Tom Stahl, Esq.
*United States v. 14.3 Acres*
May 21, 2008

Based on the information given to us on Friday afternoon, it appears that the opinions expressed in Ms. Lucast's April 28, 2008, report regarding the subject property are mostly invalid. Specifically, the Coastal Commission staff determined, and so advised us:

1.  The property is not within any California Coastal Commission retained coastal development permit jurisdiction.

2.  The property lies entirely within the City of San Diego's Tijuana River Valley Land Use Plan (LUP), as approved by the Coastal Commission, and, therefore, the City has full permit jurisdiction. No coastal development permit approval is required by the Coastal Commission.

3.  Since the Coastal Commission has approved the City of San Diego Implementation Plan (IP) for the City of San Diego's Tijuana River Valley Land Use Plan (LUP), the City's MSCP Subarea Multi-Habitat Plan is incorporated in the Land Use Plan. The Land Use Plan, in conjunction with the Implementation Plan, allow for the full development of 25% to 30% of the least sensitive area of the subject property, without further mitigation. The Coastal Commission has no authority to decrease the development area.

4.  The jurisdiction of the Coastal Commission is limited to appellate jurisdiction. On appeal, the jurisdiction of the Coastal Commission is limited to a determination of compliance with the City's Land Use Plan (LUP) and Implementation Plan (IP). The Coastal Commission has no jurisdiction on appeal to impose any conditions beyond those within the approved City of San Diego plans.

In view of these positions of the Coastal Commission, as expressed to us, it appears that if Ms. Lucast is to offer any opinions at all in this matter, her report will have to be revised. It also appears that Ms. Lucast's opinions are relied upon in the reports of most of your other experts.

We do not have any interest in embarrassing anyone in this matter. If you wish to withdraw Ms. Lucast, you may do so. If you wish to have her revise her report, you may do that. If you would like to give the rest of your experts an opportunity to revise their reports to factor in this change of circumstances, you may do that. If you would like for Mr. Roach to revise his appraisal report to factor in the change in circumstances, you may do that too.

The only thing we will insist on is that no delay is caused by whatever you choose to do and that our rebuttal expert reports should be kept under seal until after your revised reports are completed. Needless to say, you will need to make a decision on this before we submit our rebuttal expert reports on May 30, 2008. To that end, we suggest that we meet after Mr. Lichty's

Tom Stahl, Esq.
*United States v. 14.3 Acres*
May 21, 2008

deposition on Thursday, May 22, 2008, to discuss how you wish to proceed due to this change of circumstances.

Thank you for your continuing courtesy and cooperation in this matter.

Very truly yours,

**QUINTON & PETIX**

/S/

MICHAEL E. QUINTON

cc: Mr. Tim Lichty

LUCAST CONSULTING

June 11, 2008

Thomas Stahl, Esq.
Assistant U.S. Attorney
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893

      **Re:**    *USA v. 14.3 Acres of Land, Tijuana River Valley, San Diego, CA.*

            **RE: Coastal Commission jurisdiction, coastal development permit jurisdiction, and potentially allowable use on Lichty property.**

            **NOTE: This letter supplements and corrects my April 28, 2008 opinion and presents my final opinion.**

Dear Mr. Stahl:

There were a few open questions remaining after I submitted my original April 28, 2008 opinion regarding the development potential of the Lichty Mesa property due principally to conflicting mapping of the permit jurisdictions of the City of San Diego and the California Coastal Commission. Since then, I met on May 16, 2008 with Ms. Deborah Lee, San Diego Coast District Manager of the Coastal Commission, and Ms. Ellen Lirley, Senior Planner for the Tijuana River Valley. We were joined by Mr. Matt Shake of MDS Realty Advisors. I have also had several separate telephone conversations with Deborah Lee, Ellen Lirley and Mr. Lee McEachern, who heads up the Regulatory Program at the Coastal Commission's San Diego District office.

My goal was to determine:

    (1)  What is the true jurisdiction of the California Coastal Commission (Coastal Commission or CCC) on the Lichty Mesa property; and
    (2)  Given that, what might the Coastal Commission staff recommend approval of should a coastal development permit be approved by the City and appealed to the Coastal Commission.

**<u>Determination 1</u>:**

The Coastal Commission's mapping staff has decided that, notwithstanding published (but not adopted by the Coastal Commission) maps to the contrary,

**EXHIBIT F**

- The Lichty Mesa property is entirely within the coastal development permit (CDP) authority delegated to the City of San Diego;
- Likewise, the entire Lichty Mesa property is within the appeal jurisdiction of the Coastal Commission.[1]

Therefore, any CDP approved by the City of San Diego for a development (ref. Section 30106 of the CA Public Resources Code—PRC) on the Lichty Mesa property may be appealed to the Coastal Commission by any person with standing (meaning anyone who communicated with the City during the City's proceeding) and/or by any two Coastal Commissioners. No fees are imposed on appeals to the Coastal Commission.

Logistically, as far as Coastal Commissioner appeals go, Coastal Commission staff monitor all local government appealable actions on CDPs. If, after analysis, CCC staff have concerns that the local government may have not adequately conditioned a permit, or may have overstepped its authority under the certified Local Coastal Program (LCP), CCC staff will suggest to two Commissioners that they file an appeal. If two Commissioners agree, the appeal forms are completed by CCC staff and executed by the two Commissioners.

Because of the fact that the Lichty Mesa property is entirely constrained by MHPA, environmentally sensitive habitat areas (ESHA) and wetlands (degraded or not), it is very easy to foresee an appeal of any City CDP being filed here due to the strong and long-time activism of the Tijuana River Valley environmental interest groups and the Native American community, as well as the Coastal Commission staff, itself.

The standard of review for a City CDP on appeal is the certified LCP and the public access policies of the Coastal Act (PRC Section 30210 et seq).

**Determination 2:**

Turning to what kind of development the Coastal Commission staff might recommend approval of should a City CDP approval be appealed, we must first look at the actual appeal process. We have covered who has standing to appeal. An appeal must be received in the Coastal Commission office within 10 working days of the date notice of final action by the City is received by the Coastal Commission staff. Assuming a timely appeal, the CCC staff must first determine to recommend to the Commission whether the appeal(s) raises a "substantial issue." The Commission then acts on that recommendation. If "substantial issue" is found, that nullifies the City's approval and a

[1] It is anticipated that the Coastal Commission will publish a map showing this information within the next month or so.

Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 3 of 8

hearing *de novo* is set before the Coastal Commission[2], usually at some future date. This is typically a two hearing (or more) process.[3]

In the case of two Commissioner appeals, it is a virtual certainty that CCC staff will recommend a substantial issue exists. In that event, the Commission automatically finds substantial issue exists unless first, three or more Commissioners vote to hold a hearing on the question, and then a majority of Commissioners disagree with the staff position. This is rare.

On to substance: The City's local coastal program was certified in 1988, at which time the City took over the authority of issuing CDPs (although many areas were held back at first and some areas are still being held back). The City now has assumed CDP authority over the entire Tijuana River Valley Community Plan Area (including Lichtly Mesa), except the areas of retained State jurisdiction.

The following applications of the certified LCP are relevant to an analysis of feasible development potential at the Lichty Mesa site:

    a.  The entire site lies within the City's Multiple Species Conservation Plan (MSCP) of the Multi-Habitat Planning Area (MHPA).

    b.  The site is zoned AR-1-1 which would allow development of one single-family residence.

    c.  The Land Use Plan portion of the certified LCP[4] does not embrace the MSCP/MHPA concept.

    d.  On the other hand, the Environmentally Sensitive Lands (ESL) Ordinance of the City's Land Development Code (LDC) (part of the certified LCP) allows

---

[2] *Benson v. California Coastal Commission* (2006) 139 Cal.App.4th 348, 351, 42 Cal.Rptr.3d 580 (on appeal, the Commission review the permit application de novo; the Commission hears the permit application as if no local government unit was previously involved); *Kaczorowski v. Board of Supervisors* (2001) 88 Cal.App.4th 564, 569-570, 106 Cal.Rptr.2d 14 (once the Commission conducted its de novo review, there was no longer a Board of Supervisors decision to review); *City of San Diego v. California Coastal Commission* (1981) 119 Cal.App.3d 228, 236 fn. 3, 174 Cal.Rptr. 5 (In light of the "de novo" review by the Commission of a case appealed from a regional commission (section 30621), the latter decision and accompanying findings are vacated and of no controlling precedential value); and *REA Enterprises v. California Coastal Zone Conservation Com.* (1975) 52 Cal.App.3d 596, 612-613, 125 Cal.Rptr. 201 (explaining "de novo" review by the Coastal Commission). REA Enterprises is an older case under the 1972 Coastal Act, but the theoretical underpinning for "de novo" review is the explanation followed by the later cases.

[3] The Coastal Commission meets once per month, alternating between Northern and Southern California. Southern California items are generally scheduled for Southern California meetings. Aside from the initial hearing on the question of "substantial issue," no time limits apply to appeals (e.g., the "permit streamlining act" does not apply).

[4] An LCP consists of two parts: a Land Use Plan (LUP) and an Implementation Plan (IP). In the City of San Diego's case, there are numerous LUPs, based generally on Community Plan boundaries, but only one IP—the Land Development Code, or LDC.

development to occur on 25% of a "premises" that is wholly constrained by the MSCP/MHPA.

So, assuming the City would approve a CDP for a single-family home on the Lichty site, there are a few things to take into consideration, such as the provision of access and utilities, which would need to be provided from off-site.

I do not work in the local government arena, so I cannot give an opinion on what the City might or might not approve. However, I did consult with Mr. Norm Arndt and Mr. Dann Mallec of Rick Engineering who have been retained by you. They deal regularly with the City. They had met with City staff and determined the nature of the minimal on-site and off-site improvements that would be required in order to obtain approval to develop a single-family home on the Lichty site. Those are detailed in Mr. Arndt's report to you dated April 25, 2008, and were further explained to me in a meeting on May 23, 2008. I will deal with those in more detail below.

Back to the assumption that the City approves a CDP on the subject property: Because of the sensitive biological and visual nature of the site, it is practical to assume that the City's CDP, if approved, would be appealed to the Coastal Commission and that the Coastal Commission would take up the appeal (i.e., find "substantial issue"). So I will proceed on that basis. (Of course, if no appeal is filed, then the City's CDP would stand.)

We know the following about the site from the work that has been done by biologists Vincent Scheidt and Barry Jones, the Feasibility Study (including exhibits) prepared by TRS consultants, the Findings of Archaeologist Richard Carrico, all referenced in my April 28th letter, and various publications, maps and aerial photographs in the public realm:

e.  The site is within the Tijuana River National Estuarine Research Reserve;
f.  The low-lying portions of the property are within FEMA's 100-year flood plain and are either wetlands or disturbed wetlands;
g.  Under-improved Monument Road east and north of the property likewise traverses wetlands and floodplain;
h.  The higher elevations of the property support either maritime succulent scrub or disturbed maritime succulent scrub which is a Tier 1 (rare upland) habitat in the City's ESL Ordinance (known as environmentally sensitive habitat area, or ESHA at the CCC);
i.  The entire site, and especially the western portion appears to have high archaeological significance;
j.  The uplands and lowlands are separated by a steep bluff formation which supports maritime scrub chaparral, another Tier 1 habitat (and ESHA).

With clarification of the Coastal Commission jurisdictional question, clarification of the character of the off-site improvements necessary for City approval and my discussions with Coastal Commission staff, it became clear that an opinion about what the Coastal Commission staff might recommend approval for on this site on appeal from a City-approved coastal development permit must consider the following:

k.  25% of the premises area may be developed (i.e., disturbed in any way). CCC staff asserts that the definition of "premises" in the City's Land Development Code must include all areas proposed to be disturbed on-site and off-site, including any required access road, driveway, parking area, corrals, outbuildings, tennis court, pool, landscaping, hardscape, leach-field (if required), and both Zone 1 and Zone 2 brush management;

l.  According to CCC staff the Coastal Commission has never endorsed the concept of allowing an additional 5% of disturbance for "essential public facilities," so the existing Border Patrol use areas would also need to be factored into the coverage allowance as well;

m. The home must be compatible with the sensitivity of the area and be sited on the least sensitive portion of the site. Siting would be a very important consideration. For example, no structure would be allowed to encroach within 40 feet of the bluff edge (geologic conditions could warrant a greater setback) , all disturbance must avoid sensitive archaeological resources and be consistent with requirements of the State Historic Preservation Office and the California Native American Heritage Commission;

n.  Due to its location within a National Reserve and adjacent to a State Park, any structure, including any driveway cut-slope and necessary retaining walls, would need to be sensitively designed to be subordinate to its setting;

o.  Use of non-native plants would be prohibited;

p.  Lighting would need to be strictly regulated to avoid impacts on the sensitive habitat (this could conflict with security issues);

q.  State-of-the-art best management practices for water quality would need to be employed for both on-site and off-site improvements;

r.  Recalling that the standard of review on appeal is not only the certified LCP, but also the public access policies of the Coastal Act (Public Resources Code Sections 30210 – 30214), it is important to note that the entire Tijuana River Valley is a recreation area. The CCC looks to future, as well as existing conditions, to insure that public recreation opportunities are provided and protected. This could raise conflicts between the desire for perimeter fencing for security and the Commission's desire to allow the public, including Native Americans, to continue to traverse the site. In this regard, the Commission has frequently initiated formal "prescriptive rights investigations" when it has found evidence such as trails across a site. Here, there is ample such evidence. Of course, at least the bulk of it can be attributed to Border Patrol activity, but an investigation would determine

June 30, 2008
Thomas Stahl, Esq.
Assistant U.S. Attorney
Page 6 of 8

whether the site had also been used by mountain bikers, hikers, bird watchers, or Native Americans who may have potentially established prescriptive rights of access. Perimeter fencing would cut off such access. Prescriptive rights must be adjudicated in a Court of Law, of course, but the CCC has a long record of successfully conditioning permits to protect such potential rights where there is evidence of their existence;

s.  While viewing an aerial photograph, one CCC staffer suggested that the most disturbed portion of the site might be the large disturbed wetland area, rather than the mesa area, and also that special construction techniques could be employed to deal with the hazards associated with building in a flood plain. (The staffer also made the unsolicited suggestion that a more lucrative return might be had from selling mitigation credits to others). Building in the lowland could minimize the visual impacts that would accompany development on the mesa top and cutting a driveway access up to it.

Applying this new information to the clarifications received from Rick Engineering reveals some interesting information:

t.  Off-site improvements to Monument Road necessary to raise it out of the flood plain and extend it to the Lichty site to meet minimal City Engineering, City Fire Department, FEMA and Army Corps of Engineers standards will impact approximately 7 acres of coastal salt marsh (it is unclear to me whether this 7 acres includes the existing roadbed or only the area needed for widening).

u.  That area must be counted in the development allowance, according to CCC staff (the maximum development allowance of 25% of 14.3 acres is 3.58 acres).

v.  That off-site improvement to Monument Road will require a CDP from the City for the portion within the City's permit jurisdiction (which would be appealable to the Coastal Commission, and from the Coastal Commission for a small portion of that alignment that is within the Coastal Commission's area of retained jurisdiction.

w.  That is similar to a project proposed to the City of San Diego and the Coastal Commission by State Parks circa 1996 to raise and widen Monument Road to improve public access to Border Field State Park. According to CCC staff, the City denied a CDP for the portion of the road in its jurisdiction, whereupon State Parks withdrew its CDP application from the CCC for the portion of the road within the area of CCC retained jurisdiction.

x.  The standard of review for a coastal development permit within the Coastal Commission's area of retained jurisdiction is the policies within Chapter 3 of the Coastal Act. Please see my April 28, 2008 letter for an analysis of whether fill of wetlands for a road is considered an allowable use by the Coastal Commission. Furthermore, the Coastal Commission has a long-standing operating policy in San Diego County of not allowing fill in a floodplain. One could counter by

proposing to put the road on a structure (causeway or viaduct), however, such a structure would require vertical supports which also constitute fill under the Coastal Act definition (although not the Corps definition).

y.  Not to mention shading impacts, which at such low deck elevations would be expected to disallow meaningful salt marsh vegetation to flourish.

Conclusions:

1.  The plain reading of the City's LDC clearly allows up to 25% of the Lichty premises to be developed; however recent Coastal Commission decisions within the City of San Diego, which could be cited as precedent, allow exactly 25% of premises totally constrained by MHPA and/or wetlands/ESHA, whether or not disturbed, to be developed.

2.  Before development can be approved, it must be demonstrated that all-weather access to the site, satisfactory to the City Engineering and Fire Departments, the Army Corps of Engineers, FEMA, the Regional Water Quality Control Board and the California Coastal Commission can be approved.

3.  Such off-site improvements required for development to be approved on the Lichty parcel are included within the definition of "premises" under the certified Land Development Code according to CCC staff and therefore must be included within the development allowance.

4.  Simultaneous applications for CDPs for a project to improve Monument Road in a manner similar to that necessary for access to the Lichty Mesa site were previously made by State Parks to the City and to the CCC (for that portion within the CCC's area of retained jurisdiction). This project was intended to improve public access to existing Border Highlands State Park. The City denied the CDP as being inconsistent with the LCP. State Parks subsequently withdrew its application from the Coastal Commission because the Parks agency was unable to meet minimal completion requirements for "filing." This combination of events occurred about 12 years ago.

5.  The two projects---Lichty Mesa residential improvements and required accompanying Monument Road access extension---would normally proceed simultaneously.

6.  In that case, a recent provision allows the Coastal Commission to handle the CDP process for the entire project, if the City so requests

7.  If the City did not so request, the City would need to approve its (appealable) CDP for the Lichty Mesa improvements and the off-site Monument Road improvements within its permit jurisdiction before a permit application could be accepted by Coastal Commission for the retained jurisdiction portion of the Monument Road improvements.

8.  That, alone, would very likely compel an appeal by two Commissioners for the balance of the project within the City's jurisdiction.

9. But I have said before that there is not a shortage of stakeholders in this area that would be likely to appeal any City-approved coastal development permit.
10. The area that would be disturbed by the extension of Monument Road, alone, would exceed the maximum 25% development allowance in the ESL of the City's LDC. Add to that the area necessary for on-going Border Patrol activity, the footprint for a house. a driveway, parking area, leach field (if no sewer), and Zones 1 and 2 brush management, it is difficult to see how either the City or the Coastal Commission could fashion conditions that would bring a development proposal into compliance with the LCP.
11. Under such circumstances, at least at the Coastal Commission, rather than redesign a project from the dais, the Commission often denies the project as submitted, and sets out in its findings for denial, not only the rationale for denial, but performance standards to guide the applicant in preparation of a new plan which could be found consistent with the certified LCP and Coastal Act access policies.
12. There are an extraordinary number of hurdles that development of the Lichty Mesa would face, not the least of which are cost and uncertainty.

The additional information from the Coastal Commission's mapping division and conversations with Coastal Commission staff were all very helpful in clearing up some foggy areas. In fact, CCC staff's views seem to have evolved a bit in the process. However, as Coastal Commission staff will be first to remind you, they do not really get too analytical about a development proposal until one is officially put before them. Therefore, my conclusions are based on not only my conversations with staff, but also on 30 years of experience exclusively within the California Coastal Zone, with both the Coastal Commission and its staff.

Please call me if you have any questions.

Nancy A Lucast,
Principal

*Nancy a Lucast*

Lucast Consulting

Cc:    Mr. Steven Roach
       Christopher Latham, Esq.

## Nancy Lucast

**From:**   Nancy Lucast [lucastn@lucast.com]
**Sent:**   Tuesday, April 22, 2008 8:28 PM
**To:**   Barry Jones (barryj@helixepi.com)
**Subject:** FW: Lichty

FYI

**From:** Nancy Lucast [mailto:lucastn@lucast.com]
**Sent:** Tuesday, April 22, 2008 6:55 PM
**To:** Norm Arndt; Dann Mallec
**Cc:** Steve Roach; Mathew D. Shake; Tom Stahl
**Subject:** Lichty

Hey Norm and Dann:

Long time, no talk.

Like you, I am working for DOJ on the Lichty condemnation case. I have some questions:

1. Acc. to the Prelim TR, the legal desc is Lot 4 of Sec 8 of Township/Range. I have never heard of a Lot in a Section. Can you enlighten me?? (I need to find out how many legal lots exist on the site.) Do you have the Road Survey that is referenced in the TR?

2. I would like some basic geotech info garnered from existing sources: USGS; CA geological Survey, CA Seismic Safety, etc. Also, I notice that Kleinfelder provided a Preliminary Geotech Corridor Alignment Reconnaissance for the CBP on 3-7-03, and there was a later 3rd party review by Christian Wheeler on 10-3-03. Do you have access to those? I only need info on faults or traces down Yogurt and Goat Canyons (and anything else) that might trigger constraints. And then what those constraints are under current state law. Can you plot them??

3. Do you have any soils info?

As usual, I am being brought in at the last minute, so these guys want my report yesterday. Anything you can get to me ASAP would be appreciated.

~nancy

858-793-6020 ofc
619-985-8003 cell
lucastn@lucast.com  email

NOTICE: This e-mail may contain material that is confidential, privileged and/or attorney work product. It is for the sole use of the intended recipient. If you are not the intended recipient, please contact the sender, do not forward this message to anyone, and delete all copies of this message. Any review, reliance or distribution by others without express permission is strictly prohibited.

4/27/2008                                                                    **EXHIBIT G**

## Nancy Lucast

| | |
|---|---|
| **From:** | Stahl, Thomas (USACAS) [Thomas.Stahl@usdoj.gov] |
| **Sent:** | Friday, April 25, 2008 2:47 PM |
| **To:** | Nancy Lucast; Latham, Christopher (USACAS); Lamb, Tricia (USACAS) |
| **Cc:** | Dann Mallec; Steve Roach; Mathew Shake; Barry Jones |
| **Subject:** | RE: Lichty - Confusing maps |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Orange |

Nancy:

Thank you for the update. In view of our April 30 deadline, I just ask that you move forward based upon the information that is available to you now. You can certainly note in your report that there is this issue regarding the mapping and that you intend to get further clarification from the CCC. We will have the opportunity later to file supplemental reports and this could certainly be the topic of such a supplementation.

I want to inform you that I'm going to be on leave next week. Chris Latham, the attorney working with me, and Tricia Lamb, our paralegal, will be in touch with you and the other experts on Monday to see how your reports are coming. I've asked them to speak with you to explain the format for your report. The contents are dictated, somewhat, by the federal rules so we need to be sure that all expert reports comply. I don't think it will be a burden and I'm sure you'll find it pleasant to work with Chris and Tricia.

-Tom Stahl

**From:** Nancy Lucast [mailto:lucastn@lucast.com]
**Sent:** Friday, April 25, 2008 2:25 PM
**To:** Stahl, Thomas (USACAS)
**Cc:** 'Dann Mallec'; 'Steve Roach'; Mathew Shake; Barry Jones
**Subject:** Lichty - Confusing maps

Tom:

The City's map of the Coastal Permit Jurisdiction indicates that roughly half of the Lichty property (the wetland portion) is in an area of "deferred LCP certification," meaning no LCP was ever certified for it so the CCC retains CDP authority.

The same map indicates that the balance of the property (the upland portion) is labeled as being in CCC permit jurisdiction.

(By the way, this is counter-intuitive to definitions in the Coastal Act. The City maps, while adopted by the City, have never been adopted by the CCC, and are well-known to be frequently incorrect.)

This means that were Lichty to attempt to develop the land, he would need to seek a CDP from the CCC, after first obtaining all necessary discretionary approvals from the City.

BUT, CCC staff informs me that the "deferred certification" designation has been lifted from this area. CCC staff further informs me that their maps indicate the ENTIRE Lichty parcel is in "original jurisdiction," meaning that the State is prohibited from delegating permit authority to the City by virtue of certifying the City's LCP.

4/27/2008

**EXHIBIT H**

That certainly makes sense as to the wetlands. but not as to the uplands.

So I have asked CCC staff to make an inquiry of their mapping division in San Francisco.  I don't know when I'll hear back.

~nancy

NOTICE:  This e-mail may contain material that is confidential, privileged and/or attorney work product.  It is for the sole use of the intended recipient.  If you are not the intended recipient, please contact the sender, do not forward this message to anyone, and delete all copies of this message.  Any review, reliance or distribution by others without express permission is strictly prohibited.

EXPERT REPORT

OF

NORMAN C. ARNDT, PE

Opinions and Comments for use in
USA v. 14.30 Acres of Land (Lichty)
Case No. 07CV0886W-JMA

Prepared for:
Thomas C. Stahl, US Attorney
US Attorney's Office
Southern District of California
San Diego, California
April 25, 2008

**EXHIBIT 1**

1

Expert Report of Norman C. Arndt, PE

1. My name is Norman C. Arndt. I have been retained by the US Attorney's Office to testify on behalf of the plaintiff in the action entitled USA v. 14.30 Acres of Land (Lichty); Case No. 07CV0886W-JMA. I have been asked to provide opinions as they relate to providing access and certain services to the subject property.

2. My experience in the County of San Diego area includes the planning and engineering of land development projects and infrastructure projects spanning 37 years. My State of California Professional Engineering License (C-21693) was issued in 1972.

   I have been a design engineer in California since November 16, 1970. I worked at Rick Engineering Company from that time until August 1977. My role ranged from design engineer, to project engineer in the Corporate Office (San Diego), and office engineer of the Carlsbad Office. In 1977, I founded Manitou Engineering Company (MEC) in Escondido, California. In 1990, I sold my interests in MEC and became an owner and principal of Rick Engineering Company (REC); I was Principal in Charge of the Carlsbad Office. Because of a poor economy and close proximity to the San Diego office, we closed the Carlsbad office in March of 1993, and moved all personnel to the corporate office in San Diego. In the Corporate Office my duties (in addition to my VP duties) were as Principal in Charge of the Surveying and Mapping Division, an Engineering Design Section, the Planning Division and the Redevelopment Division.

   I retired from Rick Engineering Company on December 31, 2004 and signed a contract to perform "Of Counsel" duties. My role has been in Oversight of the Black Mountain Ranch project (now called Del Sur), Engineer of Work on the Via de la Valle street widening project, the El Camino Real/San Dieguito River Bridge project, the Carmel Valley Road improvement project, oversight of the Mission Gorge Technology Park Master Planning, and expert witness on various forensic engineering cases.

3. The documents and discussions that I have relied upon in forming the following opinions/comments/assumptions/limitations are from the DOJ, City of San Diego, USGS, and SANGIS documents showing the existing topography, property lines, FEMA flood information for the Tijuana River, City of San Diego Unit Price List (Bond Prices) dated December 2006, and construction cost bid estimates for similar infrastructure in the region in 2006; consultation with City of San Diego personnel; City of San Diego aerial photographs, Landis Corp aerial photographs; Dexter Wilson Engineering; The Feasibility Study prepared by TRS Consultants

2

dated January 28, 2008 inclusive of the expert reports contained within. I reserve the right to amend or expand my opinions if any additional documents become available.

4. I have not authored any publications within the last ten years.

5. Expert testimony at trial or by deposition over the last four years are as follows: Caltrans – Hall, Caltrans – Sweetwater, Caltrans – PS&R, Shea Homes – Callaghan, Caltrans – Amisra Bancorp, Caltrans – G3, Caltrans – Roll Ranch, Caltrans – Anderprises, Caltrans – Pacific Rim, Caltrans - Wright

6. Compensation to be paid for my work is as follows: $175.00 per hour – pre-deposition; $300.00 per hour at deposition; and $300.00 per hour per court appearance (half day minimum). My compensation is not contingent on the conclusions reached or ultimate resolution of the case.

April 25, 2008

REGISTERED PROFESSIONAL ENGINEER
NORMAN C. ARNDT
No. C21693
Exp. 9-30-07
CIVIL
STATE OF CALIFORNIA

EXHIBIT NO. 1

## ASSUMPTIONS AND LIMITATIONS FOR
## PRELIMINARY OPINION OF PROBABLE CONSTRUCTION COSTS

1. This is a preliminary opinion of probable construction costs (cost opinion) for the construction of certain onsite and offsite improvements for the Lichty property.

2. The Date of Value is May 16, 2007.

3. The costs contained herein (Exhibit No. 2) are intended to provide a guideline for typical costs to be anticipated in the pursuit of providing certain infrastructure to the site. While costs contained herein are our best opinions of construction costs, Public Agency fees and private industry fees, there are also other costs required to develop land which are not a part of this cost opinion.

4. Two (2) field reviews of the Lichty property were performed in preparing this preliminary cost opinion.

5. Public Agency fees were estimated based on project experience within the City of San Diego.

6. Private industry fees were estimated based on Rick Engineering Company experience and consultation with others in the industry.

7. Infrastructure assumptions used in preparing this cost opinion were as follows:

   a. Primary access to the subject property was assumed to be via existing Monument Road, from its connection at Hollister Street to the site, thence continuing up to the mesa (approximate length 14,000 lineal feet). The easterly 6,650 lineal feet (Section 1) of the access would utilize the existing pavement of Monument Road. The westerly 6,500 lineal feet (Section 2) of the access would be a new access road, following the alignment of Monument Road but raised above flood levels. The final 850 lineal feet (Section 3) would rise off the floor of the Tijuana River bed up to the mesa (of the subject property). See Access exhibit.

   b. It was assumed that Sections 2 and 3 of the access road would need to meet City of San Diego Fire Department criteria, ie. carry a 95,000 lb. Fire Truck and have an improved surface width of 20 feet as modified via discussions with the City.

   c. It was assumed that City of San Diego "Type J" paving would satisfy the 95,000 lb loading required by the Fire Department. No engineering was performed to analyze a graded section, nor a pavement structural section.

   d. It was assumed that the entire access road would need to be passable during a 100-year flood event. Observation of Section 1 led to an opinion that it could be marginally passable in its present state. This was assumed based on field observation, not a detailed hydraulic analysis.

e.  It was assumed that Section 2 of the access road would need to be graded to two (2) feet above the projected flood level of the Tijuana River in a 100-year event (roughly four (4) feet above the existing floodplain.

f.  It was assumed that Section 3 of the access road would need extensive grading and a retaining wall to reduce the steepness of the existing dirt access road to the mesa to meet Fire Department standards.  Per City of San Diego Fire Department standards, concrete paving is required for the portion of this section between 12% and 15%.

g.  It was assumed that removal and recompaction of one (1) foot of alluvium material underlying Section 2 and Section 3 of the access road would be sufficient to provide the support needed to carry said loads. The geotechnical analysis prepared for the Goat Canyon Enhancement Project supports this opinion. It was assumed that the cut material from Section 3 grading would offset the loss of the highly shrinkable alluvial material.

h.  Remediation of contaminated soils underlying the fill grading for Section 2 and Section 3 of the access road is not a part of this cost opinion. A Hazmat study was not performed.

i.  It was assumed that a reasonable source of adequate import material would be available for section 2 of the access road at the DOV, and would meet all City of San Diego requirements.

j.  It was assumed that the existing 12" AC waterline in Monument Road (near Smuggler Gulch) could be extended westerly to the subject property to provide potable water for residential and fire protection uses (see Water exhibit). The feasibility of this long extension providing adequate pressure and quantities needed was analyzed on a very preliminary basis. A water pressure of 150 psi was assumed at said connection point.

k.  Discussions with the City Fire Department Plans Officer led to the assumption that the City would require a fire hydrant and a fire sprinkler system to serve a future residence on the subject property.

l.  Removal of expansive materials in the area of future building pads was not a part this report.

m.  Dry utility service to the subject site was not engineered; costs included herein may not be fully inclusive.

n.  Private sewer system feasibility was not analyzed in this report.

8.  Hydraulic analysis assumptions used in this cost opinion were as follows:

a.  The basic hydraulic information used was promulgated from prior work performed in the Tijuana River Valley for various agencies.  Projects included, but not limited to, were the Goat Canyon Drainage Project and the Friendship Marsh Restoration Project.

b.  The topography that was utilized in the HEC-RAS model of the Tijuana River was created from City of San Diego digital terrain model data (DTM) collected in 1992 and updated with additional information.

c.  The hydraulic cross sections were originally created from the DTM by utilizing In-Roads and importing the cross-sectional data into HEC-2 and HEC-RAS for use in a sedimentation analysis of the Tijuana River utilizing FLUVIAL-12.

d. The 100-year flowrate (75,000 cfs) utilized for the hydraulic analysis was from the FEMA Study.

e. For the purposes of this cost opinion, the HEC-RAS model was revised for the Litchy property. Ineffective flow stations were added to account for the contraction/expansion occurring at the mouth of the Tijuana River and for the existing AmSod Berm(s).

f. Raising the access road to the subject property to two (2) feet above the projected flood levels essentially blocks storm flows coming from the south, and constrains the Tijuana River flows. Therefore a system of culverts was required to convey storm flows in both directions to allow for a balance that exists today.

g. The grading of Section 2 of the access road to 2' minimum above the estimated flood levels is a City of San Diego requirement. Please note that the proposal to raise Monument Road along the frontage of the Goat Canyon Enhancement Project was denied by the California Coastal Commission.

9. Offsite easements and/or R/W for grading and infrastructure purposes will be required from adjoining landowners to provide drainage and utility access to the subject property. This cost opinion does not include costs to obtain those items.

10. The cost opinion in Exhibit No. 2 does not include costs to obtain NPDES related approvals/permits such as the State Water Resources Control Board approval, the Municipal Storm Water Permit, the General Permit, a Storm Water Pollution Prevention Plan, a Water Pollution Control Plan, a Water Quality Technical Report, and a Monitoring Program.

11. The cost opinion in Exhibit No. 2 does not include costs for Environmental issues and remediation costs. Costs to obtain permits from the USF&WS, the CDF&G, and the COE are not included.

12. The Consultant has not performed rigorous preliminary engineering design for this cost opinion.

13. In providing an opinion of probable construction costs, the Consultant has no control over costs or the price of labor, equipment or materials, nor over a Contractor's method of pricing. The opinions of probable costs provided herein were made on the basis of the Consultant's research of unit prices for similar projects/improvements in the region and/or utilization of City Bond Prices. The Engineer makes no warranty, expressed or implied, as to the accuracy of such opinions as compared to actual bids or final costs that may have been obtained in the 2007 period.

14. This cost opinion is "bracketed," ie. Unit Prices used for "Cost 1" are predominantly from the current City of San Diego Unit Price List (Bond Prices). Unit Prices used for "Cost 2" are predominantly from actual 2007 bids on infrastructure in the region. It is our opinion that the construction costs would end up somewhere in-between Cost1 and Cost2, depending on the many factors beyond our control.

EXHIBIT 2

PRELIMINARY ESTIMATE [1] - CONSTRUCTION COSTS
Lichty Property - ACCESS ROAD STUDY
RICK ENGINEERING COMPANY

| | Quantity1 | Unit Price1 [2] | Cost1 | Quantity2 | Unit Price2 [3] | Cost2 |
|---|---|---|---|---|---|---|
| 1.0 Earthwork | | | | | | |
| Clear and grub | 304,800 | 0.45 | 137,160 | 304,800 | 0.05 | 15,240 |
| Grading (incl import) | 37,650 | 12.00 | 451,800 | 37,650 | 11.00 | 414,150 |
| R&R alluvium material | 11,300 | 6.50 | 73,450 | 11,300 | 7.00 | 79,100 |
| Mobilization | 1 | 0.00 | 0 | 1 | 25,000.00 | 25,000 |
| Erosion Control | | | | | | |
| silt fence | 12,700 | 1.60 | 20,320 | 12,700 | 2.25 | 28,575 |
| bonded fiber matrix | 114,300 | 0.30 | 34,290 | 114,300 | 0.27 | 30,861 |
| groundcover | 114,300 | 0.48 | 54,864 | 114,300 | 0.48 | 54,864 |
| slope irrigation - temp. | 114,300 | 0.59 | 66,866 | 114,300 | 0.90 | 102,870 |
| inlet protection (sediment) | 40 | 150.00 | 6,000 | 40 | 135.00 | 5,400 |
| Retaining Wall Onsite - keystone | 10,435 | 25.00 | 260,875 | 10,435 | 27.00 | 281,745 |
| lined ditch along top | 680 | 14.00 | 9,520 | 680 | 20.00 | 13,600 |
| | | | | | | |
| ST Earthwork | | | 1,115,145 | | | 1,051,405 |
| | | | | | | |
| 2.0 Driveway - Private Access Road | | | | | | |
| Pavement - Sch J | 144,150 | 5.00 | 720,750 | 144,150 | 4.25 | 612,638 |
| Pavement - 8" PCC | 5,000 | 6.50 | 32,500 | 5,000 | 6.80 | 34,000 |
| 3" AC Swale | 6,350 | 2.60 | 16,510 | 6,350 | 2.90 | 18,415 |
| BMP's - Bio Swale | 40 | 0.00 | 0 | 40 | 4,500.00 | 180,000 |
| Pulverize and Scarify exist. Pav't | 115,000 | 2.00 | 230,000 | 115,000 | 1.80 | 207,000 |
| | | | | | | |
| ST Driveway | | | 999,760 | | | 1,052,053 |
| | | | | | | |
| 3.0 Drainage | | | | | | |
| 24" RCP | 3,680 | 110.00 | 404,800 | 3,680 | 75.00 | 276,000 |
| Rural Inlets/outlets | 80 | 320.00 | 25,600 | 80 | 320.00 | 25,600 |
| Headwalls | 160 | 2,700.00 | 432,000 | 160 | 3,000.00 | 480,000 |
| Lined Ditch | 1,600 | 14.00 | 22,400 | 1,600 | 20.00 | 32,000 |
| | | | | | | |
| ST Drainage | | | 884,800 | | | 813,600 |
| | | | | | | |
| 4.0 Water - potable/fire | | | | | | |
| 10" PVC + appurts | 12,700 | 69.30 | 880,110 | 12,700 | 45.10 | 572,770 |
| 2" Service & Meter (house) | 1 | 2,866.00 | 2,866 | 1 | 2,500.00 | 2,500 |
| 2" Service & Meter (irrig) | 6 | 2,866.00 | 17,196 | 6 | 2,500.00 | 15,000 |
| FH | 1 | 3,500.00 | 3,500 | 1 | 3,500.00 | 3,500 |
| City Connection | 1 | 4,600.00 | 4,600 | 1 | 4,600.00 | 4,600 |
| | | | | | | |
| ST Water | | | 908,272 | | | 598,370 |
| | | | | | | |
| 4.0 Dry Utilities | | | | | | |
| Joint Trench | 6,350 | 34.50 | 219,075 | 6,350 | 45.00 | 285,750 |
| | | | | | | |
| 5.0 Professional Services | | | | | | |
| Geotechnical Engineer | 1 | LS | 18,000 | 1 | LS | 18,000 |
| geo construction observ | 1 | LS | 63,500 | 1 | LS | 63,500 |
| Civil Engineer Design | 1 | LS | 60,000 | 1 | LS | 60,000 |
| Construction Staking | 1 | LS | 60,000 | 1 | LS | 60,000 |
| | | | | | | |
| ST Professional Services | | | 201,500 | | | 201,500 |
| | | | | | | |
| 6.0 Public Agency Fee's | | | | | | |
| City Plan Check & Insp | | | 136,779 | | | 123,040 |
| | | | | | | |
| 5.0 TOTAL | | | 4,465,331 | | | 4,125,717 |
| | | | | | | |
| 6.0 TOTAL + Contingency | | 15% | $5,135,130 | | 15% | $4,744,575 |
| | | | | | | |
| 8.0 Assumptions and Limitations | | | | | | |
| 1.0 Preliminary Opinion of Probable Costs. | | | | | | |
| 2.0 City of San Diego Published Unit Bond Prices used for Range1. | | | | | | |
| 3.0 Unit Prices from 2007 bids on projects used for Range2. | | | | | | |
| 5.0 See Exhibit No. 1 for more detailed Assumptions & Limitations. | | | | | | |

1 of 1

 

**SCHIRMER ENGINEERING**

11770 Bernardo Plaza Court, Ste. 116
San Diego, CA 92128
Phone (858) 673-5845  Fax (858) 673-5849

Fire Protection ■ Code Consulting ■ Risk Control ■ Security Consulting

Via E-mail: *Quinton@quintonpetix.com*

May 29, 2008

Mr. Michael Quinton
Quinton & Petix
402 West Broadway, Suite 400
San Diego, California 92101
(619) 234-1113

Re:   U.S. vs. 14.3 Acres of Land, etc.
      Litigation Support Services
      San Diego, California
      SEC Project No.: 2008102-000

Dear Michael:

Schirmer Engineering has been retained to provide fire protection consulting services for the U.S. versus 14.3 Acres of Land case. The 14.3 acre Lichty property was taken under the federal eminent domain stipulation on May 16, 2007. Fire department access was the specific issue which was researched. This letter report presents a summary of the findings of this effort.

The site owned by the Lichty family consists of 14.3 acres of land located towards the western end of Monument Road in San Diego (See enclosed Location Map). The 14.3 acres is located adjacent to the U.S. southern border in California and also the Border Field State Park.

On May 16, 2007, the 2001 Edition of the California Building and Fire Codes (CBC and CFC respectively) were effective within the City of San Diego, as well as the State of California. Therefore, the 2001 CFC, and CBC, supplemented with City of San Diego policies, were used for this analysis.



**PICTURE 1: US BORDER FENCE AT PROPERTY HIGH POINT**

**EXHIBIT J**

U.S. vs. 14.3 Acres of Land                          2                          May 29, 2008
San Diego, California                                                 SEC Project No.: 2008102-000

The 14.3 acres consists of a mesa offering an ocean view to the northwest and a lowland area.
The mesa consists of 6.83 acres of Southern Coastal Bluff Scrub and Maritime Succulent
Scrub. Additional views include the Playas De Tijuana lighthouse and bullring. All views can be
seen from atop the mesa or the lowland area.



**PICTURE 2: OCEAN VIEW**

The lowland area consists of 3.53 acres of Southern Coastal Salt Marsh and 3.95 acres of
disturbed Southern Coastal Salt Marsh. This area is traversed by a flood zone.



**PICTURE 3: MESA AND LOWLAND FROM NORTHEAST**

U.S. vs. 14.3 Acres of Land                    3                          May 29, 2008
San Diego, California                                      SEC Project No.: 2008102-000

Multiple dirt roads exist from which the mesa is accessed by the owner and border patrol vehicles.  The disturbed dirt roads are also shown in the following pictures.



**PICTURE 4: DIRT ACCESS ROADS**

The dirt roads are approximately 12-16 feet in width and range in slope.  These roads total 0.35 acres in area.



**PICTURE 5: DIRT ACCESS ROADS**

U.S. vs. 14.3 Acres of Land
San Diego, California

4

May 29, 2008
SEC Project No.: 2008102-000



**PICTURE 6: DIRT ROAD SLOPES**



**PICTURE 7: BORDER ROAD**

U.S. vs. 14.3 Acres of Land
San Diego, California

5

May 29, 2008
SEC Project No.: 2008102-000

A paved road (Monument Road) skirts along the northern edge of the property. This road varies from approximately 40-115 feet to the property line. The road is part of Border Field State Park and leads to the parking lot at the coastal end of the park.



**PICTURE 8: MESA AND LOWLAND FROM WEST**

The land is fertile with shrubs, small trees and wildlife. Plans for the property prior to the U.S. acquisition were to build a single family residential occupancy (Group R-3) as defined by CBC Section 310 with an ocean view atop the mesa. See the enclosed Site Plan.



**PICTURE 9: SHRUBS AND TREES**

Monument Road ends at the Border Field State Park coastal parking lot and view point of the park. This road passes within 40 feet of the 14.3 acre property.



**PICTURE 10: BORDER FIELD STATE PARK ROAD**

There is no definition for fire apparatus access road or similar term in the 2001 CFC. However, 2007 CFC Section 502 defines a fire apparatus access road as "*a road that provides fire apparatus access from a fire station to a facility, building or portion thereof. This is a general term inclusive of all other terms such as fire lane, public street, private street, parking lot lane and access roadway.*"

CFC Section 902.1 requires fire apparatus access roads to be provided in accordance with CFC Sections 901 and 902. CFC Section 902.2.1 requires "*fire apparatus access roads shall be provided in accordance with Sections 901 and 902.2 for every facility, building or portion of a building hereafter constructed or moved into or within the jurisdiction when any portion of the facility or any portion of an exterior wall of the first story of the building is located more than 150 feet from fire apparatus access as measured by an approved route around the exterior of the building or facility.*"

However, there are three exceptions to this requirement which are germane to the situation at hand:

1. *When buildings are completely protected with an approved automatic fire sprinkler system, the provisions of Sections 902.2.1 and 902.2.2 may be modified by the chief.*

2. *When access roads cannot be installed due to location on property, topography, waterways, nonnegotiable grades or other similar conditions, the chief is authorized to require additional fire protection as specified in Section 1001.9.*

3. *When there are not more than two Group R, Division 3, or Group U Occupancies, the requirements of Sections 902.2.1 and 902.2.2 may be modified by the chief.*

As shown by these three exceptions, the fire department has discretion regarding the requirement for fire dept access roads especially regarding R-3 Occupancies as described in exception three. Alternate means such as a residential sprinkler system, on site water storage, or other means may be provided in lieu of fire department access roads.

The City of San Diego implements its own policies in addition to the adopted code requirements. These policies expand, clarify, or alter certain code sections as required. The policies that were

U.S. vs. 14.3 Acres of Land                7                          May 29, 2008
San Diego, California                                    SEC Project No.: 2008102-000

in effect at the time of the 14.3 acres seizure included FHPS Policy A-00-1, *"Fire Access Roadways,"* which is still in effect today. (See attached copy)

FHPS Policy A-00-1 Section IV states *"Buildings shall be accessible to emergency vehicle access. Access roadways shall not be less than 20 feet of unobstructed width, shall have an adequate roadway turning radius and shall have a minimum vertical clearance of 15 feet 6 inches. Access roads shall be extended to within 150 feet of all portions of the first story of the building served (as measured around the exterior of the building), and shall be installed with an all-weather driving surface. All access, including bridges, shall support the imposed load of fire apparatus to withstand a minimum 95,000 pound vehicle load."*

This City policy also has its own exceptions. Exception IV D states *"These access roadway requirements do not apply to Group U occupancies or to two or less Group R-3 occupancies located more than 150 feet from a public street or roadway."* Therefore, in accordance with the FHPS Policy A-00-1, a single family home on the 14.3 acre Lichty property was not required to be provided with fire apparatus access roadways.

In conclusion, a fire apparatus road was not required for a proposed single family home at the 14.3 acre property on May 16, 2007 in accordance with City of San Diego Policy FPHS A-00-1. In addition, alternative means of protection to fire apparatus access roads were available and could have been used in lieu of providing such roads, as stated in the 2001 CFC.


Submitted by:


SCHIRMER ENGINEERING CORPORATION


Garner A. Palenske, P.E.
Vice President/Regional Engineering Manager

AB:jm:kh

Enclosures      Location Map
                Site Plan
                San Diego Fire Department Policy FHPS A-00-1







**Site Plan**

☆ Potential Residence



### THE CITY OF SAN DIEGO

| FHPS POLICY A-00-1 | FIRE ACCESS ROADWAYS UFC 901.4.2 |
|---|---|

**I.  PURPOSE**

This policy clarifies Fire and Life Safety Services' access roadway requirements as outlined in UFC 901.4.2, and California Vehicle Code Section 22500.1.

**II.  SCOPE**

Fire access roadways for new and existing buildings are regulated by this policy.  Both public streets and private roadways fall under the scope of this policy.

**III.  PERMITS**

No permits are required.

**IV.  WHERE ROADWAYS ARE REQUIRED**

Buildings shall be accessible to emergency vehicle access.  Access roadways shall be not less than 20 feet of unobstructed width, shall have an adequate roadway turning radius and shall have a minimum vertical clearance of 15 feet 6 inches.  Access roads shall be extended to within 150 feet of all portions of the first story of the building served (as measured around the exterior of the building), and shall be installed with an all-weather driving surface.  All access, including bridges, shall support the imposed load of fire apparatus to withstand a minimum 95,000 pound vehicle load.

Exceptions:

A.   Proposed surfaces other than concrete or asphalt shall be designed and installed in accordance with FHPS Policy A-96-9.

B.   For buildings constructed prior to February 9, 1976, private roadway widths less than 20 feet may be permitted to remain.  The ability to conduct fire fighting operations will be the primary consideration in grandfathering these reduced roadway widths.



   C.   Bridges constructed prior to April 22, 1982 shall suffice as access if such bridge was built according to the building standards in effect at that time. If the bridge will not safely support the imposed load of fire apparatus, the Chief is authorized not to operate fire apparatus over such bridge.

   D.   These access roadway requirements do not apply to Group U occupancies or to two or less Group R-3 occupancies located more than 150 feet from a public street or roadway.

   E.   These requirements may be modified when authorized by the Chief. The Chief may require installation of a fire access roadway when circumstances warrant.

## V.  RED CURBS/NO PARKING SIGNS

The required width of access roadways shall not be obstructed in any manner, including the parking of vehicles. Where no space is provided for parking along access roadways, they shall be kept clear by the posting of signs or the painting of curbs as follows:

   A.   Owners or property representatives shall post the entrance to the required roadway with an approved sign. Sign shall read "NO PARKING FIRE LANE" in letters of 1" or greater in height. (see attached specification sheet). Signs shall be placed every 100 feet facing traffic at a height of 7 feet. Requests for placement variations, alternative sign designs, or omission of signs shall be submitted in writing and must be approved by the Plan Review Officer.

      Exception: Signs may be omitted on public streets.

   B.   All curbs that outline the access roadway shall be painted red. White 4 inch high letters reading "No Parking - Fire Lane" shall be stenciled every 30 feet on the red curb. If no curb is present, an 8 inch wide red stripe shall be painted on the pavement. The stripe shall be lettered the same as a curb.

      Exception: Red fire lane curbs on public streets do not require the white stenciled lettering.

   C.   Signs, red curbing, and white lettering shall be maintained to ensure visibility.

   NOTE:   Fire and Life Safety Services recommends that signs as well as red curbs with white lettering be provided.

FHPS Policy A-00-1
Page 2

VI.    *ADDITIONAL REQUIREMENTS (FOR NEW CONSTRUCTION)*

    A.   26 foot access roadway

        1.   When adjacent to buildings that are greater than 35 feet in height (measured from the road surface to the highest point on the roof), the access roadway shall have a minimum width of 26 feet. The location shall be 15 - 25 feet from the building and shall be positioned parallel to one entire side of the building.

        2.   When adjacent to a fire hydrant, access roadways shall be a minimum of 26 feet in width for 20 feet in either direction from the hydrant. (See attached specification sheet.)

        3.   Fire access roadway over 300 feet in length shall be 26 feet in width.

    B.   Turning radius

        A minimum 50 foot turning radius is required and shall be in accordance with the semi-trailer template detailed on the attached sheet. Inside measurement shall be according to California Truck Semi-Trailer Wheel Tracks. An additional two feet of width shall be provided to allow for clearance of apparatus bumper over-hang.

    C.   Maximum grades shall not exceed:

        1.   15% (6.75°) for concrete
        2.   12% (5.4°) for asphalt

    D.   Large buildings

        Buildings exceeding 100 feet in width and 600 feet in length shall have access roadways serving the two long sides of the building.

VII.   *NOTIFICATION OF PROPERTY OWNERS*

    A.   New Construction

        Fire access roadway requirements for new buildings are addressed during the plans review.

FHPS Policy A-00-1
Page 3

    B.    **Existing Buildings**
        1.    **On Private Streets**

            The Department will notify affected property owners when it is determined that a fire access roadway is required. The notice shall advise the property owners of their right to appeal to the Board of Appeals per Uniform Fire Code, Section 103.1.4. If an appeal takes place and is decided in favor of the City, or after 30 days if no appeal is requested, a Notice to Install Fire Lane will be issued to the property owner(s). The owner is responsible for the installation of signs and/or the painting of curbs and will be given fifteen (15) days to do so. If the owner does not comply within the given time frame, the Chief may order installation to be done by the City. The administrative and direct costs incurred will then be assessed to the property owners.

        2.    **On Public Streets**

            When it is determined that a public street needs to be designated as a fire access roadway, the Department will notify the affected property owners by mail. The Department's letter advises the property owners to address questions or appeals to Fire and Hazard Prevention Services. Once questions and appeals have been addressed or after 30 days if no appeals have been filed, the Department will contact the Traffic Engineering Division of the Public Works Business Center. A site meeting will be held between the Department and Traffic Engineering to clarify exactly which curbs are to be painted and where signs, if any, are to be placed. Traffic Engineering will issue the work order for the installation of signs and/or the painting of curbs to the Streets Division of the Public Works Business Center.

    C.    Copies of all correspondence between the Department and property owners shall be retained in Fire and Hazard Prevention Services' geographical files.

Promulgated by: _____ Date: _____

Rev. 4/12/2002



# THE CITY OF SAN DIEGO

June 20, 2008

Mr. Thomas C. Stahl
US Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101

SUBJECT:    DECLARATION OF FIRE DEPARTMENT REQUIREMENTS FOR
THE LICHTY PARCEL, APN 663-020-02

Dear Mr. Stahl,

I declare that the City of San Diego Fire Department standards for this parcel shall be used as follows. The assumption is that the property owner is considering building a residential structure on the site.

   a. City of San Diego Memorandum dated May 14, 1993 titled "Fire Access Structural Pavement Requirements" shall be applied to this property.

   b. City of San Diego FPB Policy (A-00-1) titled "Fire Access Roadways UFC 901.4.2" shall be applied to this property with the following amendments:

       1) Exception D. is not authorized, ie. circumstances warrant that a fire access roadway is required.

       2) Condition VI.A.3. is modified to allow reduction of the standard 26 foot paved surface width to a 20 foot paved surface width.

   c. City of San Diego Code allows for a 50% reduction in fire hydrant criteria for a single family residential structure if a sprinkler system is installed. Assuming an 8,000 sf structure this translates to a demand of 1,400 gpm (continuous), however the City has an absolute minimum criteria of 1,500 gpm (at 20 psi residual) which shall be followed.

R. D. Medan

R.D. Medan
Deputy Fire Marshal



**Development Services**
1222 First Avenue, MS 401 • San Diego, CA 92101-4154
Tel (619) 446-5252

**EXHIBIT K**

**Dann Mallec**

From:        Norm Arndt
Sent:        Monday, June 09, 2008 1:39 PM
To:          Dann Mallec
Subject:     lichty

Dann, do you know what Group M occupancies... or Group R-3 occupancies are?

---Norm

Norman C. Arndt, PE
"Of Counsel" to REC
ncarndt@rickengineering.com

RICK ENGINEERING COMPANY
5620 Friars Road, San Diego, CA - 92110
Tele:(619) 291-0707 <> Fax:(619) 291-4165
Cell (619) 540-3933
www.rickengineering.com

WARNING: The information provided via electronic media is not
guaranteed or warranted against any defects, including design,
calculation, data translation or transmission errors or omissions.

**EXHIBIT L**

**RICK** ENGINEERING COMPANY

RECEIVED
SAN DIEGO, CA

2008 JUN 23 P 3: 07

CIVIL DIVISION
U.S. ATTORNEY
DEPT. OF JUSTICE

June 20, 2008

Mr. Thomas C. Stahl
US Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, CA  92101

SUBJECT:    DRY UTILITIES INVESTIGATION FOR THE LICHTY PARCEL, APN
            663-020-02

Dear Mr. Stahl:

Enclosed please find two (2) copies of a report I commissioned for this case.  At the time my report was prepared, I followed normal protocol in preparing an initial preliminary opinion of probable costs for extending dry utilities to the site.  In the interest of providing the best available information for your use, I brought in Utility Specialists to augment my report after it was prepared.

Please note, that the attached estimate shows two columns.  Typically, it is run this way because the utility companies provide two options when first entering into a contract with a builder.  Sometimes, it's better for the builder to go into a "Refundable Option" format up front and get a bigger refund at the end.  This might work for someone who is spec-building for instance.  In the Lichty case, it's apparent that the builder would take the "Non-Refundable Option," ($120,435.00).

Additionally, please note that the Utility Specialists preliminary opinion of probable cost is lower that those costs I calculated by applying a unit price against the length of service extension.  This would have the net affect of lowering the average total costs in my report roughly 3%.  Please call if you have any questions.

Sincerely,

RICK ENGINEERING COMPANY

Norman C. Arndt, PE
"Of Counsel" to REC

Enclosures

**EXHIBIT M**



June 16, 2008

Norman C. Arndt, PE
Rick Engineering Company
5620 Friars Road
San Diego, CA 92110

Reference: Lichty Mesa Property – Analysis of PCG Preliminary Utility Report dated January 24, 2008.

Dear Norm:

Per your request we have reviewed the above referenced report in conjunction with our utility investigation of the Lichty Mesa Property.  As a part of our investigation we obtained utility information from San Diego Gas & Electric (SDG&E), AT&T, and Cox communications.  In addition we performed a site visit to visually confirm any above ground facilities.

The PCG report is accurate in most respects, however page two of the report appears to be misleading in its depiction of the existing SDG&E electric system.  The PCG report on page two, first paragraph, states that "SDG&E's system is a 3phase 12kv primary electric system, and AT&T's system is a minimum distribution system."   Based on our review of the SDG&E facility maps and a conversation with the SDG&E area planner, the SDG&E 3-phase system  terminates 2600 feet to the north of the Lichty property, and is only a single-phase system beyond that point going south (towards Lichty).  It is our understanding that a pump motor sized at a minimum of 150hp will be required on the property to provide water for fire control in accordance with the requirements set by the City of San Diego.  A pump motor of that size will require a 3-phase electric service.  The conduit and handholes on Monument Road passing by the Lichty property are sized to accommodate a 3-phase system, however the existing electric cable would need to be removed and replaced with larger 3-phase cable at the developers expense .

In Summary the PCG report fails to note the distance from the Licthy Mesa Property to a three-phase electric system.  While SDG&E can and would replace the single-phase system with a three-phase system they would do so at the developers expense.   The additional cost for extending this three-phase system is included in our opinion of probable cost

Sincerely
Utility Specialists Southwest, Inc.

Marty Peterson
Senior Project Specialists

# The Lichty Property

## Utility Opportunities and Constraints Report
### June 13, 2008

## Electric

San Diego Gas and Electric (SDG&E) is the local California regulated electric service company tasked with serving the project area. SDG&E would manage this project from their Century Park office located at 8315 Century Park Court, in San Diego, California. The Project Planner assigned to the project area is Brian Lawless.

### Existing Facilities

SDG&E owns and maintains an existing underground system (see attached Facility Maps) that runs along the north edge of Monument Road just north of the Lichty northerly property boundary. The existing underground system is composed of 1-4 inch conduit carrying a single-phase #2 aluminum conductor and spliced within concrete 3314 pullboxes. The nearest three-phase system ends at terminating enclosure D163332 (attached facility map sheet 138-1734) approximately 2600 feet northeast of Licthy Property northeast corner.

### Proposed Facilities

It is proposed that given the existing underground system along Monument Road that a Home on the Lichty Mesa would be served via 3-inch conduit placed in joint trench with a 4 inch telephone conduit. It is our understanding that at a minimum a 150hp pump will be required to meet water delivery/fire protection standards. A single 150hp pump creates a significant electric load and would require 3-phase power. In order to extend 3-phase power to the property SDG&E would need to remove the existing #2 single phase conductor and replace it with 2600 feet of #2 three phase conductor at the property owners expense. A 3-inch conduit would be extend approximately 900 feet from the existing 3314 handhole H1361373216, which lies 300 feet north of the Licthy Property boundary, to a new three-phase transformer on Lichty Mesa. A service conduit and cable would be extended from the transformer to an electric meter at the home, we've assumed an 80 foot service run.

### Electric Extension Requirements

SDG&E would extend electric facilities under the provision of CPUC Electric Extension Rule 16. Under these rules, the following conditions apply:

The Developer (Applicant) is responsible for: Establishing a clear unobstructed route; Providing trench, backfill, conduit, & substructures (pullboxes).

SDG&E is responsible cable, connectors, transformer.

The Developer would pay for the total cost of the system, including the 3-phase cable rearrangement, less any SDG&E applied allowance for home and pump.

## Telephone

AT&T is the local California regulated communication service company tasked with serving the project area. AT&T would manage this project from their Home Avenue Office located at 3750 Home Ave, San Diego, Ca. The Engineer assigned to the project area is Wendy Deford.

### Existing Facilities

AT&T owns and maintains an existing underground cable system along the north edge of Monument Road. The AT&T engineer for the area has confirmed that there are sufficient spare telephone pairs within the cable to serve the Lichty property.

### Proposed Facilities

It is proposed that given the existing underground telephone system along Monument Road the developer would place SDG&E electric and AT&T communication conduits in a common trench under Rule 16 of the telephone tariff. It is assumed that AT&T will require a four-inch conduit extended from their existing system to the proposed residence. Under this scenario the developer would supply the trench and AT&T would supply and pay for the conduit, cable, and connections.

## Cable Television

There are no cable television facilities near the project area and it is assumed that the low density of the project would not make this an attractive development for a cable television provider to provide service via conduit and cable. A satellite system for television could be used by the owner. AT&T does provide a dish (satellite) service for cable television. The cost for individual satellite systems is not a part of this report.

## Natural Gas

There are no natural gas facilities near the project area and it is assumed that the low density of the project would not make this an attractive development for a SDG&E, the gas provider. Gas extensions are expensive and in our opinion would not be a realistic option for this project. It is assumed that the owner would use LPG (Propane) for gas service. The cost for propane service is not a part of this report.

## Opinion of Probable Cost - Electric and Telephone

Our opinion of probable electric and telephone costs are provided on the attached preliminary cost estimate sheet.

Utility Specialists

Marty Peterson
Senior Project Specialists

**Utility Specialists**

## Preliminary Opinion of Probable Cost

Lichty Mesa Property

June 16, 2007

The following is an opinion of probable gas, electric, telephone, and CATV costs. Utility Specialists' opinion of probable costs is made on the basis of our experience and qualifications and represents our best judgement based on direction, plans, and information provided by the client. Utility Specialists, cannot and does not guarantee that proposals, bids or the construction costs will not vary from the opinions that we have prepared. This information is proprietary and not for distribution without the written consent of Utility Specialists.

|  |  | REFUNDABLE OPTION ESTIMATED COSTS | NON-REFUNDABLE OPTION ESTIMATED COSTS |
|---|---|---|---|
| **A.** | **ELECTRIC DISTRIBUTION SYSTEM    (UTILITY CHARGES)** | | |
| | 1.    Electric Deposit | $123,840 | $61,920 |
| | 2.    Tax on Value of Trench & Conduit | $9,100 | $9,100 |
| | 3.    Tax on Value of Substructures | $1,250 | $625 |
| | 4.    Electric Line Relocations & Removals | $0 | $0 |
| | 5.    Electric Conversion | $0 | $0 |
| | 6.    Right-of-Way Fees | $0 | $0 |
| | 7.    Excess Electric Service Cable/Service Delivery Point | $2,000 | $2,000 |
| **B.** | **GAS DISTRIBUTION SYSTEM    (UTILITY CHARGES)** | | |
| | 1.    Gas Deposit | $0 | $0 |
| | 2.    Gas/Fuel Line Relocations | $0 | $0 |
| | 3.    Excess Gas Service Pipe | $0 | $0 |
| **C.** | **TELEPHONE DISTRIBUTION SYSTEM    (UTILITY CHARGES)** | | |
| | 1.    Telephone Deposit | $7,210 | $7,210 |
| | 2.    Tax on Value of Customer Work | $0 | $0 |
| | 3.    Telephone Relocations | $0 | $0 |
| | 4.    Telephone Conversion | $0 | $0 |
| | 5.    Secondary M.P.O.E. | $0 | $0 |
| **D.** | **CATV DISTRIBUTION SYSTEM    (UTILITY CHARGES)** | | |
| | 1.    CATV Deposit | $0 | $0 |
| | 2.    CATV Relocations | $0 | $0 |
| | 3.    CATV Conversions | $0 | $0 |
| **E.** | **CONTRACTOR INSTALLATION COSTS** | | |
| | 1.    Trench, Backfill, Conduit & Substructure Installation | | |
| | -Mains | $39,580 | $39,580 |
| | -Services | $0 | $0 |
| | -Conversions | $0 | $0 |
| | 2.    Street Lights & Installation Cost | $0 | $0 |
| | 3.    Consulting Fees | $0 | $0 |
| **F.** | **TOTAL CAPITAL COST** | **$182,980** | **$120,435** |
| | | | |
| **G.** | **ESTIMATED REIMBURSEMENTS** | | |
| | 1.    Electric Facilities (given as a refund based on allowance) | | |
| | 2.    Gas Trench | | |
| | 3.    Telephone Trench, Conduit & Substructures | | |
| | 4.    CATV Facilities | | |
| **H.** | **ESTIMATED REFUNDS** | | |
| | 1.    Electric Deposit (refundable option only) | | N/A |
| | 2.    Gas Deposit (refundable option only) | | N/A |
| | 3.    Telephone Deposit | | |
| **I.** | **TOTAL REFUNDS AND REIMBURSEMENTS** | | |
| **J.** | **NET COST**- Total Cost Minus Estimated Refunds & Reimbursements | **$178,880** | **$116,335** |



June 27, 2008

Mr. Thomas C. Stahl
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101

SUBJECT:    LICHTY PROPERTY - SUPPLEMENTAL REPORT #1

Dear Mr. Stahl:

Subsequent to my expert report dated April 25, 2008, a question has arisen concerning full access to the subject property. That question would be, absent the City of San Diego Fire Department's requirement that the site be serviceable as explained in their June 20, 2008 letter, what other elements are known that would require full access on a continuous basis. It is my opinion that this is a health, safety, and welfare issue because the flood levels of the Tijuana River cover over the historic access to the subject property making it impassable. This is addressed in, but not limited to, the following areas:

1.  Title 14 of the California Administrative Code (Natural Resources) titled Fire Safe Road Regulations states that "Design and construction of developments shall provide for basic emergency access and perimeter wildfire protection measures. The standard measures noted . . . specify the minimums, whether public or private, provide for safe access for emergency wildland fire equipment and civilian evacuation concurrently, and provide for unobstructed traffic circulation during a wildfire emergency." In my opinion, this would require said access road to the subject property to be raised above the Tijuana River flood levels as shown in my expert report.

    Portions of Title 14 are attached.

2.  City of San Diego Municipal Code Section 62.0423 states that "Areas of special flood hazard within the City of San Diego are hereby established in accordance with the report entitled . . . published by the Federal Emergency Management Agency." The historic access road to the subject property is within Zone AE, mapped by FEMA and adopted as a Special Flood Hazard Area.

**EXHIBIT N**

Mr. Thomas C. Stahl
June 27, 2008
Page 2

Section 62.0423 also states that no person shall do or cause to be done, any work, development, or construction covered under this division within an area of special flood hazard without having first obtained a grading permit. The issuance of a grading permit must show that construction complies with the provisions for flood hazard reduction in Council Policy 600-14. In my opinion, this would require said access road to be raised above the Tijuana River flood levels as shown in my expert report.

Portions of Section 62.0423 (Public Works and Property) are attached.

3. City of San Diego Council Policy 600-14 states that "Development within areas of special flood hazard is unwise from a health, safety and general welfare standpoint." The Purpose & Intent section states "To promote the public health, safety and general welfare, and to minimize public and private losses due to flooding and flood condition . . ." In the Deviation section, it states that "the danger of life and property due to flooding or erosion damage" must be considered, along with "the safety of access to the property in time of flood for ordinary and emergency vehicles." In my opinion, this would require said access road to be raised above the Tijuana River flood levels as shown in my expert report.

Council Policy 600-14 is attached.

Given the concept that a safe access should be provided to a buildable lot, there are several factors that need to be considered for the subject property.

1. Measure 8 (Roadway Structures) of Title 14 states that all driveway, road, street and private lane roadway structures shall be constructed to carry at least the maximum load, i.e. fire equipment loads. This would require road improvements as shown in my expert report and parallels the requirements in said City Fire Department letter.

2. Measure 10 (Dead-End Roads) of Title 14 states that the maximum length of a dead-end road shall not exceed the cumulative length of 2,640 feet for parcels of 5 to 19.99 acres. The length of Monument road far exceeds this criteria, and secondary access is not available; no known solution.

3. City of San Diego Municipal Code Section 143.0145 addresses "Development Regulations for Special Flood Hazard Areas. Subarea (f) states that permanent structures and fill for permanent structures, road and other development are allowed if the development or fill will not significantly adversely affect existing sensitive biological resources on-site and off-site.

Portions of Section 143.0145 (Development Regulations for Special Flood Hazard Areas) are attached.

Mr. Thomas C. Stahl
June 27, 2008
Page 3

4. The City of San Diego Drainage Design Manual states under "Basic Policies" that adequate drainage designs for each project should provide for removal or runoff from the roadway. It also says that drainage designs shall not unduly affect the safe operation of traffic on the roadway and that design criteria for drainage should be selected to provide for safe operation of vehicular traffic. It is my opinion that the access route chosen in my expert report must be raised above the flood levels of the Tijuana River using traditional engineering criteria.

5. The American Association of State Highway and Transportation Officials (AASHTO) policy manual is the basis for most (if not all) of federal, state, and local road and drainage design. It states that "highway drainage facilities provide for carrying storm water across the right-of-way and from the road itself." The design is to secure as low a degree of risk of traffic interruption by flooding as is consistent with the importance of the road and it service requirements. Given the public concern for health, safety and welfare it is my opinion that the access route chosen in my expert report must be raised above the flood levels of the Tijuana River using traditional engineering criteria.

A portion of the AASHTO Policy Manual is attached.

In conclusion, it is clear that public policy requires that safe ingress and egress be provided to a developable site; that reasonable expectations to the buyer are that this is provided, or needs to be provided. It is my opinion that the Standard of Care to be applied by a licensed Professional Engineer in the County of San Diego dictates that a safe access in and out of a residential use site should be provided. In my opinion, the design model shown in my expert report is the most direct and cost effective for providing this level of service.

Please call if you have any questions.

Sincerely,

RICK ENGINEERING COMPANY

Norman C. Arndt
PE# 21693, Exp. 9/30/09
"Of Counsel" to Rick Engineering Company

NCA:na

Enclosures

1

2

3

4

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

5

6

7

8

9

10

11

12

13

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>14.30 ACRES OF LAND, more or less, situated in San Diego County, State of California; TIMOTHY LICHTY and SHERYL LEE LICHTY CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST DATED OCTOBER 24, 1991; AND OTHER INTERESTED PARTIES,<br><br>Defendants. | Civil No. 07 CV 00886-W (NLS)<br><br>CERTIFICATE OF SERVICE |

14          IT IS HEREBY CERTIFIED that:

15          I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 402 West Broadway, Suite 400, San Diego, CA 92101. I am not a party to the

16     above-entitled action. I have caused service of:

17     NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFF'S EXPERT REPORTS AND EXCLUDE RELATED TESTIMONY; MEMORANDUM OF POINTS AND AUTHORITIES IN

18     SUPPORT OF MOTION and DECLARATION OF MICHAEL E. QUINTON

19     on the following parties by electronically filing the foregoing with the Clerk of the District Court using the ECF System which electronically notifies them:

20

21     KAREN P. HEWITT
       UNITED STATES ATTORNEY
       Thomas C. Stahl, Esq.

22     Chief, Civil Division
       Attorneys for the Plaintiff

23     Office of the U.S. Attorney
       880 Front Street, Room 6293

24     San Diego CA  92101

25     I declare under penalty of perjury that the foregoing is true and correct.
       Executed on July 14, 2008, at San Diego, California.

26

27

28

_Michael E. Quinton_
MICHAEL E. QUINTON
Attorney for the Defendants
quinton@quintonpetix.com