1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,      )  Case No. 07CV0886-W(NLS)
                                  )
5           Plaintiff,            )  San Diego, California
                                  )
6  vs.                            )  Friday,
                                  )  August 22, 2008
7  14.30 ACRES OF LAND, et al.,   )  10:00 a.m.
                                  )
8           Defendants.           )
   _____)
9

10             TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE NITA L. STORMES
11             UNITED STATES MAGISTRATE JUDGE

12 APPEARANCES:

13 For the Plaintiff:          THOMAS C. STAHL, ESQ.
                               CHRISTOPHER B. LATHAM, ESQ.
14                             KATHERINE LIND PARKER, ESQ.
                               Assistant United States
15                              Attorney
                               880 Front Street
16                             San Diego, California 92101

17 For the Defendants:         MICHAEL E. QUINTON, ESQ.
                               Quinton & Petix
18                             402 West Broadway, Suite 400
                               San Diego, California 92101
19                             (619) 234-1113

20 Transcript Ordered by:      THOMAS C. STAHL, ESQ.

21 Transcriber:                Shonna D. Mowrer
                               Echo Reporting, Inc.
22                             6336 Greenwich Drive
                               Suite B
23                             San Diego, California  92122
                               (858) 453-7590
24

25 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

1

1   SAN DIEGO, CALIFORNIA  FRIDAY, AUGUST 22, 2008 10:00 AM

2                        --oOo--

3      (Call to order of the Court.)

4           THE CLERK:  Number 2 on calendar, Case Number

5   07CV0886-W-NLS, United States versus 14.30 Acres of Land on

6   for motion hearing.

7           THE COURT:  Good morning, everyone.  May I have

8   the appearances of counsel, please.

9           MR. QUINTON:  Yes.  Good morning, your Honor.

10  Michael Quinton, Quinton & Petix for the Defendants, Tim and

11  Sherry Lichty as the beneficiaries under the Lichty Family

12  Trust.  Mr. Lichty is also here.

13          THE COURT:  All right.  Thank you.  Welcome.

14          MR. QUINTON:  Thank you, your Honor.

15          MS. PARKER:  Good morning, your Honor.  Katherine

16  Parker on behalf of the United States.

17          MR. LATHAM:  And Christopher Latham on behalf of

18  the United States.  Good morning.

19          THE COURT:  Good morning.

20          MR. STAHL:  And Tom Stahl as well, your Honor.

21  Good morning.

22          THE COURT:  Good morning.

23          Ladies and gentlemen, I have had an opportunity to

24  read through the motion papers, which include the motion to

25  strike filed by the Defendants, the Plaintiff's opposition

2

1  and the Defendants' reply.  And I'll ask at this time

2  whether counsel have anything to add to their written

3  submissions, beginning with Mr. Quinton.

4           MR. QUINTON:  Nothing -- nothing substantive, your

5  Honor.  We just -- we brought this motion because we think

6  we need a clarification of the interpretation of Rule 26.

7  And if the -- we need to know which view the Court agrees

8  with and would further ask that the Court issue a written

9  opinion clarifying the conflict between the parties'

10 positions.

11          THE COURT:  Well, why don't you tell me what your

12 view is, Mr. Quinton.

13          MR. QUINTON:  Well, our view, your Honor, is that

14 there should be a presumption that the Court's CMC order

15 controls the discovery schedule.  We feel that the

16 supplemental reports that have been filed by the Government

17 are not, in fact, true supplemental reports.  They are new

18 reports with new opinions.  That's especially true in Mr.

19 Arnt's (phonetic) case.

20          Just by labeling them as supplemental opinions

21 doesn't make it so.  Whenever reports are produced after the

22 discovery deadline, there should be a presumption that it is

23 prejudicial to the opposition party.  The Court's schedule

24 is set up for an orderly progression of discovery.  The

25 schedule was certainly adequate to allow the parties time to

3

1 submit their reports.

2       The Government had a full 90 days from the time

3 they received the Defendants' reports until the time theirs

4 were due.  In Ms. Lucast's (phonetic) case, they did not

5 retain Ms. Lucast until, at the most, a couple of weeks

6 before the time when her report was due.  Not surprisingly,

7 she didn't have enough time to find the information she was

8 looking for.  Actually, she would have had enough time to

9 find the information she was looking for if she had looked

10 in the right place, but she, as she said, just made a phone

11 call.

12       We don't think that's adequate.  I think a good-

13 faith effort should be made by any party submitting an

14 expert report to prepare a complete expert report which in

15 fact will state the expert's opinion that the expert is

16 expected to give at trial.

17       To get back to Mr. Arnt, Mr. Arnt's reports are

18 simply new reports with new opinions.  In the case of his

19 so-called dry utilities study, when he submitted his first

20 report, he said that he --

21       THE COURT:  Can we back up?  I'm sorry to

22 interrupt you, but can we back up and let's go through

23 methodically each of these experts, beginning with Ms.

24 Lucast.  As I understand it, her original report was

25 submitted April 30th, and at that time, in pertinent part,

4

1 she said she assumed that the entire parcel lay within the

2 original jurisdiction of the State Coastal Commission.

3 However, she had requested some kind of clarification on

4 that issue signaling that she wasn't completely sure that

5 that was the case.

6       My understanding is that both counsel at different

7 times met with representatives of the Coastal Commission on

8 May 16, at which time both parties were apprised that, in

9 fact, the parcel does not lie within the original

10 jurisdiction of the Coastal Commission, but in fact lies

11 within the appellate jurisdiction of the Coastal Commission.

12       You wrote a letter to Mr. Stahl May 21 in which

13 you told Mr. Stahl that Ms. Lucast's report was incorrect,

14 and you gave him an opportunity to either withdraw Ms.

15 Lucast as an expert or to supply a new report from Ms.

16 Lucast, as it appears that her opinion was incorrect.

17       Mr. Stahl took the view that -- and you told him

18 there was a deadline for doing that of May 30th, May 30th

19 being the deadline for rebuttal information from experts.

20 Mr. Stahl took the opposite view and said, no, supplemental

21 information from Ms. Lucast would be governed by Rule

22 26(a)(2)(D) and that essentially the Government could have

23 up until the time of the pretrial disclosures to supplement

24 the report of Ms. Lucast.

25       Ms. Lucast did supply a supplemental report on

5

1  June 16 in which she admitted her error and said that yes, I

2  was wrong, it is appellate jurisdiction, not original

3  jurisdiction in the State Coastal Commission.

4          Mr. Stahl then forwarded her report -- or I

5  believe actually your expert got her report as of June 19,

6  and your expert being Mr. Schtedt (phonetic)?

7          MR. QUINTON:  Well, Mr. Schtedt is not a Coastal

8  Commission expert, your Honor.  He is a land development

9  consultant.

10          THE COURT:  Okay.  But in any event, Ms. Lucast's

11 report was provided to Mr. Schtedt June 19th, and his

12 deposition took place July 10.  And then Ms. Lucast was

13 deposed by you on July 25, at which time you did ask her

14 apparently at length -- although I do not have the

15 deposition transcript in front of me, you did ask her about

16 her supplemental report and her opinion regarding the

17 jurisdiction of the State Coastal Commission.

18          You have not retained an expert on jurisdictional

19 issues with regard to the Coastal Commission; is that right?

20          MR. QUINTON:  That's correct, your Honor.

21          THE COURT:  And there's no reason for you to do

22 that, as it now appears that both sides agree that Coastal

23 Commission jurisdiction lies only within the appellate

24 jurisdiction of the Coastal Commission and not within the

25 original jurisdiction, correct?

6

1          MR. QUINTON:  Well, that's correct, your Honor, up
2     to a point.

3          THE COURT:  Okay.

4          MR. QUINTON:  And the significant point is that
5     Ms. Lucast has now found that even though the Coastal
6     Commission only has appellate jurisdiction -- but that's
7     good enough -- they could still stop any development on the
8     property.

9          THE COURT:  And what expert do you have who can
10    rebut that position?

11         MR. QUINTON:  None, your Honor.  We didn't have
12    Ms. Lucast's supplemental report at the time we had to
13    designate our rebuttal experts, which was May 30th.

14         THE COURT:  So that would be the prejudice to the
15    Defendants in this case, is that now Ms. Lucast says the
16    State Coastal Commission only has appellate jurisdiction;
17    however, they do have jurisdiction to determine whether
18    certain kinds of development can take place on the property.
19    You have nobody to rebut that position.

20         MR. QUINTON:  That's correct, your Honor.  Ms.
21    Lucast's new opinion is, even though the Coastal Commission
22    only has appellate jurisdiction, someone would be certain to
23    file an appeal, and that appeal would most likely be --
24    well, in the first place, the appeal would delay any
25    development on the property.  And secondly, in her opinion,

7

1  the appeal would most likely be successful.

2          THE COURT:  And have you consulted previously with

3  an expert on Coastal Commission jurisdiction and appellate

4  issues?

5          MR. QUINTON:  I have not, your Honor.  Mr. Schtedt

6  apparently contacted some prospective Coastal Commission

7  experts in May when we were trying to find out what Ms.

8  Lucast's position might be when we were dealing only with

9  the first report.  But ultimately, Mr. Schtedt -- Mr.

10 Schtedt's opinion was that we did not need a Coastal

11 Commission expert.  However, that's not his decision.  It's

12 mine.

13         THE COURT:  And his opinion was based on the fact

14 that it appeared that both sides agree that the State

15 Coastal Commission's jurisdiction is appellate only, but he

16 didn't go beyond that point, which is that appellate

17 jurisdiction in itself was going to create a roadblock, for

18 lack of a better term, as far as development of the property

19 is concerned?

20         MR. QUINTON:  That's correct, your Honor.

21         THE COURT:  Okay.

22         MR. QUINTON:  I'm only stating Ms. Lucast's

23 position as her position.  I'm not saying that I agree with

24 it, that is, that appellate jurisdiction would be enough to

25 preclude any development of the property.

8

1          THE COURT:  But that is what she stated in her

2    deposition on July 25?

3          MR. QUINTON:  Yes, your Honor, and what she says

4    in her report.

5          THE COURT:  Okay.

6          MR. QUINTON:  I would like -- there's one

7    technicality that I would like to correct the Court on, and

8    that is counsel for the Government did not meet with the

9    Coastal Commission.  Ms. Lucast and one of their

10   consultants, Mr. Shake (phonetic), met with the Coastal

11   Commission the morning of May 16.

12         THE COURT:  Okay.  Thank you.

13         Let me ask -- because I do want to take this

14   seriatim as far as the experts are concerned.  I'd like to

15   ask for the Government's position with regard to Ms. Lucast

16   at this point in time.  And then, Mr. Quinton, I'm going to

17   ask you about Mr. Arnt and his reports.

18         MR. QUINTON:  Okay.  You don't want to hear the

19   rest of what I have to say about Ms. Lucast?

20         THE COURT:  Oh, you're not done.

21         MR. QUINTON:  Well, I think -- I just think it's

22   significant that Ms. Lucast should have found -- even if she

23   didn't find the information she should have had to give a

24   good-faith report by the April 30th deadline, she certainly

25   should have.

9

1          Our position is there should be a good reason why

2  someone could not submit a serious report within the Court's

3  deadline.  And I don't think Ms. Lucast did what she should

4  have done.  I don't think her due diligence meets the test

5  that should be applied by the Court.

6          As she said, she made a phone call, and she was

7  waiting for someone to call her back or waiting to get in

8  contact with the right person when she submitted her first

9  report saying that she's waiting to find out the rest of the

10  information.  The information was there for her to find if

11  she had looked.  And we think that that should be enough to

12  exclude her report.

13          THE COURT:  Now, just so I'm clear, you are

14  attempting to preclude her testimony as an expert in this

15  case altogether or you are simply attempting to strike her

16  supplemental report and any testimony relative to the

17  supplemental report?

18          MR. QUINTON:  I have to say, your Honor, after our

19  motion was filed, we had Ms. Lucast's deposition.  The

20  motion was filed July 14.  The deposition was July 25.

21  That's when we found out how little she had actually done to

22  prepare her first report.  So I have to say our position has

23  changed, and that is yes, now we do think her entire

24  testimony should be stricken, including her first report.

25          For all practical purposes, her first report is

10

1  not of any consequence anyway.  If her second report is

2  stricken, her first report is simply, everyone agrees, not

3  valid.  So the effect is the same.  But it's our position,

4  since we took her deposition and found out that she had not

5  checked the Coastal Commission's website for the information

6  that she needed to find whether or not this property was

7  subject to original jurisdiction by the Coastal Commission,

8  that that is unacceptable.  That's not an acceptable amount

9  of research with which to prepare an expert report in good

10 faith.

11      And we think an expert report should be a good-

12 faith attempt to state the expert's opinion that's going to

13 be expressed at trial.  That's the whole purpose of it.  And

14 we don't think Ms. Lucast did that.

15      THE COURT:  All right.  Thank you.

16      MR. QUINTON:  Thank you, your Honor.

17      THE COURT:  May I hear from Plaintiff's counsel.

18      MS. PARKER:  Yes, your Honor.  I'd like to first

19 address the suggestion that Ms. Lucast's preparation was

20 incomplete or improper in this case.  And this is the first

21 we've heard that Defendants are moving to strike all of Ms.

22 Lucast's testimony or challenging her entire -- all of her

23 opinions in this case.

24      I do have a full copy of Ms. Lucast's deposition

25 transcript if you'd like it.  At her deposition, she

11

1  explained that in her process of determining -- attempting

2  to determine the jurisdiction of the Coastal Commission

3  prior to submitting her initial report, she had a telephone

4  conversation with Lee McGeckern (phonetic), who is the chief

5  of the regulatory program for the Coastal Commission's San

6  Diego district office.

7              Mr. McGeckern told her that the Lichty property

8  was within the original jurisdiction of the Coastal

9  Commission, and she based her report on that telephone

10 conversation.  This isn't someone who's just making a guess

11 or just going out on a limb in making her determination.

12 This is what she was told by the Coastal Commission.

13             And she took it upon herself to say, wait a

14 second, let's clarify this.  I need a mapping opinion from

15 the San Francisco Mapping Division of the Coastal

16 Commission.  And that's what she was unable to obtain prior

17 to the submission of her first report.

18             She did conduct her research and she did go

19 directly to the source, to the Coastal Commission, before

20 submitting her initial report.  And if your Honor would like

21 a copy of her deposition transcript, I can provide that.

22 It's on pages 34 and 36 of her transcript where she

23 discusses the research that she did prior to submitting her

24 initial report.

25             I'd also like to address whether the report is a

12

1  supplemental report or not.  Rule 26(e) addresses that and

2  requires supplementation when any disclosure, including an

3  expert report, is either inaccurate or is incomplete -- is

4  incomplete or incorrect.  That was the case with Ms.

5  Lucast's initial report.  It was incorrect, and she

6  acknowledged that error and made that change through her

7  second report.

8          It's therefore a clear supplementation, which was

9  within the time line provided in the CMC governing this case

10 under which it could have been provided on the date of

11 pretrial disclosures, but it was provided, in fact, five

12 weeks before her deposition.

13         Now, in terms of the prejudice that counsel claims

14 regarding the timing of her report and the inability to hire

15 an expert.  The Defendants were aware as of April 30th that

16 the Government was designating an expert on Coastal

17 Commission issues and that that expert was Nancy Lucast.

18 And we've cited the deposition testimony of Mr. Schtedt in

19 which he explains that -- he went through the process of

20 listing some potential Coastal Commission experts and then

21 determined not to hire one.

22         And therefore, the Government's position is there

23 simply is no prejudice from the delay in Ms. Lucast

24 providing her final opinion on the jurisdiction of the

25 Coastal Commission.

13

1          THE COURT:  All right.  Mr. Quinton, let's talk

2     about your -- the Government's civil engineer, Mr. Arnt.

3          MR. QUINTON:  Yes, your Honor.  Mr. Arnt -- in Mr.

4     Arnt's case, he submitted an initial report dated April 25.

5     We received it on April 30th.  And in this report, he gives

6     a rather detailed analysis of the costs of building a road

7     for fire access to the property.

8          The assumption was that it was to be built two

9     feet above the flood plain and therefore would require that

10    the road be either improved or rebuilt, depending on how you

11    look at it, and also that it would be necessary to install a

12    10-inch water line or water main to the property for

13    firefighting purposes.

14          Mr. Arnt's first report, that is, the April 25

15    report, was then supplemented with a later report, a so-

16    called dry utilities report.  In his first report, Mr. Arnt

17    said that he did not engineer the dry utilities.  I think in

18    my reply brief I said he did not consider them.  That's not

19    exactly correct.  What he said was he did not engineer them,

20    and therefore his estimate that he gave in his first report

21    was not an engineering estimate.  It was just an estimate.

22          In his deposition, as far as the dry utilities

23    report goes, Mr. Arnt -- I asked Mr. Arnt why he didn't

24    submit that report with his original report.  He said that

25    he simply didn't have the time, that he -- after the April

14

1  30th -- or after the April 25 report went in, he then went

2  out and hired someone to do the engineering for the dry

3  utilities, and then he came up with this estimate for --

4  which is the dry utilities report.

5          His testimony in the deposition was that he didn't

6  understand that the April 30th deadline was a Court-imposed

7  deadline, and therefore his report was just plain late.  I

8  don't think there's any basis to say that that is a

9  supplemental report.  The Government again, I will say, had

10  from January 29, 2008 to April 30th, 2008 to come up with

11  these reports.  I don't know when Mr. Arnt started on this

12  dry utilities estimate, but his testimony was that he just

13  couldn't get it done in time.  That's not acceptable.  He

14  has to have -- his reports should be in on the Court-imposed

15  deadline.

16          With respect to the so-called supplemental report

17  number one, which tends to imply there may be others in the

18  works, we would say that that report likewise is just plain

19  late.  In the deposition of Mr. Roach (phonetic), Mr. Roach

20  was asked, do you know of any reason other than the fire

21  department regulations that would require this access road

22  to be improved.  Mr. Roach said, well, other than general

23  health and safety, no, I don't.

24          Three days later, we get a report from Mr. Arnt

25  saying general health and safety considerations require that

15

1 the road would need to be improved.  And in his report, he

2 said a question has arisen as to whether or not, absent the

3 fire department regulations, the road would need to be

4 improved.  I mean, that's -- it couldn't be any plainer.

5 Mr. Arnt's report was simply responding to an issue that had

6 been raised in Mr. Roach's deposition.

7          THE COURT:  Mr. Roach is?

8          MR. QUINTON:  Mr. Roach -- I'm sorry.  He's the

9 Government's appraiser, your Honor.

10          THE COURT:  Okay.  And when was he deposed?

11          MR. QUINTON:  He was deposed on June 24.

12          THE COURT:  Okay.

13          MR. QUINTON:  And Mr. Arnt's supplemental report

14 number one is dated June 27 and specifically references the

15 question that was asked of Mr. Roach in his deposition.

16          I think that it's very clear, at least to me, that

17 the stimulus for the production of supplemental report

18 number one was the issue that was raised in Mr. Roach's

19 report, which had not heretofore been raised -- had not been

20 addressed by Mr. Arnt.

21          THE COURT:  Okay.  I'm a little confused.  I

22 understood that Mr. Arnt's original report dated April 25,

23 2008 talked about the Fire Code requirements and the

24 requirement that the road be improved based on fire access

25 as well as addressing the dry utilities, and basically his

16

1 opinion would be that it would cost somewhere in the

2 neighborhood of 219,000 to 285,000 to put -- to extend dry

3 utilities to the property.

4        And the first supplemental report I understood

5 that came from Mr. Arnt revised downward the cost of the dry

6 utilities somewhere in the neighborhood of half what was

7 originally opined by Mr. Arnt.  I thought that the second

8 supplemental report discussed the health and safety

9 requirements and improvement of the road for those purposes,

10 not the first supplemental report.  Maybe I'm incorrect

11 about that, but I --

12        MR. QUINTON:  Well, if I may clarify, your Honor.

13 The second supplemental report is labeled "Supplemental

14 Report Number One."  That's the June 27 supplemental report.

15 The first supplemental report doesn't have a number on it.

16 It's just the dry utilities report.

17        THE COURT:  Okay.  Okay.

18        MR. QUINTON:  What is different about the first --

19 the dry utilities report is in that report Mr. Arnt opines

20 that it would be necessary to extend a three-phase

21 electrical line to the property for firefighting -- again,

22 for firefighting purposes because, in his opinion or the

23 opinion of someone with whom he consulted, it would be

24 necessary to have a pump which would require three-phase

25 electrical power.

17

1            And a big part of the dry utilities estimate was

2  extending that three-phase electrical line some -- I don't

3  remember the exact distance.  But the electrical utilities

4  are available at the property, within 20 feet of the

5  property line.  There's no reason to extend electrical

6  utilities to the property, except in his supplemental --

7  well, in his June 20th supplemental report, that is, the dry

8  utilities supplemental report, Mr. Arnt found a necessity to

9  extend a three-phase electrical line which is not located at

10 the property.  That's what's different.

11            THE COURT:  Okay.

12            MR. QUINTON:  That's the new wrinkle in his --

13            THE COURT:  I see.

14            MR. QUINTON:  -- in his dry utilities report.

15            THE COURT:  Okay.  But --

16            MR. QUINTON:  I didn't go into that kind of detail

17 in my motion.

18            THE COURT:  Yeah.  But Mr. Polansky, who is the

19 Defense expert in this case, is a fire engineer.

20            MR. QUINTON:  Fire protection engineer, yes, your

21 Honor.

22            THE COURT:  Right.  So you have an expert who can

23 rebut the opinions of Mr. Arnt from his June 20 dry

24 utilities report with regard to the need for a three-phase

25 electrical outlet at the property, do you not?

18

1          MR. QUINTON:  Well, it just so happens that we do,

2   your Honor, but --

3          THE COURT:  Okay.

4          MR. QUINTON:  Mr. Polansky's report went in on May

5   30th.  Mr. Arnt's report came in after that.  It's our

6   position in this case and the entire reason we brought the

7   motion, your Honor, that it's inherently prejudicial when

8   reports are not submitted on time.  The sequence of

9   production of the reports is that it is necessarily

10  prejudicial to the party who is victimized by late expert

11  reports, whether or not they can address them at trial or

12  later or at some other time.

13         THE COURT:  Okay.  But tell me how you are

14  victimized or your client is victimized by Mr. Arnt's -- and

15  I'm just referring now to the dry utilities report of June

16  20.  How is your client prejudiced, given the fact that you

17  have the testimony of Mr. Polansky, who is no doubt going to

18  rebut the testimony of Mr. Arnt that there's any need for a

19  three-phase electrical outlet to be extended at the

20  property.  So where is the victimization or the prejudice to

21  your client?

22         MR. QUINTON:  That we have to deal with it, your

23  Honor.  We shouldn't have to deal with it.

24         THE COURT:  Okay.  Let's then move to the June 27

25  second -- I'm going to call it the -- all right.  Just so

19

1 everybody is on the same page, I will call it the first

2 supplemental report because that's what it's denominated by

3 Mr. Arnt.

4          My understanding is that that first supplemental

5 report was received by Defense counsel four days before Mr.

6 Arnt's deposition.

7          MR. QUINTON:  Well, in point of fact, your Honor,

8 it was delivered to my office late on Friday afternoon.  I

9 was not in the office.  It was received on -- by me on

10 Monday, the day before Mr. Arnt's deposition.

11          THE COURT:  Okay.

12          MR. QUINTON:  Either way, I think producing a

13 report late on Friday for an expert who's going to be

14 deposed on Tuesday is not adequate notice, is not an

15 adequate amount of time to consult with consultants or

16 experts or to read the report.

17          There were other items produced at the same time,

18 I might add.  But I do not think that there was any reason

19 why Mr. Arnt could not have produced that report within the

20 original period of time if he had anticipated the issue that

21 was raised.  I don't think there is a license on the part of

22 the Government to submit unlimited expert reports and call

23 them supplemental reports whenever a new issue comes up that

24 they didn't anticipate.

25          THE COURT:  Okay.  And the new issue again is the

20

1  health, safety and welfare reasons for requiring improvement

2  of the road as opposed to the fire access reasons for

3  requiring improvement of the road; is that accurate?

4              MR. QUINTON:  Yes, your Honor, that's correct.

5              THE COURT:  Okay.

6              MR. QUINTON:  The first report was based entirely

7  on the requirements that the San Diego Fire Department might

8  put on -- might put on a property owner of Lichty Mesa or

9  the subject property --

10             THE COURT:  Okay.  And this --

11             MR. QUINTON:  -- in order to build or get a

12  development permit on the property.

13             THE COURT:  Okay.  And these new reasons, at least

14  from your perspective, followed Mr. Roach's deposition in

15  time?

16             MR. QUINTON:  Yes.

17             THE COURT:  Okay.  And it's your belief that it

18  was Mr. Roach's deposition testimony which triggered this

19  new report from Mr. Arnt citing health, safety and welfare

20  issues as requiring improvement for the road separate and

21  apart from the Fire Code access requirements?

22             MR. QUINTON:  Yes, your Honor.  Mr. Roach's

23  response and my questioning on that point.  And I might add,

24  your Honor, since -- to inject some reality into the

25  proceedings, since all of this, Mr. Medan's (phonetic)

21

1  deposition has been taken, and the fire access road

2  requirements are completely out the window now.  The San

3  Diego Fire Department has absolutely no authority to require

4  an owner of the subject property to do anything to the road.

5  So Mr. Arnt's second report would now become the entire

6  rationale for requiring the property owner to improve the

7  road.

8           THE COURT:  Okay.  And we'll get to Mr. Medan in a

9  minute, but do you have --

10          MR. QUINTON:  If I may say, your Honor, my motion

11  about Mr. Medan's letter is now moot.  His deposition

12  testimony has mooted everything about the letters and

13  anything that he might have said to anyone before or after

14  his deposition was taken.

15          THE COURT:  Okay.  So the whole issue about the

16  exemption to the Fire Code requirements is now mooted by his

17  testimony at his deposition that the Fire Department has no

18  jurisdiction to require them to do anything with regard to

19  fire access to the property?

20          MR. QUINTON:  That's correct, your Honor.  The

21  Government may disagree with that, but that's my view of it.

22          THE COURT:  Okay.  So tell me this, Mr. Quinton.

23  Do the Defendants have an expert who can address the health,

24  safety and welfare issues that were raised by Mr. Arnt in

25  the June 27 report?

22

1          MR. QUINTON:  Of course we do, your Honor.  But
2  that's not the point.

3          THE COURT:  Who is that expert?

4          MR. QUINTON:  That would be Mr. Chang.

5          THE COURT:  Mr. Chang.  He's the water
6  hydrologist?

7          MR. QUINTON:  He's the surface hydrologist, the
8  flood expert, yes, your Honor.

9          THE COURT:  He's the flood guy.

10          MR. QUINTON:  Right, your Honor.

11          THE COURT:  Mr. Wayne Chang.

12          MR. QUINTON:  Yes, your Honor.

13          THE COURT:  The flood guy.  Okay.  So he can
14  address those issues.  All right.

15          And I appreciate and understand the distinction
16  that you're making.  The distinction, as I understand it, is
17  it doesn't matter whether or not you have an expert that can
18  address those issues.  It's not fair, essentially, and it's
19  not in compliance with the Rules for the Government to file
20  late reports and denominate them supplemental reports.

21          MR. QUINTON:  And to require us to address those
22  issues, your Honor.

23          THE COURT:  Okay.

24          MR. QUINTON:  Now, prudence requires that we had
25  to prepare to address those issues.  However, I don't think

23

1  we should be required to.

2          THE COURT:  Okay.  So let me -- if you have

3  nothing else to add at this point, I would like to ask the

4  Government to respond first to the question of Mr. Arnt's

5  supplemental reports and also let me know whether they agree

6  with your position with regard to Mr. Medan.

7          MR. QUINTON:  Yes, your Honor.  Thank you, your

8  Honor.

9          THE COURT:  You're welcome.

10         Ms. Parker.

11         MS. PARKER:  Thank you, your Honor.  I will begin

12  with the first in time of Mr. Arnt's supplemental report,

13  which was the report dealing with dry utilities.

14         THE COURT:  Okay.

15         MS. PARKER:  The issue of dry utilities was

16  addressed in Mr. Arnt's initial report.  He provided an

17  estimate of those costs and then revised that estimate based

18  on the study that he commissioned from utility specialists.

19         And as pointed out in the papers, he lowered --

20  nearly cut in half his overall estimate regarding the cost

21  of extending dry utilities to the property.  There was

22  inaccuracy in the estimate, and he changed his estimate.

23  And it falls within the -- what would be called a

24  supplemental report because he was correcting an inaccuracy.

25         And in addition, the lowering of the estimate is

24

1   to the benefit rather than the prejudice of the Defendants.

2   And further, there would be no reason to exclude that

3   opinion.

4           I'd like to address just in general the position

5   that because any of these reports were late or were not

6   filed on time that that is inherently prejudicial.  And it's

7   simply not the law.  There's no case law presuming

8   prejudice, and the Federal Rules don't provide for a

9   sanction of automatic exclusion.

10          The Rules, in fact, recognize and the Ninth

11  Circuit has recognized this Court's discretion in

12  considering these issues.  Rule 37(c)(1) builds into it the

13  provision that if -- and this is presuming that these

14  reports are not supplemental reports, that they're, quote,

15  untimely reports.  Rule 37(c)(1) has built into it the

16  provision that if a disclosure is harmless, that there's no

17  basis to exclude it.

18          And the Ninth Circuit's five-factor test applying

19  Rule 37, which is quoted at page four of our opposition,

20  sets forth five different factors that the Court should

21  consider before even looking at exclusion and doesn't

22  mention inherent prejudice and doesn't say that there's an

23  automatic exclusion.

24          One of the factors is the risk of prejudice, and

25  another factor is the public policy of disposing of cases on

25

1 their merits and the availability of less drastic sanctions.

2 All of these factors counsel in favor of not excluding any

3 of the opinions in this case.

4          And that brings me to the report from Mr. Arnt

5 that was titled number one but that did come second in time.

6 That was the report regarding health, safety and welfare.

7 Mr. Quinton is correct that this report was prompted by

8 questions that he asked at Mr. Roach's deposition.  At that

9 deposition, Mr. Quinton was questioning Mr. Roach, who is

10 the Government's appraiser, about Mr. Arnt's report.  He was

11 showing him Mr. Arnt's report and asking him questions and

12 asking -- and I believe it's quoted in the reply -- are you

13 aware of any other regulations.

14          Mr. Arnt logically figured that these were

15 questions he would be asked at his deposition the following

16 week.  It was essentially providing his responses to those

17 questions in writing in advance.

18          This case has been -- and I think with most cases,

19 there's been a dialogue among the experts, among the experts

20 on each side of the case and across the case between the

21 experts on these various issues.  And the experts' thinking

22 has evolved, and that's made clear in the depositions of

23 both the Defense experts and the Government's experts that

24 there's been an evolution of the issues that are raised and

25 the positions that have been taken.  And that report was

26

1  part of that process.

2          There was no intent to be tricky, no intent to lay

3  in wait and then spring opinions at a late date without any

4  opportunity for the Defense to address them.  And as Mr.

5  Quinton pointed out, he does have experts to address these

6  issues.  And therefore, that goes to the prejudice and the

7  fact that there just is no prejudice.

8          This isn't a case like the cases cited in the

9  motion where reports came out long after discovery had

10  closed, long after depositions had been taken or experts are

11  completely changing their theory of the case.  That just

12  isn't what's happening here.

13          So looking at the rules regarding what is a

14  supplement and the rules regarding, even if something isn't

15  a supplemental, when would you exclude it, under that case

16  law, we have opinions that were provided in the interest of

17  full disclosure and are not prejudicial.  And therefore,

18  there's no basis to exclude them.

19          I did want to address Mr. Medan's deposition.  At

20  his deposition, Mr. Medan testified that the -- the City,

21  the Fire Department would not have jurisdiction over roads

22  outside of the Lichty property, but it would have

23  jurisdiction over the property itself, and it would require

24  that the City's fire access requirements be satisfied on the

25  property, which is a portion of what's at issue here.  So we

27

1  disagree that the deposition completely mooted the issue of

2  fire access requirements.

3           THE COURT:  All right.  So Mr. Medan is going to

4  testify that a fire access road is required?

5           MS. PARKER:  On the property.

6           THE COURT:  On the property.

7           MS. PARKER:  Yes.

8           THE COURT:  And Mr. Quinton, you took the position

9  that Mr. Medan was not of that opinion, correct?

10          MR. QUINTON:  Well, your Honor, what counsel says

11 is correct.  Mr. Medan says and the fire regulations do

12 require a fire access road on the property.

13          THE COURT:  Yeah.

14          MR. QUINTON:  The difference between our position

15 and Mr. Arnt's position, however, is that Mr. Arnt posits

16 access to the property from the east side, which would

17 require the construction of a very long, very expensive

18 driveway up to the property at a cost of hundreds of

19 thousands, if not million of dollars.

20          Our access point is from the other side, that is,

21 on the west side, which would require a, quote, fire access

22 road only from the western boundary of the property, which

23 is at a level -- which is even with the level part of the

24 mesa top and would be a minimal expense.  It would be a

25 driveway of perhaps 50 to 100 feet long and to whatever

28

1  requirements the Fire Department might require.

2          THE COURT:  Okay.  So Mr. Medan is essentially

3  going to testify that a fire access road is required, but he

4  isn't going to say where that road has to be?

5          MR. QUINTON:  No.

6          THE COURT:  Okay.

7          MR. QUINTON:  He has nothing to say about that,

8  your Honor.

9          THE COURT:  And you don't care --

10         MR. QUINTON:  No, we don't care.

11         THE COURT:  -- about that, and neither do you.

12 Okay.

13         MR. QUINTON:  Well, except Mr. Arnt seems to

14 think -- well, he has given the opinion that the access to

15 the property would have to be from the east side because

16 that's what he's engineered.  That's the very elaborate,

17 quote, access road that he has posited as, I believe,

18 Section Number 3 within his report.

19         But our access to the property and the preferred

20 access to the property is from the west side.  It requires

21 no changes to anything except perhaps paving an existing

22 dirt road on the property.

23         THE COURT:  Okay.  But Mr. Arnt's testimony in

24 that regard would be based upon his original report plus the

25 information provided by Mr. Medan, would it not?  Because it

29

1  has to do with the fire access requirements and not with the

2  health, safety and welfare requirements.

3          MR. QUINTON:  Well, your Honor, it would be our

4  position that there is absolutely no reason to approach this

5  property from the east side as Mr. Arnt has engineered the

6  road.  There is absolutely no reason.  The access to the

7  property -- the best access to the property is from the west

8  side of the property which uses existing roads to get up to

9  the property.  And the only requirement that the Fire

10  Department would make is that you have to have a driveway on

11  the top of the property, which would be no more than a few

12  hundred feet, 100 feet at most.

13          THE COURT:  Okay.  So you have no problem with Mr.

14  Medan's proposed testimony regarding fire access

15  requirements to the property?

16          MR. QUINTON:  No, absolutely not, your Honor.

17          THE COURT:  Okay.  All right.

18          MR. QUINTON:  Mr. Arnt is the one that has the

19  problem here.

20          THE COURT:  Okay.  Mr. Quinton, do you have

21  anything further that you would like to add to what we've

22  discussed this morning?

23          MR. QUINTON:  If the Court has heard all it wants

24  to hear on this, I would like to ask the Court to re-examine

25  the schedule that has been set and perhaps reschedule some

30

1  of the matters that are presently on the Court's calendar.

2          THE COURT:  Well, before we get to that, let me

3  just make sure I understand that -- with regard to Mr. Arnt,

4  are you moving to strike his entire testimony as an expert

5  or only testimony based on his June 27 report that deals

6  with health, safety and welfare issues?

7          MR. QUINTON:  Well, his -- the motion is to

8  exclude his late reports and the testimony relating to them,

9  your Honor.  That is the dry utilities report insofar as he

10 posits a requirement for extension of a three-phase

11 electrical line.  We think that's a new requirement that

12 is -- that was brought up for the first time in his dry

13 utilities report and the so-called supplemental report

14 number one, which is actually a second late report which was

15 dated June 27, 2008.

16         THE COURT:  Okay.

17         MR. QUINTON:  We did not make a motion to exclude

18 his first report based upon the Fire Department questions.

19 We did not have Mr. Medan's deposition until July 31.

20         THE COURT:  Okay.  Anything further from the

21 Government?

22         MS. PARKER:  I believe Mr. Quinton --

23         THE COURT:  Other than the schedule?

24         MS. PARKER:  No.  Just one more point, your Honor,

25 with respect to the report from Mr. Arnt titled number one

31

1 that came second in time. This isn't a new opinion from Mr.

2 Arnt. His opinion is that a road is necessary. It is a new

3 basis for his opinion, additional reasons why that road

4 would be necessary.

5        THE COURT: Okay. Mr. Quinton, is there -- is

6 there any discovery that you think you have been denied by

7 virtue of the Government's late filing from your perspective

8 of the supplemental reports that you believe you need in

9 order to prepare this case for trial? And if so, what is

10 it?

11        MR. QUINTON: That's not a question that I

12 anticipated, your Honor. And at this point, I cannot think

13 of any. However, if the Court is indicating that the

14 motions are going to be denied, then we would like to have

15 leave to undertake any further discovery that may be

16 necessary.

17        THE COURT: That's not an answer to my question.

18 I am asking you, what have you been deprived of by reason of

19 these late-filed, from your perspective, supplemental

20 reports that have, at least with regard to Mr. Arnt's June

21 27 report, from your perspective, changed a theory that you

22 were not prepared to address? So what is it that you need?

23        MR. QUINTON: Well, from the Defendants -- excuse

24 me. From the Government, your Honor, there is nothing. We

25 will have to address that with discovery from other parties.

32

1          THE COURT:  And what experts, if any, have you

2    been denied by virtue of the Government's, from your

3    perspective, late-filed reports?

4          MR. QUINTON:  Well, the -- in the case of Mr.

5    Arnt, perhaps there are not any.  In Ms. Lucast's case, we

6    would ask for the option of retaining a Coastal Commission

7    expert if we should decide that it's necessary.

8          THE COURT:  All right.  Now, with regard to the

9    Court's schedule, what is it that you wanted to address, Mr.

10   Quinton?

11         MR. QUINTON:  Well, your Honor, at the present

12   time, discovery has been completed.  It was completed on

13   August 1.  The next scheduled matter in this case is not

14   until November 10, which is the Court's scheduled settlement

15   conference.  We don't feel that there's any reason why we

16   should wait until November for that when it can be held at

17   any time.

18         THE COURT:  Really?

19         MR. QUINTON:  Why not?

20         THE COURT:  Well, because the Court has about 350

21   civil cases on my calendar, including criminal cases on top

22   of that.

23         MR. QUINTON:  Oh.

24         THE COURT:  So, you know, holding it at any time

25   is really not an accurate characterization.  That's not to

33

1 say that I'm not willing to help you --

2          MR. QUINTON:  Yes, your Honor.

3          THE COURT:  -- find an earlier date, but, you

4 know, let's put a little reality into this equation as well.

5          MR. QUINTON:  Well, from -- especially from the

6 Defendants' point of view, your Honor, we do not know of any

7 reason why it would be -- need to be delayed until November.

8          THE COURT:  All right.  Would the Government like

9 an earlier settlement conference as well?

10          MR. LATHAM:  Your Honor, if I may, I can speak to

11 that.  This is a repeat of a request that was made to Judge

12 Adler when he had the case for an accelerated trial date,

13 which is what the Defense has been after I think from the

14 time -- maybe even before the case was filed.  And we do

15 not -- we're not in a position at this point with all of the

16 other work that we have to do, including lots of other

17 border fence cases, to put those all aside and prepare this

18 case up earlier than according to the Court's schedule.

19 We've been planning on the Court's schedule as set by Judge

20 Adler, and we'd like to stay with that, if we could.

21          THE COURT:  All right.

22          MR. QUINTON:  Well, if I may, your Honor.  In

23 February -- I think it was February 24th -- we had a

24 telephonic status conference with Judge Adler, and counsel

25 is correct, at that time I said that I thought the Court's

34

 1  schedule could be accelerated.  Judge Adler seemed to be

 2  sympathetic with the point of view and --

 3          THE COURT:  He's much more sympathetic than I am.

 4          MR. QUINTON:  -- understanding of that point of

 5  view, your Honor, and said that we would revisit that issue

 6  in the further telephonic status conference which was

 7  scheduled for June 20th, which we didn't actually have.  So

 8  that's why I'm asking to bring it up at this time.

 9          It's always been our position that this case

10  should be moved along as quickly as possible.  There was a

11  one-year delay in filing the case to begin with.  We're

12  now -- well, it was filed May 16, and we have just now

13  finished discovery.  I understand the Court's calendar and

14  counsel's case load, but we would just ask that the

15  Defendant be given a speedy resolution of this matter.

16          THE COURT:  All right.

17          MR. QUINTON:  I might -- I just might add, your

18  Honor, that the deposit that was put down on this case was

19  $358,000.  That's all the Defendant has been paid.  The

20  Government's litigation appraisal by Mr. Roach is

21  $1,145,000, but needless to say, we haven't been paid any of

22  that money.  That's the minimum expectation that the

23  Defendant would have on the case.  Our appraisal is

24  substantially more.

25          THE COURT:  What's yours?

35

1           MR. QUINTON:  Six point two million, your Honor.

2           THE COURT:  Okay.  The Court is going to take the

3    issues raised by the motion under submission.  And I will

4    issue a written decision.  With regard to the request to

5    accelerate at least the date of the mandatory settlement

6    conference in this case, the Court will likewise take that

7    matter under submission, and I will look at my calendar to

8    see what's available on my calendar for an earlier

9    settlement conference.

10          At this point, we are off the record.  Thank you.

11   I'm going to convene in chambers with counsel for a few

12   minutes.

13       (Proceedings concluded.)

14

15

16          I certify that the foregoing is a correct

17   transcript from the electronic sound recording of the

18   proceedings in the above-entitled matter.

19

20   s/Shonna Mowrer                        12/3/08
     Transcriber                            Date

21

     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

22

23

     s/L.L. Francisco
24   L.L. Francisco, President
     Echo Reporting, Inc.

25