UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br>v.<br><br>14.3 ACRES OF LAND, more or less, situated in San Diego County, State of California; TIMOTHY LICHTY and CHERYL LEE LICHTY, CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST DATED OCTOBER 24, 1991; and OTHER INTERESTED PARTIES,<br><br>           Defendants. | Civil No.07cv886-W(NLS)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' EXPERTS' REPORTS AND EXCLUDE RELATED TESTIMONY**<br><br>[Doc. No. 75] |

Before the Court in the above-captioned matter is Plaintiff's Motion to Exclude: 1) the Expert Designation of Deborah Rosenthal; 2) the Expert Report and expert testimony of Deborah Rosenthal; and 3) the Supplemental Expert Report of Jeffrey Kauttu. (Doc. No. 75). Plaintiff requests that the Court find good cause to impose evidentiary sanctions pursuant to Federal Rule of Civil Procedure 37(c) against Defendants for alleged violations of court-imposed deadlines and the Federal Rules of Civil Procedure governing the exchange of expert reports. Defendants filed an opposition to the motion [Doc. No. 76], and Plaintiff filed a reply (Doc. No. 77). The Court vacated the January 30, 2009 hearing date and now decides the motion on the papers submitted. For the reasons stated below, the Court **GRANTS** Plaintiff's motion.

//

# I. BACKGROUND

This action arises from the condemnation of 14.3 acres of land adjacent to the United States – Mexico border. On May 16, 2007, the United States government (Plaintiff in this case, hereafter "Government"), acting under the authority of the Department of Homeland Security Act, 6 U.S.C. §§ 111, 202, 251, and 557, took possession of Defendants Timothy and Cheryl Lichty's (hereafter "Defendants") property in south San Diego County. (*See Decl'n. of Taking*, Doc. No. 3, Schedules "A" and "C" attached.) The acquisition occurred due to the proximity of Defendants' land to the Mexican border and its categorization as land for public use in connection with the Multi-Tiered Fence Project in San Diego County, California, commonly referred to as the Border Fence project. (*Id.*) At the time of filing the Declaration of Taking, the government deposited into the Registry of this Court the amount of Three Hundred Fifty-Eight Thousand Dollars ($358,000.00) as estimated just compensation for Defendants' condemned property. (*See Joint Motion for Disbursement of Funds*, Doc. No. 6.) On October 17, 2008, the Government deposited supplemental estimated just compensation for taking the estate condemned, in the amount of Seven Hundred Eighty-Seven Thousand Dollars ($787,000.00.) (Doc. No. 50.) Defendants do not challenge the statutory authority for the taking. The sole issue in this case is whether the previously disbursed funds constitute just compensation for the land.

The discovery period in this case began in September 2007 and closed on August 1, 2008. The parties focused their discovery efforts primarily on obtaining documentation and expert opinions regarding the fair market value of Defendants' land on the date of the taking. In November 2007, the Court issued a Scheduling Order setting discovery deadlines and other pretrial proceedings. (*See Court's November 7, 2007 Scheduling Order*, Doc. No. 14.) The instant motion concerns the deadlines set for the exchange of expert disclosures. Paragraph 3 of the Scheduling Order provides as follows:

> Defendants' expert disclosures required by Fed. R. Civ. P. 26(a)(2) shall be served on all parties on or before ***January 31, 2008***. Plaintiff's expert disclosures required by Fed. R. Civ. P. 26(a)(2) shall be served on all parties on or before ***April 30, 2008***. Any contradictory or rebuttal information shall be disclosed on or before ***May 30, 2008***.

(Emphasis in original). This paragraph also references the duty to supplement expert disclosures pursuant to Federal Rules of Civil Procedure 26(e) and 26(a)(3) prior to the December 1, 2008 deadline

set for pretrial disclosures, and emphasizes that failure to comply with these deadlines may result in the sanctions provided for by Rule 37, including the exclusion of evidence. (*Id.*)

Defendants designated Ms. Deborah Rosenthal ("Rosenthal") on November 28, 2008. On December 19, 2008, Defendants issued a supplemental report of expert witness Jeffery Kauttu ("Kauttu"). The Government asserts that Defendants' designation of Rosenthal as an expert witness was untimely and seeks an order excluding her expert report and expert testimony. The Government also asserts that Kauttu's supplemental report is untimely and should be excluded.

Defendants oppose the motion, arguing that Rosenthal's report was necessary in response to a supplemental report issued by Government expert Nancy Lucast ("Lucast") containing new opinions. Defendants also argue that the Kauttu supplemental report was submitted in accordance with Rule 26(e) as part of the continuing duty of parties to supplement their previous expert disclosures. Defendants assert that the Kauttu Supplemental Report was based on new information that, despite their best efforts, Defendants could not obtain until three days before the Final Pretrial Conference.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26 governs the disclosure of expert testimony. Rule 26(a)(2) provides that a party must disclose to other parties "the identity of all expert witnesses who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Rule 26 adds:

> Unless as otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-- prepared and signed by the witness . . . . The report must contain a complete statement of all opinions the witness will express and the basis and reasons for them.

Fed. R. Civ. P. 26(a)(2)(B). With respect to the timing of expert disclosures, Rule 26(a)(2)(C) provides that: "A party must make these disclosures at the times and in the sequence that the court orders." Rule 26(e)(2) governs the supplementation of expert reports. It provides, in pertinent part:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2). "Although Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' a disclosure upon information later acquired, that provision does not give license to sandbag one's

opponent with claims and issues which should have been included in the expert witness' report. . .."
*Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 635 (D. Haw. 2008) *quoting Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (citation omitted).

Parties who run afoul of Rule 26 may face sanctions as specified in Federal Rule of Civil Procedure 37, which provides in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The exclusion sanction is "self-executing" and "automatic." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (referencing the Advisory Committee's Notes to Rule 37(c)(1) (1993 Amendments)). However, "[t]wo express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the party can prove that its failure to disclose the required information is substantially justified or harmless." *Id.* at 106-07 ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness.") The Ninth Circuit "give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Id.* The following factors are used to guide the court's discretion: "1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the defendants; 4) the public policy favoring disposition of cases on their merits; 5) the availability of less drastic sanctions." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

### III. DISCUSSION

The Government seeks an order from the Court imposing evidentiary sanctions against Defendants for submitting late reports prepared by experts Rosenthal and Kauttu. The Court has previously addressed this issue in this case. On August 29, 2008, the Court denied Defendants' motion to exclude the supplemental expert reports of Government experts Nancy Lucast and Norm Arnt. [Docket No. 29.] The Court found that the reports were timely submitted supplemental reports. The Court specifically found that the supplemental reports were submitted prior to depositions of the experts, there was no evidence that the Government was "sandbagging," and that the reports were submitted well in advance of the December 1, 2009 pretrial disclosures deadline.

4

07cv886

### A.     The Rosenthal Designation, Testimony and Report

Defendants claim that their designation of Rosenthal was necessitated by a second supplemental report issued by Government expert Nancy Lucast. One of the factors addressed by experts in this case is the jurisdiction of the California Coastal Commission over Defendants' property and its effect on the land's fair market value. The Government retained Nancy Lucast as its expert on this subject. Lucast submitted her expert report before the April 30, 2008 deadline for Plaintiff's experts' disclosures set by the Court's Scheduling Order. In this report, dated April 28, 2008, and received by Defendants April 30, 2008 ("Lucast I" hereafter), Ms. Lucast opines that the property lies entirely within the retained coastal development permit jurisdiction of the California Coastal Commission (hereafter "CCC"). (Quinton Declaration Ex. E, Lucast I.) She goes on to detail the effect of this jurisdiction on future development of Defendants' property, and reviews Coastal Act policies applicable to the site. (*Id*. at 3-6.) She notes at the beginning of the report that her opinion is based on representations made by the San Diego District CCC staff. Skeptical of the Commission's assertion that it has original jurisdiction over the entire parcel of land, lowlands and uplands alike, Ms. Lucast indicates in the report her intention to obtain a mapping opinion from the CCC's mapping unit to confirm the nature and extent of its jurisdiction. (*Id*. at 2, n.1.) Ms. Lucast concluded, based on the available evidence, that it was very unlikely that the CCC would allow Defendants to build a custom home and equestrian facilities on the subject property or to have road access to it across the wetlands.

On May 6, 2008, Defendants objected to the Lucast Report as being incomplete because it did not contain the "final" opinion. Defendants claim that the Government responded on May 8, 2008 and "refused to acknowledge any obligation to supplement this report 'in a timely manner,' as required by Rule 26(e)(1)(A)." (Quinton Decl. Ex. G.) This characterization is puzzling as the May 8, 2008 letter clearly states that Ms. Lucast "is aware of the requirement to supplement her report if warranted by the facts." (*Id.*)

On May 16, 2008, Defendants met with CCC representatives and were informed that the subject property is in the permit jurisdiction of the City of San Diego and only in the appellate jurisdiction of the CCC. (Lichty Decl ¶ 7, Quinton Decl. ¶ 14.) Defendants knew that the CCC provided the same information to Lucast on that day. (Quinton Decl. ¶ 10.) In a letter to Government counsel dated May

21, 2008, defense counsel requests that Lucast submit her revised report before the May 30, 2008 rebuttal disclosures deadline. (*Id*., Ex. H.)

On May 30, 2008, Defendants submitted their expert rebuttal information to the Government. Defendants did not designate a CCC expert to rebut Lucast's opinions.

On June 3, 2008, the Government informed Defendants that Lucast "will prepare a supplemental report which will be promptly delivered to you." (Quinton Decl. Ex. O. ). On June 11, 2008, Ms. Lucast submitted her second report, which Defendants received on June 18, 2008 ("Lucast II" hereafter). Lucast II revises the prior opinion based on the corrected information regarding the CCC's jurisdiction over Defendants' property. (*Id.*, Ex. "I.") Lucast II concludes that access roads to the subject property would have to be improved and the CCC would not allow the roads to be improved. Lucast II also finds that an appeal would be both likely to occur and to result in a denial of the permit.

On July 14, 2009, Defendants moved to exclude Lucast II as untimely. (Docket No. 29). On August 1, 2008, all expert discovery closed in this case. On August 29, 2008, the Court denied Defendants' Motion to Exclude Lucast II, finding it an appropriate supplemental report. (Docket No. 39). Lucast was deposed on July 25, 2008 and Defendants asked her if she might have new opinions about the issues in Lucast II. Lucast testified that she had renewed her request to the CCC for a boundary determination and that "if new information comes to light, I'm certainly not going to ignore it." (Lucast Depo. Tr., Quinton Decl. Ex. J at 100-102.)

On September 26, 2008, the CCC issued a memorandum finding that the subject property was entirely within its original jurisdiction. (Latham Reply Decl., Ex. 3.) On October 7, 2008, the CCC produced a revised memorandum finding that the subject property was partially within its permit jurisdiction and partially within the permit jurisdiction of the City of San Diego. (Latham Decl. Ex. 7.) The parties dispute who requested this boundary determination. The Government asserts that Defendants, by procuring the boundary determination, improperly engaged in discovery after the discovery deadline had passed. This allegation is contradicted by Lucast, the Government's own witness. Apparently, Lucast made a request for a boundary determination as did Defendants' expert, Mr. Stedt. After receiving Lucast II, Stedt contacted the CCC and stated that the boundary determination was no longer necessary. When Lucast discovered that the CCC had abandoned the

project she renewed her request for a boundary determination. (Quinton Decl. Ex. J, Lucast Depo. Tr. at 100-101.)

On November 15, 2008, Lucast issued a second supplemental report ("Lucast III"), taking into account the October 7, 2008 official determination of the CCC. On November 17, 2008, the Court denied the Government's motion to exclude the testimony of Clay Phillips, Reserve Manager of the Tijuana River National Estuarine Research Reserve, Silver Strand State Beach, and Border Field State Park.[1] (Doc. No. 66, hereafter "the Discovery Order".) The Government sought to exclude the testimony because Defendants had never disclosed Phillips as a witness. The Court found the failure to disclose was not justified, but that allowing for Phillips' deposition would render the failure to disclose in a timely manner harmless and, therefore, denied the motion to exclude the expert testimony. The Court specifically stated: "the Court concludes that Defendants are not entitled to any further discovery privileges. . . . Defendants may not take any additional depositions or conduct any further discovery." (Docket No. 66 at 6.)

On November 28, 2008, Defendants designated Ms. Rosenthal as an expert witness to rebut Lucast's opinions. The Government seeks to exclude Rosenthal's testimony and expert report, claiming that Defendants' failure to timely designate her as an expert witness was neither justified nor harmless.[2] For the following reasons, the designation of Ms. Rosenthal was neither justified nor harmless and the Motion to Exclude the Expert Testimony and Report is GRANTED as to Ms. Rosenthal.

    1.    <u>The Designation of Rosenthal Was Not Justified</u>

        a.    Defendants had sufficient information to timely designate rebuttal experts

---

[1] The issue came to light when Defendants submitted a declaration from Mr. Phillips in support of a motion in limine to exclude the testimony of Government expert witnesses. (Doc. No. 44.). Judge Whelan denied Defendants' motions in limine without prejudice.

[2] The Government claims that the designation of Ms. Rosenthal violated the Discovery Order. Designating an expert witness is not the conducting of further discovery and, therefore, is not a violation of the Discovery Order. The Government also asserts Defendants violated the Discovery Order by procuring the CCC determination. There is a difference, however, between formal discovery and investigation that does not require court issued documents. *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 560 (S.D. Cal. 1999) ("it is certainly permissible for a party to continue its informal investigation of facts underlying claims in a case after the expiration of the discovery period). As described above, Defendants did not procure the determination, but even if they had, it would not have violated the Discovery Order.

Defendants claim that it was not possible for them to designate a CCC expert until after the deadline because "The only thing known on May 30, 2008, was that Lucast I was not going to be Ms. Lucast's final/eventual opinion." (Opp at 9.)  Defendants understate their knowledge.  Defendants knew that Lucast had issued an opinion that was unfavorable to them, that they disputed the opinion, and that the opinion was subject to change.  Indeed, Defendants argue in Opposition that the conditional reliance on the jurisdiction map in Lucast I "makes it clear that, until she learns the true status of the subject property, she is assuming the most favorable scenario to the Government, which is trying to minimize the market value of the property, and the most unfavorable scenario to the Defendants, the former owners of the subject property who are entitled to the market value of their property." (Opp. at 5.) Thus, as early as April of 2008, Defendants were on notice of the utility of a rebuttal CCC expert witness.  Defendants made a series of choices, as described below, that they did not need a rebuttal expert.

Moreover, Defendants' argument that no designation is possible until a final opinion is known is unsupportable.  As the Government points out, the Court's Scheduling Order set a May 30, 2008 deadline for designating rebuttal experts, an August 1, 2008 expert discovery deadline, and a December 1, 2008 deadline for the supplementation of expert reports. (Doc. No. 14.)[3]  Thus, the scheduling order commands designation of rebuttal experts long before the deadline for supplemental expert reports.

Defendants claim that the late designation is justified because no need existed for a rebuttal witness earlier.  According to Defendants' calculations, as of the May 16, 2008 oral notification by the CCC that the land lay outside its permit jurisdiction, there was no need to designate a rebuttal expert because Lucast I could be discredited by fact witnesses.[4]  Defendants assumed that, because Lucast I relied upon a jurisdictional fact now determined to be in error, the Government's only choices at that point were to rely upon the now factually incorrect Lucast I or not to present expert testimony on CCC jurisdiction.  Defendants' assumption was in error and Defendants should have known that.  In April of

---

[3] Rule 26(e)(2) sets the deadline for supplemental expert reports as the same date that pretrial disclosures are due.  The Scheduling Order set the deadline for pretrial disclosures at December 1, 2008.

[4] The Court expresses no opinion on whether or not fact witnesses would be allowed to testify on the topic of CCC jurisdiction.

2008, Defendants were specifically informed that Ms. Lucast had asked for clarification of the interpretation of the City of San Diego CDP jurisdiction maps and that her conclusions were subject to change. Government counsel specifically reaffirmed, by letter dated May 8, 2008, that Lucast "is aware of the requirement to supplement her report if warranted by the facts." (Quinton Decl. Ex. G.) Thus, Defendants should have realized that they would need an expert because Lucast I would be supplemented. This mistaken assumption is at the heart of the current dispute and, unfortunately for Defendants, their mistaken assumption does not justify Defendants' failure to designate their own expert.      Defendants also argue that their failure to timely designate a rebuttal expert is due to Lucast's delay in submitting Lucast II. According to Defendants, Lucast only spent seven days preparing Lucast I, but took twenty-six days after the CCC's oral determination to issue Lucast II. Thus, Defendants argue that the two weeks Lucast took to issue her second report caused their failure to designate a rebuttal expert before May 30, 2008. Defendants allege: "If she had produced a report by May 22, 2008, the Defendants would have at least known if it would be necessary to retain an expert on CCC matters by May 30, 2008, the Court-ordered date to name rebuttal experts and to produce reports." (Opp at 12.) This argument fails, however, because Defendants knew all they needed to know on May 30, 2008. First, Defendants knew in April that Lucast would change her opinions if the CCC changed its interpretation of the jurisdiction maps. Second, Defendants knew on May 16, 2008, that the CCC had changed its interpretation. Accordingly, on May 30, 2008, Defendants were on notice that they would need a rebuttal expert.[5]

Defendants next argue that, as of the July 31, 2008 deposition of Deputy Fire Marshal Robert Medan, there was again no need for a CCC expert.[6] According to this argument, Mr. Medan's testimony refuted the conclusion in Lucast II that access roads to the subject property would have to be improved. Lucast II relied, at least in part, on that conclusion in finding that the CCC would not allow the

---

[5]Moreover, Defendants were specifically informed by the Government on June 3, 2008, that Lucast "will prepare a supplemental report which will be promptly delivered to you." (Quinton Decl. Ex. O.) Defendants point to no action taken to designate a rebuttal expert at that point. Indeed, Defendants did not designate a rebuttal expert upon reading Lucast II on June 11, 2008.

[6]Tellingly, Defendants do not attempt to justify their failure to seek leave to designate an expert witness during the time between when they received Lucast II on June 18, 2008 and the July 31, 2008 Medan deposition.

residence to be built.  Thus, Defendants claim that they did not need a rebuttal expert because they could have simply called Mr. Medan as an impeachment witness.  Defendants, however, should have known that a third supplemental report could be produced.  As described earlier, Lucast testified at her deposition that new information could lead to new conclusions and that she had renewed her request to the CCC for a boundary determination.  (Lucast Depo. Tr., Quinton Decl. Ex. J at 100-102.)  Defendants also knew that the deadline to produce supplemental expert reports was not until December 1, 2008.  Thus, Defendants were on notice that a rebuttal expert would be useful and they were not justified in resting upon the assumption that impeachment witnesses would suffice.

Defendants cite *Childress v. Darby Lumber, Inc.* 357 F.3d 1010 (9th Cir. 2004) as support for their justification in designating Ms. Rosenthal.  *Childress* is simply inapposite.  In that case, the designating party timely designated the expert witness and provided the best report possible.  The court excused the lack of detail in the report, finding that the objecting party had prevented the expert from making detailed findings by refusing to produce relevant documents in discovery.  Here, Defendants simply failed to make any timely designation and the Government has not withheld information.  Accordingly, *Childress* provides no support for Defendants alleged justification.

       b.   The designation is not supported by Rule 26

Defendants final argument is that the Rosenthal designation is permitted by Rule 26(a)(2)(C), which provides:

> Time to Disclose Expert Testimony.  A party must make these disclosures at the times and in the sequence that the court orders.  Absent a stipulation or a court order, the disclosures must be made:
>
>   (I) at least 90 days before the date set for trial or for the case to be ready for trial; or
>
>   (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B), within 30 days after the other party's disclosure.

Fed. R. Civ. P. 26(a)(2)(C).  Defendants claim that the Rosenthal report was prepared solely as rebuttal to Lucast III, which they claim is an entirely new report and not truly a "supplemental report."  Defendants apparently argue that Lucast III can only be authorized by Rule 26(a)(2)(C)(ii), authorizing the disclosure of a rebuttal expert within thirty days of disclosure by another party.  Though it is not

clear, Defendants appear to argue that Lucast III was a new report in rebuttal to the CCC memorandum and, therefore, they are entitled to the Rosenthal report as a rebuttal within thirty days of Lucast III. Defendants argue "if correctly viewed" Lucast III is a new report because it "contains a totally new opinion." (Opp at 21.) Notably, Defendants do not identify this totally new opinion.

Lucast III is not a totally new opinion. Lucast III revises Lucast II in light of two new pieces of information: 1) the October 7, 2008 CCC boundary memorandum finding the property partially within its permit jurisdiction; and 2) the August 22, 2008 declaration of Clay Phillips. Lucast II relied upon an oral representation that the subject property lay outside of the CCC's permit jurisdiction. Lucast II, nonetheless concluded that Defendants would not be granted a permit to build a custom residence on the property. Lucast II based this conclusion on the need for off-site improvements to Monument Road that would require CCC approval not likely to be granted. Lucast II also concludes that an appeal to the CCC would be likely to occur and likely to result in the CCC denying the permit. (Quinton Decl. Exh I, Lucast II at 7-8).

Lucast III does not alter that conclusion. Lucast III states: "In conclusion, whether as an original jurisdiction permit matter or an appellate matter the CCC would be all but certain to have the final say on any development of the subject property. In my opinion, the CCC is exceptionally unlikely to have allowed development of residential estate, business or equestrian facilities on the subject property or to have allowed increased intensity of vehicular access across the surrounding wetlands, disturbed or not, at the date of value or subsequently." (Quinton Decl Exh B, Lucast III at 5.)[7]

In short, in every iteration of the Lucast report, the conclusion is constant: the development is unlikely to be approved. Moreover, Lucast I contained a cautionary note that the conclusions were based on information currently available and described how that information might change. Lucast II was prompted by the CCC's oral determination (sought by both sides) that the subject property lay outside its permit jurisdiction. In July (between Lucast I and Lucast II) Lucast testified that she had requested a formal boundary determination and that a determination might change her opinions. Lucast

---

[7]The conclusion in Lucast I was also the same: "I would fully expect the CCC staff to recommend denial of the application and the CCC to follow its staff's recommendation. As presently contemplated, the project simply raises too many issues for CCC staff or the Commission itself to be able to craft mitigating conditions of approval." (Quinton Decl. Ex. E, Lucast I at 5.)

1 III was prompted by the CCC's Memorandum (sought at some point by both sides) deciding that the
2 subject property lay partially within its permit jurisdiction. Thus, there was no "sandbagging" and no
3 attempt to surprise Defendants with new information at the last minute. Accordingly, Lucast III is not a
4 new opinion, but an appropriate supplemental opinion and, as such, did not justify or allow Defendants
5 to designate a new rebuttal expert.

### 2. The Rosenthal Designation Was Not Harmless

7 The Government argues that the Rosenthal designation is not harmless. Expert discovery closed
8 on August 1, 2008 and the Government prepared for trial with the understanding that Defendants chose
9 not to retain a CCC expert. If the Rosenthal designation stands, the Government will be prejudiced by
10 having to prepare for and take Rosenthal's deposition. The deposition testimony will likely require
11 more supplemental reports by the Government's expert, and possibly more depositions. Moreover, the
12 new information would render moot much of the Government's completed trial preparation.

13 Defendants do not directly address how the designation would be harmless. Defendants argue
14 that trial is not scheduled until June 9, 2009, and may not go forward on that date. Defendants do not
15 mention, however, that the pretrial conference has already occurred. Moreover, Defendants do not
16 refute the Government's argument that allowing the Rosenthal designation would increase the
17 Government's costs in completing its trial preparation. Accordingly, Defendants have not met their
18 burden of showing that the designation would be harmless.

19 In sum, Defendants have not established that the Rosenthal Report was either justified or
20 harmless. Additionally, because the Final Pretrial Conference has already taken place and the Court
21 needs to manage its docket, no lesser sanction is available that would not unduly burden and prejudice
22 the Government, therefore defeating the public's interest in expeditious resolution of this litigation.
23 Accordingly, the Government's motion to strike the designation of Ms. Rosenthal and to Exclude her
24 expert report and related testimony is Granted.

### B. The Kauttu Supplemental Report

26 On January 25, 2008, Defendants produced an expert report of Mr. Jeffrey Kauttu ("Kauttu") on
27 the valuation of the subject property. The parties disagree on the potential use of the subject property.
28 The Government claims that residential use is not feasible and that the entire property can only be

valued as environmental mitigation. Defendants claim the highest and best use of the property is to use the 4 acres of lowlands, consisting of coastal salt marsh, as mitigation land and the 6.83 acres of upland for development of a custom residential house. On December 19, 2008, Defendants issued a supplemental expert report from Kauttu. This designation was almost three weeks after the December 1, 2008 deadline for producing supplemental expert reports, and only three days before the Final Pretrial Conference in this matter. Accordingly, the Government moves to exclude the Supplemental Kauttu report. As described above, the Supplemental Kauttu report must be excluded unless Defendants can show that it is either justified or harmless.

The Supplemental Kauttu report is different from the original in two ways: 1) the valuation of the four acres of lowlands is increased from $1,000,000 to $1,600,000; and 2) a mitigation valuation of $546,000 for the 6.83 acres of uplands is provided for the first time. In his original report, Kauttu relied upon the opinion of Defendants' land use expert, Mr. Thure Stedt, that the property's highest and best use was as environmental mitigation for the lowlands and residential development for the uplands. Kauttu appraised the lowland portion as mitigation property with a value of $1,000,000 and the remainder of the property as a single family residence with a value of $5,200,00, creating a total value of $6,200,000. The supplemental report increased the estimate for the mitigation portion from $1,000,000 to $1,600,000 based on information that existed at the time of the original valuation, but was unknown to Defendants. The Supplemental report presents, for the first time, an estimate of the value for the land if used entirely for mitigation and estimates that the 6.83 acres of uplands would be worth $80,000 per acre for a total of $546,000. The total mitigation value for the property is estimated at $2,146,000. The supplemental report, however, does not alter Kauttu's conclusion in the original report that the best use is as mixed residential and mitigation, valued at $6,800,000.

        1.     <u>The Supplemental Report Is Not Justified</u>

Defendants claim that, despite their diligent efforts, the information relied on in the supplemental report was not available to them until days before the final pretrial conference. Mr. Kauttu identifies the new information as four documents as follows: 1) TransNet 2/ Environmental Mitigation Program Memorandum of Agreement and Funding Recommendations, dated February 22, 2008; 2) TransNet Extension Habitat Cost Estimate, dated February 9, 2004; 3) Memo entitled "Various Mitigation Parcel

1  Sales for Your Review;" and 4) San Diego Union Tribune article entitled "Opening of Berm Completes
2  Restoration," dated December 4, 2008. (Latham Decl. Ex. 9, Kauttu Supplement Report). Each of the
3  documents either pre-date Mr. Kauttu's July 16, 2008 deposition or contain information that was
4  available before his deposition. The first two documents are dated February 22, 2008 and February 9,
5  2004, respectively. The third document summarizes the sales information for twelve properties, eleven
6  of which sold before May 16, 2007. The fourth document, as Mr. Kauttu himself admits, contains
7  "detail about project history and costs that predate the date of value of the appraisal." (Latham Decl. Ex.
8  9, Kauttu Supplemental Report at p. 3). As the Government argued in its moving papers, an expert
9  should not be able to supplement a report with information that existed when the original report was
10 created. *Lindner v. Meadow Gold Dairies, Inc*., 249 F.R.D. 625, 640  (D. Haw. 2008). Defendants
11 made no attempt to either distinguish *Lindner* or to argue that the information did not exist at the time
12 the original report was produced.

13 Defendants instead argue that their efforts to obtain this information were sufficient to justify
14 the late supplementation. (Lichty Decl. ¶¶ 17-23, Quinton Decl. ¶¶31-39.) In April of 2008, Lichty
15 received a call from a realtor who stated that CalTrans was paying $1,000,000 per acre for coastal salt
16 marsh mitigation property to offset the coastal salt marsh destroyed in the creation of the I-5 HOV lanes.
17 (Lichty Decl. ¶ 18.) On the same day, Lichty directed his attorney to obtain information from CalTrans
18 about this mitigation value. (Lichty Decl. at ¶ 19.) Between April and July, Defendants apparently
19 relied on the realtor to obtain information about recent sales from CalTrans. (Quinton Decl. ¶¶ 31-33.)
20 Between July and October of 2008, Defense Counsel, Mr. Quinton, had eight separate telephone
21 conversations with three attorneys for the State of California and CalTrans to try to get access to the
22 CalTrans employees with correct information about the purchases of environmental mitigation land. On
23 October 6, 2008, Defense expert Stedt informed Lichty that he had met with Mr. Reinhart, CalTrans'
24 Senior Right-of-Way Agent, and that Reinhart indicated that mitigation property could be valued up to
25 $1,000,000 per acre. (Lichty Decl. ¶ 19.) Defendants claim that they were unable to acquire
26 SANDAG's  (San Diego Association of Governments) 2030 Regional Transportation Plan prior to
27 November 21, 2008, even though the plan was approved in March of 2003. (Lichty Decl. ¶ 21.)
28 On October 9, 2008, Mr. Quinton was told by a CalTrans attorney that the person to speak with

was a Mr. Bruce April, Senior Environmental Planner. Quinton called April on October 9 and 10, but not again until November 19, 2008. (Quinton Decl. ¶¶34-35.) On November 21, 2008, Mr. April sent Quinton a link to a website with a 522 page document with information about environmental mitigation land values. (Quinton Decl. ¶ 36.) Although seeking the information since April, Defendants first made a Public Records Request to SANDAG on December 3, 2008. (Lichty Decl. ¶ 21.) On December 9, 2008, Mr. Kauttu met with CalTrans personnel who agreed to provide him with additional information concerning mitigation values. (Lichty Decl. at ¶ 22.)

Defendants provide all this information, but do not provide any information as to how these efforts led to the specific documents used to supplement the Kauttu report. Nor do Defendants assert that the information was not available when the original report was prepared. Instead, they merely assert that they had not yet located the information and it was therefore not available to them. The Court disagrees. Defendants learned of the potential existence of these documents in April, but for three months their sole effort to acquire the information was to rely upon a realtor to get it for them. For the next three months, Defendants' sole efforts were to make eight phone calls or approximately two calls every three weeks. Next, Defendants allowed over a month to elapse between October 9 and November 18, 2008, without doing anything even though they knew the deadline to produce a supplemental expert report was December 1, 2008. Defendants did not even make a public records request until after the deadline had passed. Accordingly, the Court cannot find that these documents were unavailable to Defendants such that supplementation three days before the Final Pretrial Conference was justified.

Moreover, Defendants do not assert that they could not provide an appraisal based on the value of the entire property as mitigation. Indeed, Defendants offer no justification for the entirely new opinion as to the value of the entire property. For all of these reasons, the Supplemental Kauttu report is not justified.

2.      The Supplemental Kauttu Report is Not Harmless

Defendants claim that the "supplemental appraisal is a benefit to the Government" because it contains an estimate for the entire property as mitigation value which is lower than Defendants' estimate for the property with mixed mitigation and residential use. (Reply at 23.) This argument is frivolous. The Supplemental Report increases the appraisal for the four acres of degraded wetlands from

1  $1,000,000 to $1,600,000 (an increase of 60%) and provides an appraisal for the mitigation value of the
2  entire property that is presumably higher than the Governments' estimate. Therefore, the Supplemental
3  Report is very unlikely to be of benefit the Government. Moreover, the question is not whether the
4  information could be used to harm the Government's case at trial. The question is whether the
5  Government has been harmed by the lateness of the disclosure of the information. The late
6  supplementation occurred after the close of discovery and indeed only three days before the Final
7  Pretrial Conference. Accordingly, if the late supplementation was allowed it would disrupt the
8  Government's trial preparation and increase expert costs and litigation expenses. Therefore, the
9  Supplemental Report is not harmless.

10  In sum, the Supplemental Report is neither justified nor harmless. Additionally, because the
11  Final Pretrial Conference has already been held, the Court's interest in managing the docket and the
12  public's interest in expeditious resolution render no lesser sanction is appropriate. Accordingly, the
13  Motion to Exclude the Supplemental Kauttu Report is GRANTED.

### IV.  CONCLUSION

Based on the foregoing reasons, **It Is Hereby Ordered** that:

1. The Court **Grants** the Government's Motion to Strike Defendant's Designation of Expert Witness Rosenthal and to Exclude the Rosenthal Expert Report and any related Expert Testimony by Rosenthal;
2. The Court **Grants** the Government's Motion to Exclude the Supplemental Report and related Expert Testimony of Kauttu.

**IT IS SO ORDERED**.

DATED: January 30, 2009

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court