1  **ANDERSEN MANN HILBERT & PARKER, LLP**
   Jeffrey N. Garland, Esq. SBN 61229
2  Andrew M. McKenzie, Esq. SBN 230968
   1230 Columbia Street, Suite 1050
3  San Diego, California 92101
   Telephone:    (619) 233-8292
4  Facsimile:    (619) 233-8636
   Email: jgarland@amhplaw.com
5          amckenzie@amhplaw.com

6  **QUINTON & PETIX**
   Michael E. Quinton, Bar No. 051370
7  402 West Broadway, Suite 400
   San Diego CA  92101
8  Telephone: ( 619)234-1113
   Fax: (619)595-3147
9  quinton@quintonpetix.com

10 Attorneys for Defendants,
   TIMOTHY LICHTY and
11 SHERYL LEE LICHTY
   CO-TRUSTEES

12

13              **UNITED STATES DISTRICT COURT**

14            **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 UNITED STATES OF AMERICA,          )   Civil No. 07 CV 00886-W (NLS)
                                      )
17              Plaintiff,            )
                                      )
18 v.                                 )
                                      )   Courtroom:    7
19                                    )
   14.30 ACRES OF LAND, more or less, situated )   NO ORAL ARGUMENT
20 in San Diego County, State of California; )
   TIMOTHY LICHTY and SHERYL LEE     )
21 LICHTY CO-TRUSTEES OF THE TIM AND  )
   SHERRY LICHTY FAMILY TRUST DATED   )
22 OCTOBER 24, 1991; AND OTHER        )
   INTERESTED PARTIES,                )
23                                    )
                Defendants.           )
24 ─────────────────────────────────  )

25 **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE**

26 **TESTIMONY AND REPORT OF DEFENDANTS' LAND USE EXPERT, THURE**

27

28

1

**TABLE OF CONTENTS**

2      TABLE OF AUTHORITIES ...................................................................................ii

3   I.  INTRODUCTION ... .......................................................................................  2

4   II  MR. STEDT'S ASSUMPTION THAT LEGAL ACCESS EXISTS FOR
        THE PURPOSE OF HIS FEASIBILITY STUDY WAS ENTIRELY PROPER..................5
5
    III  NO IMPROVEMENTS TO THE ACCESS ROADS TO LICHTY MESA
6         WOULD HAVE BEEN REQUIRED, BUT EVEN IF THERE IS A POSSIBILITY
          THAT THEY MIGHT HAVE BEEN, FACTUAL DISPUTES PREVENT THE
7   EXCLUSION OF STEDT'S TESTIMONY......................................................................6

8          (A)      Medan's Testimony Fails To Demonstrate Any Requirement That Access
                    Roads To The Property Be Improved Before It Could Be Developed...................6
9
           (B)      The State Of California Would Not Require Improvement Of The
10                  State Park Road...........................................................................11

11  IV  SINCE NO ROAD IMPROVEMENTS WOULD BE REQUIRED, WHETHER
        OR NOT THE CALIFORNIA COASTAL COMMISSION WOULD
12      ALLOW ROAD IMPROVEMENTS IS NOT A RELEVANT CONSIDERATION ..........14

13
    IV.  CONCLUSION.................................................................................................15
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07 CV 00886

**TABLE OF AUTHORITIES**

**CASES**

*U.S. v. 319.88 Acres of Land*, 498 F.Supp. 763 (D.Nev. 1980)                    5, 6, 15

*Daubert v. Merrell Dow Pharmaceuticals. Inc.,* 509 U.S. 579 (1993)                    2

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167 (1999)                    2

**FEDERAL RULES OF EVIDENCE**

Rule 702                    2

**STATUTES**

California Health & Safety Code §§ 13145, 13146                    11

2001 California Fire Code, Part 3, Article 9                    11, 12

2001 California Fire Code, Part 3, Article 10                    13

07 CV 00886

1     COME NOW the Defendants, TIMOTHY LICHTY AND SHERYL LEE LICHTY CO-

2     TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST DATED OCTOBER 24,

3     1991,  by and through their counsel, ANDERSEN MANN HILBERT & PARKER, LLP, and

4     Jeffrey N. Garland, Esq., and QUINTON & PETIX, and Michael E. Quinton, Esq. and hereby

5     oppose the Plaintiff's Motion in Limine to Exclude Testimony and Report of Defendants' Land

6     Use Expert, Thure Stedt. This Opposition is based on the files and records of this case and on the

7     following Memorandum of Points and Authorities, and the attached exhibits.

8                                 **I**

9                   **INTRODUCTION**

10     The Government has filed this Motion in Limine to exclude the testimony of the

11     Defendants' designated land use expert, Mr. Thure Stedt [1]  under Federal Rule of Evidence § 702

12     and the line of cases based on *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)

13     and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  As grounds for the Motion in Limine,

14     the Government argues three alleged faulty assumptions which the Government contends taint

15     Mr. Stedt's expert report and expert testimony.  The Government contends that these

16     suppposedly faulty assumptions constitute grounds for exclusion of Mr. Stedt's report and

17     testimony.[2]

18     The Defendants do not differ with the Government's statement of the basic rules of law

19     controlling this matter, insofar as the argument is that expert opinions which are not based on

20     fact should be excluded.  However, in order for the Court to exclude the testimony of a witness

21     on *Daubert* grounds, the facts must be clearly established.  Contrary to the Government's

22

23

24     [1]Tragically Defendant's land use expert Mr. Stedt has become terminally ill [acute myeloid leukemia]

25    and is incapable of any testimony in this action.  Accordingly, Defendants will need to designate a replacement
land use expert.  The Government argues that it is not necessary to replace Mr. Stedt because his expert

26    opinions are unreliable and inadmissible.  The Government brings this motion to test that theory.

27     [2] In footnote 1, page 1 or its Memorandum of Points and Authorities, the Government asserts that it
"reserves the right to argue" "other alleged problematic aspects to Mr. Stedt's opinions" not stated in the

28    instant motion.  The Defendants object to this alleged right and contend that the Government does not have
a right to multiple tries to disqualify a witness on grounds presently known.

1   assertions, the Defendants contend that Mr. Stedt's assumptions are entirely correct or, at least,

2   based on factual disputes that must be determined at trial.

3         More specifically, this Motion in Limine seeks to exclude the testimony of Mr. Stedt,

4   based upon three primary arguments:

5   1.     (1) that Mr. Stedt's testimony relies upon the supposedly false assumption that the Lichty

6          property ("Property") has legal access;

7   2.     (2) that even if legal access exists, Mr. Stedt incorrectly assumed that no improvements

8          need be made to the access route to the Property to accommodate fire department

9          requirements; and

10  3.     (3) Mr. Stedt failed to consider the supposed fact that the California Coastal Commission

11         ("CCC") would not permit residential development of the Property because the CCC

12         would not allow improvements to the access route as required by fire department

13         regulations.

14        In effect, the Government improperly seeks through its motion in limine an adjudication

15  that, as a matter of law, the construction of a single family residence cannot possibly be the

16  highest and best use of the property.  Each of the Government's contentions is erroneous and

17  relies upon misleading statements of testimony and facts, and misinterpretations of the law.  That

18  is, as set out in more detail below:

19          ♦      The Court recently determined that factual issues exist concerning the question of

20               legal access to the Property when it denied both parties' motions for partial

21               summary judgment.  As a result, the question of legal access, and the propriety of

22               Mr. Stedt's assumption regarding the existence of legal access, can only be

23               determined at trial.  It is therefore not only premature, but also, clearly

24               inappropriate and unavailing for the Government to seek to exclude Mr. Stedt's

25               testimony on this ground. [3] See, Section II, *infra.*

26

27

28         [3] The Lichtys have always posited that if no legal access to the property exists, there would be no ability to use the property for residential purposes and Mr. Stedt's testimony would be moot.

1    ◆    The Government's contentions concerning the need for improvements to the

2      access route to the Property rely upon: (a) out-of-context and misleading

3      testimony that the Government "cherry-picked" while ignoring pertinent and more

4      reliable contrary testimony; and (b) misunderstandings of and incomplete citations

5      to pertinent statutes and regulations concerning state and local fire safety

6      requirements.  In fact, based on the testimony of Robert Medan, a former City of

7      San Diego deputy fire marshal, the Government's position is not only

8      demonstrably wrong, [4] but also, in the best light to the Government, is subject to

9      factual disputes that must be determined at trial.  In either event, this motion fails.

10      See Section III, *infra.*

11    ◆    The Government's position that CCC approval would not be forthcoming is, at

12      best, premature because either no improvements to the roads to the Property

13      would be required, or factual issues exist concerning such requirements.  Needless

14      to say, if the roads do not have to be improved, as Defendants contend is the case,

15      there is no need to consider CCC approval.  These threshold issues can only be

16      determined at trial.  See Section IV, *infra.*

17      In essence, the Government is improperly attempting to try hotly contested issues in the

18 context of this motion in limine in an apparent attempt to do whatever possible to avoid a trial on

19 the merits and a fair determination of the highest and best use of the Property and its resultant

20 fair value.  This motion in limine is not the forum in which such determinations should be made;

21 instead these determinations must await trial, where both sides can present all of their witnesses

22 and evidence in order to assure that the issues are fully heard and a reasoned decision can be

23

24          _____

25          [4] The Defendants filed a Motion in Limine to exclude the testimony of Mr. Mallec, the Government's community planning expert, and Mr. Arndt, the Government's engineering expert, on September 16, 2008. (Docket number 44)  The Motion in Limine to exclude the testimony of Mr. Mallec and Mr. Arndt was based

26 on Rule 702 of the Federal Rules of Evidence and the *Daubert* line of cases.  The facts presented in the Defendants' motion, which included the August 13, 2008, Declaration of Robert D. Medan which is attached

27 to this Opposition, showed that Mr. Mallec's and Mr. Arndt's expert reports and their testimony to the effect that improvements would have to be made to the access roads were not based on fact.  The Motion in Limine

28 and two other Motions in Limine (Numbers 42 and 43), were denied without prejudice because they were filed prematurely and did not comply with the Court's Chambers Rules.  (Docket number 45)

1  reached.  Moreover, as set out below, the Government's assertions are not only most likely

2  wrong, but, at best, raise  factual disputes that do not serve as a legitimate basis for excluding Mr.

3  Stedt's testimony.

4  ## II

5  ### MR. STEDT'S ASSUMPTION THAT LEGAL ACCESS EXISTS
   ### FOR THE PURPOSE OF HIS FEASIBILITY STUDY WAS ENTIRELY PROPER

6

7      It is true that counsel for the Defendants instructed Mr. Stedt that access is a legal issue

8  and, for the purposes of preparing his Feasibility Study, he should assume that legal access is

9  available.[5]  This instruction was given for the simple reason that if legal access is not available, a

10  feasibility study is not necessary because a residential use is not possible.  The Lichtys have

11  always recognized this obvious fact.

12      This Court, in its Order of October 5, 2009, denied the parties' cross-motions for partial

13  summary judgment, finding that issues of fact exist regarding legal access to the Property and

14  that those issues must be tried.  The Court's Order, alone, completely undermines the assertion

15  that Mr. Stedt's testimony must be excluded.  Quite obviously, if, after trial, the Court finds that

16  legal access is available to the Property, then the legal instruction and Mr. Stedt's assumption

17  regarding the existence of legal access will have been correct and Mr. Stedt's Feasibility Report

18  will have been properly based.  Conversely, if, after trial, the Court decides that legal access to

19  the subject property is not available, a residential use could not possibly be the highest and best

20  use of the property and Mr. Stedt's testimony will be moot.   Either way, the Government's

21  apparent attempt to make an "end run" around this Court's Order, by "relitigating" its denied

22  summary judgment motion with the same arguments reincarnated in the form of a motion in

23  limine should not be countenanced, and certainly does not justify the granting of this motion.

24      The Government attempts to support its position by citing *United States. v. 319.88 Acres

25  of Land*, 498 F.Supp. 763 (D.Nev. 1980), for the proposition that expert testimony based upon

26  false assumptions should be excluded.   Defendants have no quarrel with this principle- only its

27

28      [5] The Government's own appraiser, Mr. Steven Roach, in fact conceded in deposition that the issue of access is a legal question.  Roach Depo, pp.26:19-28:4 (Exhibit A hereto).

1    purported application here.  In *319.88 Acres of Land*, an expert at trial rendered an opinion

2    concerning the value of property condemned by the Government based upon the assumption that

3    a casino could be constructed upon it.  A law which was clearly on point unquestionably

4    prohibited casinos on the subject land.  The court held that the expert's testimony should have

5    been excluded because it was based upon a premise that was improper as a matter of law.  *319.88*

6    *Acres of Land* is easily distinguished from this action.  Whereas there existed no legal possibility

7    that the expert's opinion in *319.88 Acres of Land* could be correct, this Court has specifically

8    found that the existence of legal access to the Lichty property remains in dispute and must be

9    tried.  The question of the propriety of Mr. Stedt's testimony can only be decided after the trial

10   on the question of legal access.[6]  The Government will of course have its day in court on the

11   issue of legal access, but not through a motion in limine which simply tries to reargue its failed

12   summary judgment motion.

13                                              **III**

14            **NO IMPROVEMENTS TO THE ACCESS ROADS TO LICHTY**
              **MESA WOULD HAVE BEEN REQUIRED, BUT EVEN IF THERE IS A**
15            **POSSIBILITY THAT THEY MIGHT HAVE BEEN, FACTUAL DISPUTES**
                 **PREVENT THE EXCLUSION OF STEDT'S TESTIMONY**
16
     **(A)    Medan's Testimony Fails To Demonstrate Any Requirement That Access Roads To**
17           **The Property Be Improved Before It Could Be Developed**

18            In its Motion in Limine, the Government argues that "Stedt Erroneously Assumes Road

19   Improvements Are Not Required."  In making this argument, counsel for the Government quotes

20   selectively from Mr. Robert Medan's [7] deposition and a June 20, 2008, Memorandum regarding

21   the City of San Diego Fire Access Road requirements, ignores a subsequent, July 8, 2008, letter

22   which supplemented the June 20, 2008, Memorandum and does not even acknowledge Mr.

23   Medan's August 13, 2008, Declaration in which he clearly states the policies and practices of the

24   City of San Diego regarding fire access roads.  In fact, Mr. Medan has made it perfectly clear that

25

26            [6] Triable issues also exist with respect to the other points raised in their motion.

27            [7] On May 16, 2007, and throughout 2008, Mr. Robert D. Medan was the Deputy Fire Marshall in plan

28   check with Development Services for the City of San Diego.  As such, he would determine what the City of
     San Diego would require for fire protection measures before a building permit would be approved.

1    not only would no improvements to the roads leading to the Lichty property have been required,

2    but he also clearly states that he did not have jurisdiction to require any improvements to the

3    State Park roads which would be used to get to a residence on the Lichty Mesa property.  (Medan

4    Declaration Dated August 13, 2008, at ¶ 5, Exhibit D, Medan Deposition, Vol. 1, p.63, ln. 13-20,

5    Exhibit C; See, Exhibit B, July 8, 2008, letter from Mr. Robert D. Medan to Mr. Garner

6    Palenske.)

7        The Government argues that the City of San Diego would require that all of the roads to

8    Lichty Mesa comply with City fire access road requirements before a building permit could be

9    issued for the Property.  The basis for this argument is the City of San Diego's FHPS Policy A-

10   00-1 (Exhibit 2 to the Government's Motion in Limine) and certain statements in Mr. Medan's

11   deposition.  However, the statements from Mr. Medan's deposition are so out of context that they

12   appear to be purposely misleading.

13       In his deposition, Mr. Medan testified that when Mr. Mallec (the Government's planning

14   expert) and Mr. Arndt (the Government's engineering expert) came to see him about the subject

15   property, he was led to believe that Mr. Mallec and Mr. Arndt represented the owners of Lichty

16   Mesa and that the property owner of Lichty Mesa owned all of the property on which the access

17   roads were located [including the state park road and City owned Monument Road].  When Mr.

18   Medan learned that the roads to the subject property were on State Park and City property, Mr.

19   Medan made it clear that he had no authority to require a property owner who is applying for a

20   building permit to improve or rebuild roads on property he does not own.  (See, Exhibit B, July

21   8, 2008, letter from Robert D. Medan to Garner Palenske.)

22       In fact, there is no requirement that the road to Lichty Mesa through the State Park be

23   improved and Mr. Medan had no authority to require any road on State Park property be

24   improved.  Mr. Medan testified as follows:

25       5    Q.  When Mr. Arndt and Mr. Mallec came to you

26       6        earlier this year, I am not sure we established a date,

27       7        but approximately April 25th of this year, did you

28       8        assume that they were representing the owners of the

         9        property?

10   A.  Yes.

11   Q.   Did they tell you that they were representing

12   the government in an eminent domain or a land

13   condemnation case?

14   A.   Not that I recall.

15   Q.   Did you assume that the property owner whom you

16   thought they represented owned all of the property on

17   which the road in question passed over?

18   A.   Yes.

19   Q.   Now, we've had considerable discussion about

20   the FHPS memorandum.  Let me refer to it by exhibit

21   number.  Exhibit No. 4:  FHPS Policy A-00-1 Fire Access

22   Roadways.  And it gives a UFC, Uniform Fire Code,

23   reference number.

24   This policy that is Exhibit 4 to your

25   deposition actually only applies to roadways being built

87

1   on the property that is owned by the person applying for

2   a building permit; isn't that correct?

3   A.   Yes.

4   Q.   So this "Fire Access Roadways" memorandum or

5   policy actually has no application to improving or

6   making any changes to any roadway that is on anything

7   other than the privately-owned property of the

8   applicant; is that correct?

9   A.   Yes.

10   Q.   So under this policy, a property owner of the

11   Lichty Mesa property, this policy could not be used --

12   that's Exhibit 4 could not be used to require anything

13   to be done on Monument Road or any of the rest of the

14   access road leading to the Lichty property; is that

15   correct?

16   A.   Yes.

(See, Exhibit C, Deposition of Robert D. Medan, pages 87-88)

Mr. Medan further testified:

19    Q.  So what you're saying is you don't have

20    jurisdiction to require anything outside of the property

21    line?

22    A.  Correct.

23    Q.  But you do have jurisdiction over improvements

24    and requirements within the parcel itself?

25    A.  Correct.

(See, Exhibit C, Medan Deposition, pp 72-73).

As is clear from Mr. Medan's deposition testimony, if Mr. Arndt and Mr. Mallec had told him the truth that the owner of Lichty Mesa did not own the property on which the roads leading to the property were located, Mr. Medan would have made it clear to them that the fire department had no authority to require any modifications to the state road leading to the property.

The Government asserts, "No road on the subject property complied with these requirements on the date of taking." (Page 5, lines 14-15 of the Governments Motion.)  While this is a true statement, it is utterly irrelevant to this Motion and misleading at best.  This Motion is based on the Government's argument that the Defendants, or any other owner of Lichty Mesa, would have had to have improve all of the roads [including city owned Monument Road and the state park road] leading to Lichty Mesa in order to develop it to a residential use.  As the above deposition transcript shows, this statement is not true.

In fact: 1.)  FHPS Policy A-00-1 Fire Access Roadways only applies to roadways being built on the property that is owned by the person applying for a building permit; 2.)  FHPS Policy A-00-1 Fire Access Roadways has no application to improving or making any changes to any roadway that is on anything other than the privately-owned property of the applicant; 3.)  FHPS Policy A-00-1 Fire Access Roadways could not be used to require anything to be done on City-owned Monument Road or any state park road leading to Lichty Mesa.  (See, Exhibit C, Excerpts of Deposition of Robert D. Medan, pp 87-88; Medan Declaration of October 21, 2009, Exhibit E).

Moreover, the Government's Motion in Limine conveniently makes no mention of Mr. Medan's Declaration dated August 13, 2008.  If there was any ambiguity in Mr. Medan's

deposition testimony, his Declaration has made the record absolutely clear, by unequivocally

stating that no improvements to any of the roads to the Lichty property would be required:

> "5.  Policy A-00-1 only applies to fire access roadways located on the property to be developed and does not require that a private property owner improve substandard city streets or roadways that are owned by others to the standards required by Policy A-00-1.  Furthermore, there is no City of San Diego Fire Department requirement that fire access roadways be above a 100 year flood plain elevation.  ***Accordingly, with respect to a single family development on Lichty Mesa, if the Lichtys had applied to build a single family dwelling on Lichty Mesa on May 16, 2007, they would not have been required to make any improvements to Monument Road or any of the State Park roads so as to comply with FHPS Policy A-00-1.***" (emphasis added).

(See, Exhibit, D, August 13, 2008, Declaration of Robert D. Medan.)

Mr. Medan, in his Declaration (Exhibit D) made it equally clear that even in situations

where Policy A-00-1 applies, but for some reason cannot be met, compliance with the fire code

would be met through the imposition of on-site mitigation measures.  Mr. Medan states:

> "6.  In the event it is impractical or impossible for a property owner to comply with Policy A-00-1 as it relates to the property to be developed, mitigation measures will be required to offset their inability to fully comply with Policy A-00-1.  With respect to the development of a single family dwelling on Lichty Mesa, such mitigation measures could include but would not have been limited to any or all of the following:
>
> A.  Modification of roadway requirements because of topography, nonnegotiable grades or other similar conditions.
>
> B.  An on-site 1,500 to 10,000 gallon water tank with a four-inch standpipe in lieu a fire hydrant pressurized by a municipal water supply.
>
> C.  Noncombustible construction.
>
> D.  A residential fire sprinkler system such as an NFPA 13-D system.
>
> E.  Reduction in brush clearance due to sensitive and protected plants."

(See, Declaration of Robert D. Medan, Dated August 13, 2008; Exhibit D).

And, as explained by Mr. Medan, in his Declarations, the City of San Diego would not

hold up development of the property because on-site mitigation measures, such as those quoted

above, can counteract the inability of the access route to adhere to ideal specifications.  In his

Declaration, Mr. Medan stated as follows:

> 7.  Until a full development plan has been submitted it is impossible to fully determine the exact mitigation measures that would be required to develop a single family residence on

1    Lichty Mesa.  However, it is Fire Department policy to work with property owners so as to
     enable them to develop their property.  I feel confident that satisfactory mitigation measures
2    are available to allow for a single family residence development on Lichty Mesa."

3    (See, Declaration of Robert D. Medan, Dated August 13, 2008; Exhibit D).

4         The Government's contention that the San Diego Fire Department would require an

5    owner of Lichty Mesa to rebuild or improve the state park road to Lichty Mesa is simply not true.

6    Indeed to avoid any confusion, Mr. Medan has submitted an additional declaration which should

7    put all of these issues to rest once and for all.  (See, Declaration of Robert D. Medan, Dated

8    October 21, 2009; Exhibit E).  At most, the Government raises an issue that must be determined

9    based on evidence presented at trial, including the testimony of Mr. Medan.  Under no

10   circumstances has the Government made a showing sufficient to exclude Mr. Stedt's testimony.

11   **(B)    The State Of California Would Not Require Improvement Of The State Park Road**

12        The Government next argues that an additional hurdle in the accessibility/developability

13   of the property is within the purview of the California State Fire Marshall and portions of the

14   California Fire Code.  The Government wrongly assumes two separate regimes of fire code

15   enforcement, one by the State and the other by the City of San Diego, and implies that the State

16   Fire Marshall would never permit the development of the property without improvement to the

17   state park road.  The Government misapprehends both the statutory and jurisdictional framework

18   pertaining to fire codes, and, in any event, failed to cite the statutes that are applicable in full,

19   thereby leaving a false and misleading impression of the law.

20        The Government mistakenly imagines there are two different enforcement policies

21   depending on who owns the property.  This is wrong.  California Health & Safety Code §§ 13145

22   and 13146 delegate enforcement of the Fire Code to local authorities with respect to all property

23   within their jurisdiction, including State owned property.[8]  Accordingly, the state park road is

24

25        [8]  Health & Safety Code § 13145 provides: "The State Fire Marshal, the chief of any city or county
     fire department or district providing fire protection services, and their authorized representatives, shall enforce
26   in their respective areas building standards relating to fire and panic safety adopted by the State Fire Marshal
     and published in the State Building Standards Code and other regulations that have been formally adopted by
27   the State Fire Marshal for the prevention of fire or for the protection of life and property against fire or panic."
     (Emphasis added.) § 13146 provides that the responsibility for enforcement of the State Fire Marshal's
28   regulations falls on "the chief of any city or county fire department or of any fire protection district, and their
     authorized representatives" where the property lies within city boundaries, unless the local fire chief has

1   treated no differently than any other city or county road with respect to fire access.  This is why

2   Medan stated in his Declarations that no improvement would be necessary to Monument Road

3   (city owned) or the State Park road (state owned).  Moreover, the City of San Diego is allowed by

4   code to create its own special fire regulations and it is the City approved regulations that apply to

5   all property within the City.  Thus, there are no separate State Codes with which compliance is

6   required.  (See, Declaration of Robert D. Medan, Dated October 21, 2009; Exhibit E).

7          Nonetheless, the Government claims that improvements on the State Park road to the

8   Lichty property are required under California Fire Code Section 902.2. [9]  Again, the

9   Government's position is disingenuous.  First, the Government fails to cite all of Fire Code

10  Section 902.2.1 and omits the provisions most pertinent to this action. [10]  The following is Section

11  902.2.1 in its entirety (the exceptions omitted by the Government which, the Lichtys submit, are

12  the key portions of the section as it relates to this case, are italicized):

13          Sec. 902.2.1  Required access.  Fire apparatus access roads shall be provided for every
           facility, building or portions of a building hereafter constructed or moved into or within the
14         jurisdiction when any portion of the facility or any portions of an exterior wall of the first
           story of the building is located more than 150 feet from fire apparatus access as measured by
15         approved route around the exterior of the building or facility.

16          Exceptions:   [Not included in the Government's Motion]

17                 1.  When buildings are completely protected with an approved automatic fire
                  sprinkler system, the provisions of this section may be modified by the fire chief.
18
                  2.  When access roads cannot be installed due to topography, waterways,
19                nonnegotiable grades or other similar conditions, the fire chief is authorized to
                  require additional fire protection as specified in the C.F.C., Section 1001.9.
20
                  3.  When there are not more than two Group R, Division 3, or Group M
21                occupancies, the requirements of this section may be modified, provided that in
                  the opinion of the fire chief, firefighting or rescue operations would not be
22                impaired.

23  (2001 Cal. Fire Code, Ch. 9; Exhibit F)

24  _____

25  requested otherwise.

26     [9] The above mitigation measures are consistent with those enumerated in § 1001.9 of the California
    Fire Code, cited below.

27
       [10] San Diego's FHPS Policy A-00-1 basically restates  California Fire Code Section 902.2.1 which
28  authorizes the Chief to apply exceptions to fire access roads.  A comparison of San Diego Policy and Section
    902.2.1 shows the two to be virtually the same.

07 CV 00886

It is apparent from § 902.2.2 that the fire code specifically contemplates situations where a standard fire access road will not be able to be installed, and that such a circumstance can be resolved by appropriate on-site mitigation measures [11] as deemed necessary by the fire chief. [12]

In addition to the fact that Mr. Medan testified that he was confident that the Lichty Property could be developed and fire access issues resolved through on-site mitigation measures, the fire department has never imposed conditions upon a residential development so as to prevent that development, and the Government knows it. In his July 31, 2008, deposition, Mr. Medan was questioned by Government counsel to determine if he would support the Government's position that San Diego Fire Department fire access requirements could prevent a residential development. The colloquy was as follows:

```
21    Q.  Has there ever been a situation where a
22    property owner was prevented from developing their
23    property because of the requirements that you wanted to
24    impose on them -- on the property?
25    A.  Not that I'm aware of.  Usually there are
                              18
1     mitigation measures.
2     Q.  When you say "mitigation measures," what do you
3     mean?
4     A.  Alternative ways of doing things.
5     Q.  So there is usually a way that a property owner
6     can develop their property?
7     A.  Yes.
```

(See, Exhibit C, Medan Deposition, pages 18-19.)

Consequently, it is clearly erroneous to suppose that state fire regulations pose a barrier to residential development of the property.

---

[11] In fact, the mitigation measures referred to by Medan are entirely consistent with those enumerated in C.F.C. § 1001.9, *supra*. (2001 Cal. Fire Code, Ch. 10; Exhibit G)

[12] In this instance, the term "fire chief" obviously refers to the local fire chief because of the provisions of the Health and Safety Code which clarify that properties to be developed within city boundaries fall under the jurisdiction of the local fire chief, not the State fire chief. Moreover, the term "Chief" as used in the California Fire Code is specifically defined in C.F.C. § 201.3 as "the chief officer of the fire department serving the jurisdiction or the chief officer's authorized representative."

1

**IV**

2

3

**SINCE NO ROAD IMPROVEMENTS WOULD BE REQUIRED, WHETHER
OR NOT THE CALIFORNIA COASTAL COMMISSION WOULD
ALLOW ROAD IMPROVEMENTS IS NOT A RELEVANT CONSIDERATION**

4

The Government argues that Mr. Stedt's Feasibility Study analysis is flawed because it

5

fails to consider that the California Coastal Commission would not allow improvements to the

6

road through the State Park.  As explained above no improvements would be necessary to the

7

State Park  road.  If no improvements are necessary, the Coastal Commission's position on road

8

improvements would not need to be considered.[13]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

———————————

[13]  To the extent that the Government's passing reference to the CCC's supposed objection to "increased activity along Monument Road and through the protected wetlands" may be construed as an argument that the CCC would hold up development even if no improvements to the access roads would be required, such an argument cannot form the basis for excluding Mr. Stedt's testimony. The November 15, 2008 report of the Government's California Coastal Commission expert, Ms. Lucast, was generated long after Mr. Stedt's Feasibility Study was finished and given to the Government in January of 2008 and his deposition was taken on July 10, 2008.  His testimony cannot be excluded based on an opinion of one of the Government's witnesses which did not even exist until November 15, 2008.  Furthermore on the California Coastal Commission reversed their previously jurisdiction determination and determined that all of the Lichty property was in City of San Diego primary jurisdiction and not Coastal Commission jurisdiction.

### III

### CONCLUSION

As set forth above, the Government's position is erroneous, both factually and legally. *319.88 Acres of Land* is of no help to the Government, because factual issues exist concerning whether legal access to the property exists. Neither the fire code of the City of San Diego nor the California Fire Code could or would require improvements to the City and State roads to the property, but even in the light most favorable to the Government, factual issues exist concerning this issue as well.  Consequently, no determination can be made at this time concerning whether development of the property would be rendered impossible or unfeasible as a result of the California Coastal Commission's supposed objections to improvements to the State Park road. Because the Government has not supported its motion to exclude Mr. Stedt's testimony with uncontradicted dispositive evidence (and, in fact, the evidence submitted shows the contrary), the motion must be denied.  Nothing short of a trial can resolve the predicate factual disputes raised by the Government which bear on the admissibility of Mr. Stedt's expert testimony, and thus this Motion should be denied.   In the event the Court grants the Motion in Limine, the Defendants respectfully request leave of Court to substitute another land use expert to replace Mr. Stedt.

DATED: October 21, 2009          **QUINTON & PETIX**


                                       /S/
                                  MICHAEL E. QUINTON
                                  Attorneys for Defendants,
                                  TIMOTHY LICHTY and
                                  SHERYL LEE LICHTY CO-TRUSTEES


DATED: October 21, 2009          **ANDERSEN MANN HILBERT & PARKER
                                 LLP**


                                       /S/
                                  JEFFREY N. GARLAND
                                  ANDREW M. McKENZIE
                                  Attorneys for Defendants,
                                  TIMOTHY LICHTY and
                                  SHERYL LEE LICHTY CO-TRUSTEES

1  **ANDERSEN MANN HILBERT & PARKER, LLP**
   Jeffrey N. Garland, Esq. SBN 61229
2  Andrew M. McKenzie, Esq. SBN 230968
   1230 Columbia Street, Suite 1050
3  San Diego, California 92101
   Telephone:    (619) 233-8292
4  Facsimile:    (619) 233-8636
   Email: jgarland@amhplaw.com
5           amckenzie@amhplaw.com

6  **QUINTON & PETIX**
   Michael E. Quinton, Bar No. 051370
7  402 West Broadway, Suite 400
   San Diego CA 92101
8  Telephone: ( 619)234-1113
   Fax: (619)595-3147
9  quinton@quintonpetix.com

10 Attorneys for Defendants,
   TIMOTHY LICHTY and
11 SHERYL LEE LICHTY
   CO-TRUSTEES

12

13                   **UNITED STATES DISTRICT COURT**

14                **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 UNITED STATES OF AMERICA,              )      Civil No. 07 CV 00886-W (NLS)
                                          )
17                      Plaintiff,        )
                                          )
18                                        )      DECLARATION OF MICHAEL
            v.                            )      E. QUINTON
19                                        )
                                          )
20 14.30 ACRES OF LAND, more or less, situated in San )
   Diego County, State of California; TIMOTHY LICHTY )
21 and SHERYL LEE LICHTY CO-TRUSTEES OF THE )
   TIM AND SHERRY LICHTY FAMILY TRUST DATED )
22 OCTOBER 24, 1991; AND OTHER INTERESTED )
   PARTIES,                               )
23                                        )
                                          )
24                      Defendants.       )
                                          )

25        I, MICHAEL E. QUINTON, hereby declare as follows:

26        1. I am counsel for the Defendants, TIMOTHY LICHTY and SHERYL LEE LICHTY, CO-

27 TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST, etc., in this case presently

28

1    pending in the United States District Court.  I have first hand knowledge of the statements in this

2    Declaration, unless stated otherwise.

3        2. The document attached to this Declaration as Exhibit A is a true and correct copy of pages

4    26 through 34 of the deposition of Mr. Stephen D. Roach, taken on June 24, 2008.

5        3.  The document attached to this Declaration as Exhibit B is a true and correct copy of a letter

6    from Mr. Robert D. Medan to Mr. Garner Palenske, dated July 8, 2008.

7        4.   The document attached to this Declaration as Exhibit C is a true and correct copy of

8    excerpts of the deposition of Mr. Robert D. Medan, taken on July 31, 2008.

9        5.  The document attached to this Declaration as Exhibit D is a true and correct copy of a

10   Declaration of Mr. Robert D. Medan, executed August 13, 2008.

11       6.  The document attached to this Declaration as Exhibit D is a true and correct copy of a

12   Declaration of Robert D. Medan, executed October 21, 2009.

13       7.  The document attached to this Declaration as Exhibit D is a true and correct copy of Article

14   9 of the 2001 California Fire Code.

15       8.  The document attached to this Declaration as Exhibit D is a true and correct copy of Article

16   10 of the 2001 California Fire Code.

17       I declare under penalty of perjury that the foregoing is true and correct.

18       Executed on October 21, 2009.

19                                    /S/ Michael E. Quinton

20                                    MICHAEL E. QUINTON

21

22

23

24

25

26

27

28

1    **ANDERSEN MANN HILBERT & PARKER, LLP**
     Jeffrey N. Garland, Esq. SBN 61229
2    Andrew M. McKenzie, Esq. SBN 230968
     1230 Columbia Street, Suite 1050
3    San Diego, California 92101
     Telephone:    (619) 233-8292
4    Facsimile:    (619) 233-8636
     Email: jgarland@amhplaw.com
5           amckenzie@amhplaw.com

6    **QUINTON & PETIX**
     Michael E. Quinton, Bar No. 051370
7    402 West Broadway, Suite 400
     San Diego CA 92101
8    Telephone: ( 619)234-1113
     Fax: (619)595-3147
9    quinton@quintonpetix.com

10   Attorneys for Defendants,
     TIMOTHY LICHTY and
11   SHERYL LEE LICHTY
     CO-TRUSTEES
12

13
                    **UNITED STATES DISTRICT COURT**
14
                  **SOUTHERN DISTRICT OF CALIFORNIA**
15

16
     UNITED STATES OF AMERICA,              )    Civil No. 07 CV 00886-W (NLS)
17                                          )
                                Plaintiff,  )    DEFENDANTS' TABLE OF
18                                          )    EXHIBITS IN SUPPORT OF
                          v.                )    DEFENDANTS' OPPOSITION
19                                          )    TO PLAINTIFF'S MOTION IN
                                            )    LIMINE TO EXCLUDE
20   14.30 ACRES OF LAND, more or less, situated in San)  TESTIMONY AND REPORT OF
     Diego County, State of California; TIMOTHY LICHTY)   DEFENDANTS' LAND USE
21   and SHERYL LEE LICHTY CO-TRUSTEES OF THE)            EXPERT, THURE STEDT
     TIM AND SHERRY LICHTY FAMILY TRUST DATED)
22   OCTOBER  24,  1991;  AND  OTHER  INTERESTED)         Ctrm: 7
     PARTIES,                               )            Hon. Thomas Whelan
23                                          )
                                Defendants. )
24   _____)

25
             The Defendants hereby lodge the exhibits listed in the attached Table of Exhibits in support
26
     of this Opposition to Plaintiff's Motion in Limine to Exclude Testimony and Report of Defendants'
27
     Land Use Expert, Thure Stedt.
28

| Exhibit | Description | Page No. |
|---|---|---|
| A | Deposition of Mr. Stephen D. Roach, taken on June 24, 2008, Pages 26 through 34. | 01-10 |
| B | Letter from Mr. Robert D. Medan to Mr. Garner Palenske, Dated July 8, 2008. | 11-12 |
| C | Deposition of Mr. Robert D. Medan, taken on July 31, 2008, Pages 85 through 96. | 13-20 |
| D | Declaration of Mr. Robert D. Medan, executed August 13, 2008. | 21-23 |
| E | Declaration of Mr. Robert D. Medan, executed October 21, 2009 | 24-26 |
| F | 2001 California Fire Code, Article 9 | 27-30 |
| G | 2001 California Fire Code, Article 10 | 31-42 |

DATED: October 21, 2008          **QUINTON & PETIX**

/S/ Michael E. Quinton

MICHAEL E. QUINTON
Attorneys for Defendants,
TIMOTHY LICHTY and
SHERYL LEE LICHTY CO-TRUSTEES

2                    7-cv-00886

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3
    ------------------------------)
4   UNITED STATES OF AMERICA,     )
                                  )
5      Plaintiff,                 )
                                  )
6      vs.                        ) Case No.: 07 CV 00886-W
                                  )         (JMA)
7   14.30 ACRES OF LAND, more or  )
    less, situated in San Diego   )
8   County, State of California;  )
    TIMOTHY LICHTY and SHERYL LEE )
9   LICHTY CO-TRUSTEES OF THE TIM )
    AND SHERRY LICHTY FAMILY TRUST )
10  DATED OCTOBER 24, 1991; AND   )
    OTHER INTERESTED PARTIES,     )
11                                )
    Defendants.                   )
12  _____)

13

14

15      DEPOSITION OF STEPHEN D. ROACH, MAI, taken at

16      101 West Broadway, Suite 1500, San Diego,

17      California, commencing at 9:00 a.m., June 24,

18      2008, before Adela Medina, RPR, CSR No. 11964

19

20

21

22

23

24

25   PAGES: 1 - 161

                              1

EXHIBIT A

1

1   equestrian access currently, potentially bicycle access.

2   They wouldn't have vehicular access at this -- as of the

3   date of value.

4       Q.   Well, on the day that you drove down there,

5   you just drove around the gate, correct?

6       A.   I did.  I also, with border patrol permission,

7   drove on the road that was marked no trespassing.

8       Q.   No trespassing was on what was formerly the

9   Lichty property?

10      A.   No.

11      Q.   Where was the no trespassing sign located?

12      A.   Very close to the gate.  Within -- within 50

13  to 100 yards of where that road turns off Monument Road

14  prior to the gate.

15      Q.   In your report, Mr. Roach, on page 36, just

16  below the middle of the page under "Location and

17  Access," you -- do you have that?

18      A.   I do.

19      Q.   Beginning with "Physical access to the

20  property."  It says, "Physical access to the property

21  from the community of Nestor is via Hollister Street to

22  Monument Road, and then to a private road (also referred

23  to as Monument Road) that is situated near the north

24  boundary of the subject.  The property currently has no

25  known legal access, and no off-site access easement is

26

26
EXHIBIT A

2

1    indicated in the legal description."

2            Now, referring specifically to the statement

3    "the property currently has no known legal access," is

4    it your understanding that legal access is a legal

5    judgment?  That is -- well, let me restate the question.

6            Is it your understanding that whether or not

7    property has legal access is a legal question?

8        A.   I think that's a rational conclusion.

9        Q.   Okay.  But did you receive any legal

10   instructions about whether or not the property has legal

11   access?

12       A.   No.

13       Q.   Was that statement "the property currently has

14   no known legal access" -- and by currently, you meant as

15   by the date of value, correct?

16       A.   I did.  Thank you for the clarification.

17       Q.   That was your judgment alone?

18       A.   It was my judgment, yes.  I don't know whether

19   it was alone or not.  Mr. Shake certainly concurred.

20   And I don't recall.  I think that was the conclusion of

21   everyone who looked at the access issue, which I believe

22   involved Mr. Arndt as well, but that was my judgment and

23   my statement.

24       Q.   Okay.  Did you ask for any legal instructions

25   from counsel on this matter regarding legal access?

27

27
EXHIBIT A

3

1    A.  No.

2    Q.  Did you receive any legal instructions

3  regarding legal access?

4    A.  No.

5    Q.  With respect to the second part of that

6  statement after "has no known legal access," you say,

7  "and no off-site access easement is indicated in the

8  legal description."  Could you explain that statement to

9  me?

10    A.  Sure.  A legal description of a property would

11  properly include typically as parcel two or three or

12  four any off-site access rights that are -- that are --

13  have been legally granted and are maintained with title.

14  Neither the title report nor the grant deed in the file,

15  in the public records where the Lichtys transferred the

16  property to their trust indicated that the property

17  included any off-site rights of any kind.

18    Q.  Did you do any title examination or did you

19  ask a title company or anyone else to do any research of

20  the chain of title to determine whether or not the

21  Lichty property would be entitled to implied easements

22  across properties to the north?

23    A.  No.

24    Q.  Did you do any public records search to

25  determine whether or not there were any dedicated roads

28

28
EXHIBIT A

4

1   that led to the Lichty property from Monument Road that
2   would give the Lichty property legal access?
3        Do you understand the question?
4       A.   Somewhat.  It was my understanding that there
5   are no dedicated roads going to the property.
6       Q.   What is your understanding about the status of
7   Monument Road?
8       A.   It varies.  At some points it's a public road,
9   and then at some point within the park it becomes a
10  private park road.
11      Q.   When did it become a private park road?
12      A.   Are you asking me temporally or locationally?
13      Q.   Temporally.
14      A.   I don't know.  I don't know that it was ever a
15  public road that later became a private road.
16      Q.   Well, if Monument Road, that is the part of
17  Monument Road that goes to the northeast corner of the
18  property that we've been talking about and then proceeds
19  westerly to the state park, if that road were at one
20  time a public road, it would remain a public road,
21  correct?
22      A.   I -- I don't know.  There are many ways that
23  public roads are vacated.  I see it all the time, so not
24  necessarily, no.
25      Q.   Okay.  Do you have any reason to think that

                              29

1   any part of Monument Road was ever -- in the route that

2   we just described leading to the state park was ever

3   vacated?

4      A.   I'm not aware of it having been vacated.  The

5   fact that it's gated indicates to me that the State has

6   more than the typical control over a public road.

7      Q.   Well, just the fact they put a gate up doesn't

8   mean that it's legal, does it?

9      A.   I think that would -- that would be certainly

10  unusual from my perspective, but I think it would be a

11  legal question as to whether it is or isn't legal.

12     Q.   Do you know when Monument Road, the road that

13  we've been describing as going from the east/west

14  portion, the north/south portion back to the east/west

15  portion and to the state park, when that road was

16  constructed?

17     A.   No.

18     Q.   Do you know who constructed it?

19     A.   No.

20     Q.   In making your judgment about the legal access

21  or the right to legal access to the Lichty property, did

22  you consider the effect of Public Resources Code Section

23  5003.5?

24     A.   Yes.

25     Q.   In what way and what effect did you determine

                                30

1   Public Resources Code Section 5003.5 affects the status
2   of access, legal access to the Lichty property?
3      A.   My understanding is that that code section
4   would require the State to provide some sort of permit
5   for access that would provide some level of access to
6   the property, whether that would constitute legal access
7   or insurable access or for what uses and under what
8   conditions is certainly unknown.
9      Q.   Well, in your report you state that you
10  discussed this matter with the park superintendent, and
11  I believe -- and without referring specifically to your
12  appraisal report and the quote -- your impression was
13  that they would do the minimum necessary to comply with
14  5003.5.  Is that correct?
15     A.   It's a reasonable paraphrase of what we were
16  told, correct.
17     Q.   Okay.  Would it be your interpretation of
18  5003.5 that the park ranger could restrict access to the
19  Lichty property, that is by time and by means of access?
20     A.   That -- first of all, he's not a ranger.
21     Q.   Well, excuse me.  The park superintendent.
22     A.   That he could restrict, is that the question?
23     Q.   Yes, that he could enforce hours on the access
24  to the Lichty property, that is if he locks the gate,
25  then they would not be entitled to access to their

31

31
EXHIBIT A

7

1  property?

2      A.   I -- I didn't make that determination.  The

3  only thing I read was subject to such conditions and

4  construction and maintenance specifications as the

5  department may determine, and as it continues in the

6  code section.

7          Whether the owners of the property that had

8  that permit would have unfettered access through a

9  locked gate or not, I didn't -- I didn't make that

10  determination.

11      Q.   Well, would it be your understanding that

12  5003.5 would give the owners of the Lichty property on

13  the date of value access to the property on a 24/7

14  basis?

15      A.   Not necessarily.  It wouldn't surprise if me

16  they would, but not necessarily, no.

17      Q.   And what restrictions would be -- well, what

18  restrictions do you think the State could impose on

19  access to the property?

20      A.   They could impose whatever conditions and

21  construction and maintenance specifications that they

22  determined would cause a minimum alteration to the

23  features of the park and interference with its use by

24  the public, as a code section says.

25          Whether that would include time restrictions,

32

32
EXHIBIT A

1    I don't know.  It certainly could include limitations,

2    prohibitions on physical improvements to the road.  I --

3    I think there's a wide variety of limitations they could

4    put on it.  Number of trips.

5        Q.   Okay.  Is it your interpretation of Section

6    5003.5 that it implies or it imposes an obligation on a

7    property owner who wants to use an existing road to

8    access his property to assume an obligation to maintain

9    that existing road?

10       A.   Not necessarily.  If the existing road is

11   adequate for the intended use, not necessarily, no.

12       Q.   Okay.  You have talked about maintenance of

13   the property and the construction of property.   That

14   section of 5003.5 only applies where the property owner

15   has to actually build a road to his property, correct?

16       A.   Which part are you referring to?

17       Q.   On page 37, I'm referring to the part that

18   begins in the second paragraph, "Where reasonable access

19   does not exist or cannot be economically constructed

20   outside the boundaries of the park, the department shall

21   grant a permit for right-of-way over the park over such

22   route and subject to such conditions and maintenance

23   specifications as the department may determine."

24          That only applies if you have to build a road,

25   correct, that is the obligation for maintenance and

33

33
EXHIBIT A

9

1   maintenance of the road?

2       A.   Or construction, if necessary, for some other

3   reason.

4       Q.   Yes, but none of that is necessary here

5   because there is already a road here, correct?

6       A.   Depends on what you're trying to do with it.

7   Depends on what you're trying to do with the property.

8       Q.   Well, if you just want to drive to your

9   property.

10      A.   Correct.

11      Q.   The road is already there and it's adequate to

12  get to your property.

13      A.   Partly true.  It's not all the way to the

14  property, but that's partly true, and again, it depends

15  on drive to it, for what purpose.

16      Q.   In your report I believe you said that you

17  had -- it was your understanding that the property or

18  that the road to the property is located within a

19  floodplain?

20      A.   Portions of it, yes.

21      Q.   Okay.  And reading on the bottom of page 36,

22  page immediately before where we just were,

23  "Additionally, a portion of the subject property and

24  property adjacent to the north where Monument Road is

25  located is located within the floodplain.  As such, the

                                34

                                34
                            EXHIBIT A

# EXHIBIT B



# THE CITY OF SAN DIEGO

July 08, 2008

Mr. Garner Palenske, PE
Schirmer Engineering
11770 Bernardo Plaza Court, Suite 116
San Diego, CA 92128

Re: Fire Department Access/Fire Flow Requirements For
    Litchty Mesa, APN 663-020-02
    San Diego, CA

Dear Garner:

This letter is intended to supplement my previous letter regarding the requirements for fire department access and fire flow for the parcel located just north of the Mexican border, to the south of Monument Road, presently known as Litchty Mesa.

From our conversation it is my understanding that this land is presently vacate and has been obtained by the Federal Government for the construction of the new border fence. However, you have requested the requirements for a virtual single family house be explored.

The 2001 edition of the California Fire Code (CFC), as amended or supplemented by the City of San Diego is the applicable code for such determination, as the property was obtained by the government on May 16, 2007 prior to the adoption of the 2007 California Fire Code.

Fire department access requirements are found within CFC Article 9. Additionally, the San Diego Fire-Rescue Department has published Policy A-00-1 that provides additional requirements and clarification.

As shown in both of these documents, flexibility is allowed in the application of such requirements.  This is necessary because every site is unique and judgment is often required to arrive at an access plan which provides adequate access for fire fighting yet is not excessively restricted for the property owner.

The road leading to Lichty Mesa travels upon property owned by the State of California. As such, I have no jurisdiction to require the road to be upgraded or modified for the Fire Department's use.  We discussed providing additional safe guards to facilitate fire fighting as an alternate approach to the improvement of the existing dirt access road. These include providing noncombustible construction for all building construction, automatic sprinkler protection, enhanced construction to mitigate wild land exposure,



EXHIBIT B
Division of Building and Safety • Development Services

and a water tank to be used for fire fighting purposes.  The water tank will be provided with a 4" standpipe connection compatible with the Fire Department's hose connections and will be elevated to allow suction from the tank by an apparatus without use of a hard suction connection.  Additionally, a minimum water flow of 1500 gpm at 20 psi residual pressure will be provided for a duration to be determined.

Although approval of your proposal will require a formal submittal with additional details, the safeguards suggested above are consistent with the intent of the CFC regarding fire department access and fire flow requirements.  Should you consider moving forward to obtain formal approval for your proposal, please contact me directly.

Sincerely:

R.D. Medan
Deputy Fire Marshal

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,

           Plaintiff,       Case No.
  vs.                07 CV 00886-W (JMA)

14.30 ACRES of LAND, more or less,
situated in San Diego County, State
of California; TIMOTHY LICHTY AND
SHERYL LEE LICHTY, CO-TRUSTEES OF
THE TIM AND SHERRY LICHTY FAMILY
TRUST DATED OCTOBER 24, 1991;
and OTHER INTERESTED PARTIES,

           Defendants.
_____/


DEPOSITION OF ROBERT D. MEDAN

Taken at San Diego, California

Thursday, July 31, 2008




Reported by Marsha Lewsley, CSR
Certificate No. 7726




EXHIBIT C

13

1    A.  Sure.

2    Q.  Are you able to require improved roads and

3 driveways?

4    A.  Yes.

5    Q.  Have you ever done that?

6    A.  Yes.

7    Q.  When you're working with a property owner, do

8 you ever consider the cost that the requirements that

9 you impose, what those requirements would cost to the

10 property owner?

11    A.  No.

12    Q.  Is that a big concern for you?

13    A.  No.

14    Q.  Do you ever receive complaints from property

15 owners that what you're requiring is too expensive?

16    A.  Yes.

17    Q.  How do you respond to that?

18    A.  It's not part of the fire code -- it's not part

19 of the consideration of what it costs.  It's the price

20 of doing business.

21    Q.  Has there ever been a situation where a

22 property owner was prevented from developing their

23 property because of the requirements that you wanted to

24 impose on them -- on the property?

25    A.  Not that I'm aware of.  Usually there are

18

18
EXHIBIT C

1    mitigation measures.

2        Q.   When you say "mitigation measures," what do you

3    mean?

4        A.   Alternative ways of doing things.

5        Q.   So there is usually a way that a property owner

6    can develop their property?

7        A.   Yes.

8        Q.   So you said the City of San Diego has an

9    obligation to provide fire and emergency service to

10   structures in the City, correct?

11       A.   Yes.

12       Q.   If you were looking at a piece of property and

13   it couldn't be -- you couldn't receive satisfaction, you

14   couldn't be certain that the City of San Diego could

15   access that property in the time of an emergency, would

16   you have the jurisdiction to -- would the City have the

17   jurisdiction to deny a permit altogether?

18       A.   At my level, no.  I would have to take it to

19   the fire marshal.  And probably from there it would go

20   to the fire chief.  And at that level the decision would

21   be made whether or not a project would proceed.

22       Q.   Have you ever been in that situation where you

23   didn't receive adequate confirmation that a property was

24   accessible by fire vehicles or emergency vehicles?

25       A.   No.

                                          19

                         19
                       EXHIBIT C

                         15

1    Q.   Nothing that you haven't told me?

2    A.   Yeah.

3    Q.   And at this meeting with Mr. Lichty did he

4    again ask you to sign another letter?

5    A.   Yes.

6    Q.   Did you discuss the wording itself?

7    A.   Yes.

8    Q.   Did he bring a draft with him?

9    A.   No.

10   Q.   What did you discuss about the wording?

11   A.   That there is always discretion, there is

12   always leeway in properties.  And that if there was

13   going to be a letter, it should mention that.  And that

14   the letter should also mention that we, the fire

15   department, don't have control over public streets or

16   streets that go through state parks.  And that as part

17   of the review process, we, the fire department, I don't

18   have any jurisdiction to go and tell the state or the

19   city to raise something two feet.  I have jurisdiction

20   once it's on the property.

21       We discussed potential mitigation measures.  If

22   we couldn't meet the access requirements of which Garner

23   was familiar with.  And I asked him that if he was going

24   to -- he should mention all this in the letter in case

25   this project was submitted, and in case we didn't have

63

63
EXHIBIT C

16

1    A.   No.  I would just have to call the state,

2    explain who I was, what the situation was, and hope that

3    they could put me in touch with somebody who I could

4    discuss the issue with.

5    Q.   When you say "the state," is it going to be

6    somebody in Sacramento?

7    A.   I honestly don't know.

8    Q.   Is there a state fire agency that would be

9    responsible for that decision?

10    A.   The state fire marshal has an office, I

11    believe, in the Rancho Bernardo area maybe, but. . .

12    Q.   You don't know who you would contact?

13    A.   No.

14    Q.   You haven't -- you haven't dealt with someone

15    related to Border Field State Park in the past?

16    A.   No.

17    Q.   So you don't know if they would allow the road

18    to be upgraded or not?

19    A.   Correct, I don't know if they would or not.

20    Q.   You said you do have jurisdiction to require

21    improvements on a property itself when we're looking at

22    a property that's in the City of San Diego?

23    A.   Correct.

24    Q.   So with reference to the Lichty parcel, I'm

25    going to show you a different aerial and ask if you've

72

1    seen it.  This is a different aerial photo that's closer

2    to the Lichty parcel.  Do you know if you've seen this

3    before?

4        A.   I believe I have, yes.

5        Q.   Do you know when you saw it?

6        A.   I think it's in the packet of information I

7    received from Mr. Lichty.

8        Q.   So he gave you an aerial like this?

9        A.   Yes.

10       Q.   And you'll see at the bottom of the aerial is

11   Mexico.

12       A.   Yes.

13       Q.   And I'll represent to you that these lines here

14   represent the borders of the Lichty parcel (indicating).

15       A.   Yes.

16       Q.   And north of the Lichty parcel is state park

17   land?

18       A.   Yes.

19       Q.   So what you're saying is you don't have

20   jurisdiction to require anything outside of the property

21   line?

22       A.   Correct.

23       Q.   But you do have jurisdiction over improvements

24   and requirements within the parcel itself?

25       A.   Correct.

73

73
EXHIBIT C

18

1     A.   Yes.

2     Q.   You don't go out of your way to find

3   restrictions on building on the property, do you?

4     A.   No.

5     Q.   When Mr. Arndt and Mr. Mallec came to you

6   earlier this year, I am not sure we established a date,

7   but approximately April 25th of this year, did you

8   assume that they were representing the owners of the

9   property?

10    A.   Yes.

11    Q.   Did they tell you that they were representing

12   the government in an eminent domain or a land

13   condemnation case?

14    A.   Not that I recall.

15    Q.   Did you assume that the property owner whom you

16   thought they represented owned all of the property on

17   which the road in question passed over?

18    A.   Yes.

19    Q.   Now, we've had considerable discussion about

20   the FHPS memorandum.  Let me refer to it by exhibit

21   number.  Exhibit No. 4:  FHPS Policy A-00-1 Fire Access

22   Roadways.  And it gives a UFC, Uniform Fire Code,

23   reference number.

24       This policy that is Exhibit 4 to your

25   deposition actually only applies to roadways being built

87

1    on the property that is owned by the person applying for

2    a building permit; isn't that correct?

3        A.   Yes.

4        Q.   So this "Fire Access Roadways" memorandum or

5    policy actually has no application to improving or

6    making any changes to any roadway that is on anything

7    other than the privately-owned property of the

8    applicant; is that correct?

9        A.   Yes.

10       Q.   So under this policy, a property owner of the

11   Lichty Mesa property, this policy could not be used --

12   that's Exhibit 4 could not be used to require anything

13   to be done on Monument Road or any of the rest of the

14   access road leading to the Lichty property; is that

15   correct?

16       A.   Yes.

17       Q.   And I believe you've already discussed the fact

18   that Mr. Lichty gave you a copy of Mr. Arndt's expert

19   report; is that correct?

20       A.   Yes.

21       Q.   And you later read it?

22       A.   Yes.

23       Q.   Were you aware, up until that time -- that is

24   the time that you read Mr. Arndt's report -- that it was

25   Mr. Arndt's opinion that the roadway would have to be

88

88
EXHIBIT C

20

# EXHIBIT D

**QUINTON & PETIX**
Michael E. Quinton, Bar No. 051370
402 West Broadway, Suite 400
San Diego CA  92101
Telephone: ( 619)234-1113
Fax: (619)595-3147
quinton@quintonpetix.com

Attorneys for Defendants,
TIMOTHY LICHTY and
SHERYL LEE LICHTY
CO-TRUSTEES

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil No. 07 CV 00886-W (NLS) |
| Plaintiff, | |
| v. | DECLARATION OF ROBERT D. MEDAN |
| 14.30 ACRES OF LAND, more or less, situated in San Diego County, State of California; TIMOTHY LICHTY) and SHERYL LEE LICHTY CO-TRUSTEES OF THE TIM AND SHERRY LICHTY FAMILY TRUST DATED OCTOBER 24, 1991; AND OTHER INTERESTED PARTIES, | |
| Defendants. | |

I, Robert D. (Bob) Medan declare as follows:

1. I am employed by the City of San Diego as a Deputy Fire Marshal in the Development Services Department. I have held this position for approximately 20 years. My primary job within the Development Services Department is new construction plan check to determine if proposed projects or developments meet the requirements of fire department regulations.

2. In making this declaration, I am applying the City of San Diego Fire Department regulations as they were as of May 16, 2007, the date of taking in the above-referenced condemnation action.

3. I am aware of an approximate 14.3 acre parcel of vacant land in the southwestern part of the City of San Diego, hereinafter referred to as "Lichty Mesa". It is my understanding that Lichty Mesa is a private property in-holding within the boundaries of Border Field State Park (State Park) and

EXHIBIT D

Declaration of Robert Medan                                                    7-cv-00886

is owned by the Tim and Sherry Lichty Family Trust (the Lichtys). Lichty Mesa is accessed via the City of San Diego owned Monument Road, a paved State Park road and State Park unimproved roads. It is my further understanding that portions of Monument Road and the State Park road are within a 100 year flood plain.

4. Any development of Lichty Mesa would require compliance with City of San Diego FHPS Policy A-00-1. Policy A-00-1 clarifies fire and life safety services access roadway requirements as outlined in UFC 902.2.1 and California Vehicle Code Section 22500.1. Section IV.E. of Policy A-00-1 provides for the modification of Policy A-00-1 when authorized by the Chief. I have been delegated by the Chief to make modifications to Policy A-00-1 on a case by case basis.

5. Policy A-00-1 only applies to fire access roadways located on the property to be developed and does not require that a private property owner improve substandard city streets or roadways that are owned by others to the standards required by Policy A-00-1. Furthermore, there is no City of San Diego Fire Department requirement that fire access roadways be above a 100 year flood plain elevation. Accordingly, with respect to a single family development on Lichty Mesa, if the Lichtys had applied to build a single family dwelling on Lichty Mesa on May 16, 2007, they would not have been required to make any improvements to Monument Road or any of the State Park roads so as to comply with FHPS Policy A-00-1.

6. In the event it is impractical or impossible for a property owner to comply with Policy A-00-1 as it relates to the property to be developed, mitigation measures will be required to offset their inability to fully comply with Policy A-00-1. With respect to the development of a single family dwelling on Lichty Mesa, such mitigation measures could include but would not have been limited to any or all of the following:

A. Modification of roadway requirements because of topography, nonnegotiable grades or other similar conditions.

B. An on-site 1,500 to 10,000 gallon water tank with a four-inch standpipe in lieu a fire hydrant pressurized by a municipal water supply.

C. Noncombustible construction.

D. A residential fire sprinkler system such as an NFPA 13-D system.

E. Reduction in brush clearance due to sensitive and protected plants.

EXHIBIT D

1        7.  Until a full development plan has been submitted it is impossible to fully determine the

2    exact mitigation measures that would be required to develop a single family residence on Lichty Mesa.

3    However, it is Fire Department policy to work with property owners so as to enable them to develop

4    their property.  I feel confident that satisfactory mitigation measures are available to allow for a single

5    family residence development on Lichty Mesa.

6        I declare under penalty of perjury that the foregoing is true and correct.

7        Executed on August 13, 2008.

8    

9               ROBERT D. MEDAN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D

Declaration of Robert Medan         23     3         7-cv-00886

# EXHIBIT E

1  **ANDERSEN MANN HILBERT & PARKER, LLP**
   Jeffrey N. Garland, Esq. SBN 61229
2  Andrew M. McKenzie, Esq. SBN 230968
   1230 Columbia Street, Suite 1050
3  San Diego, California 92101
   Telephone:   (619) 233-8292
4  Facsimile:   (619) 233-8636
   Email: jgarland@amhplaw.com
5         amckenzie@amhplaw.com

6  **QUINTON & PETIX**
   Michael E. Quinton, Bar No. 051370
7  402 West Broadway, Suite 400
   San Diego CA 92101
8  Telephone: ( 619)234-1113
   Fax: (619)595-3147
9

10 Attorneys for Defendants,
   TIMOTHY LICHTY and
11 SHERYL LEE LICHTY
   CO-TRUSTEES
12

13                **UNITED STATES DISTRICT COURT**

14             **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 UNITED STATES OF AMERICA,          )   Civil No. 07 CV 00886-W (NLS)
                                      )
17                      Plaintiff, )
                                      )
18           v.                       )   DECLARATION OF ROBERT
                                      )   MEDAN IN SUPPORT OF
19                                    )   DEFENDANTS' OPPOSITION
   14.30 ACRES OF LAND, more or less, situated in San)   TO PLAINTIFF'S MOTION IN
20 Diego County, State of California; TIMOTHY LICHTY)   LIMINE TO EXCLUDE
   and SHERYL LEE LICHTY CO-TRUSTEES OF THE)   TESTIMONY AND REPORT OF
21 TIM AND SHERRY LICHTY FAMILY TRUST DATED)   DEFENDANTS' LAND USE
   OCTOBER 24, 1991; AND OTHER INTERESTED)   EXPERT, THURE STEDT
22 PARTIES,                           )
                                      )   Courtroom:   7
23                      Defendants. )
                                      )   NO ORAL ARGUMENT
24 ───────────────────────────────────)

25 I, ROBERT MEDAN, hereby declare as follows:

26        1.  I am a retired Deputy Fire Marshal for the City of San Diego.  I make the statements

27 herein of my own personal knowledge.

28        2.  I previously testified in deposition and submitted a declaration in this matter.  In those

   submittals I clearly stated various facts.  However, I have reviewed the Government's memorandum

                                EXHIBIT E

                                   24                                    07 CV 00886

1    of points and authorities in support of its motion to exclude the testimony of Mr. Thure Stedt, and I

2    find several statements that either mis-construe my prior testimony or, in my opinion are in error or

3    are mis-leading.  I submit this declaration to clarify these points.

4         3.  The Government assumes that, as a condition for the construction of a single family

5    residence on Lichty Mesa, City of San Diego's FHPS Policy A-00-1 and California Fire Code

6    sections 902.2 et. seq. would require improvements to roads which are not part of the Lichty parcel.

7    That is wrong.  FHPS Policy A-00-1 Fire Access Roadways only applies to access roads on-site;

8    i.e., improvements to fire access roads that are located on the property sought to be improved or

9    developed.  Consequently, the City of San Diego Fire Marshal could not and would not require any

10   improvements to City-owned roads (i.e., Monument Road), or State-owned roads located in Border

11   Field State Park as a condition for a residential development on the Lichty property.

12        4.  In situations where total compliance of FHPS Policy A-00-1 cannot be accomplished,

13   other types of on-site improvements to the property sought to be improved or developed may be

14   required.  These mitigation measures are available under San Diego FHPS Policy A-00-1 which is

15   consistent with the mitigation measures and fire access road requirements spelled out in California

16   Fire Code, §§ 902.2 and 1001.9.

17        5.  With respect to the issues outlined above, because FHPS Policy A-00-1 is consistent

18   with the California Fire Code, the California Fire Code creates no additional requirements for the

19   development of the Lichty property than does the fire code of the City of San Diego.  Moreover,

20   even under the California Fire Code, §§ 902.2 and 1001.9 I, as deputy fire marshal of the City of

21   San Diego, had authority to determine, as of the date the Government took the property in

22   question, which mitigation measures would be required under FHPS Policy A-00-1 and California

23   Fire Code, §§ 902.2 and 1001.9.  These mitigation measures have been clearly stated in my

24   previous declaration and deposition testimony.

25        6.  I remain confident that satisfactory on-site mitigation measures could be applied to the

26   Lichty property in order to permit residential development in a manner that complies with all

27   applicable State and City fire codes and regulations.

28

1
2

I declare under penalty of perjury that the foregoing is true and correct.

3

Executed on October 21, 2009.

4
5

Robert Medan

6
7

C:\Documents and Settings\Owner\Local Settings\Temporary Internet Files\OLK14CC\lichty-oppos'n 2 exclude stedt.Medan.Decl. 2 .wpd

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT E

3

26

07 CV 00886

# EXHIBIT F

# Part III

# GENERAL PROVISIONS FOR SAFETY

# ARTICLE 9 — FIRE DEPARTMENT ACCESS AND WATER SUPPLY

## SECTION 901— GENERAL

**901.1 Scope.** Fire department access and water supply shall be in accordance with Article 9.

For firesafety during construction, alteration or demolition of a building, see Article 87.

**901.2 Permits and Plans.**

**901.2.1 Permits.** A permit is required to use or operate fire hydrants or valves intended for fire-suppression purposes which are installed on water systems and accessible to public highways, alleys or private ways open to or generally used by the public. See Section 105, Permit f.1.

> **EXCEPTION:** A permit is not required for persons employed and authorized by the water company which supplies the system to use or operate fire hydrants or valves.

**901.2.2 Plans.**

**901.2.2.1 Fire apparatus access.** Plans for fire apparatus access roads shall be submitted to the fire department for review and approval prior to construction.

**901.2.2.2 Fire hydrant systems.** Plans and specifications for fire hydrant systems shall be submitted to the fire department for review and approval prior to construction.

**901.3 Timing of Installation.** When fire protection, including fire apparatus access roads and water supplies for fire protection, is required to be installed, such protection shall be installed and made serviceable prior to and during the time of construction.

> **EXCEPTION:** When alternate methods of protection, as approved, are provided, the requirements of Section 901.3 may be modified or waived.

**901.4 Required Marking of Fire Apparatus Access Roads, Addresses and Fire-protection Equipment.**

**901.4.1 General.** Marking of fire apparatus access roads, addresses and fire-protection equipment shall be in accordance with Section 901.4.

**901.4.2 Fire apparatus access roads.** When required by the chief, approved signs or other approved notices shall be provided and maintained for fire apparatus access roads to identify such roads and prohibit the obstruction thereof or both.

**901.4.3 Fire-protection equipment and fire hydrants.** Fire-protection equipment and fire hydrants shall be clearly identified in an approved manner to prevent obstruction by parking and other obstructions.

When required by the chief, hydrant locations shall be identified by the installation of reflective markers.

See also Section 1001.7.

**901.4.4 Premises identification.** Approved numbers or addresses shall be provided for all new and existing buildings in such a position as to be plainly visible and legible from the street or road fronting the property.

**901.4.5 Street or road signs.** When required by the chief, streets and roads shall be identified with approved signs.

**901.5 Obstruction and Control of Fire Apparatus Access Roads and Fire-protection Equipment.** See Sections 902.2.4 and 1001.7.

**901.6 Fire Protection in Recreational Vehicle, Mobile Home and Manufactured Housing Parks, Sales Lots and Storage Lots.** Recreational vehicle, mobile home and manufactured housing parks, sales lots and storage lots shall provide and maintain fire hydrants and access roads in accordance with Sections 902 and 903.

> **EXCEPTION:** Recreational vehicle parks located in remote areas shall be provided with protection and access roadways as required by the chief.

## SECTION 902 — FIRE DEPARTMENT ACCESS

**902.1 General.** Fire department access roads shall be provided and maintained in accordance with Sections 901 and 902.

For access to residential developments of three or more dwelling units, the chief may be guided by Appendix III-E.

**902.2 Fire Apparatus Access Roads.**

**902.2.1 Required access.** Fire apparatus access roads shall be provided in accordance with Sections 901 and 902.2 for every facility, building or portion of a building hereafter constructed or moved into or within the jurisdiction when any portion of the facility or any portion of an exterior wall of the first story of the building is located more than 150 feet (45 720 mm) from fire apparatus access as measured by an approved route around the exterior of the building or facility. See also Section 902.3 for personnel access to buildings.

> **EXCEPTIONS:** 1. When buildings are completely protected with an approved automatic fire sprinkler system, the provisions of Sections 902.2.1 and 902.2.2 may be modified by the chief.
>
> 2. When access roads cannot be installed due to location on property, topography, waterways, nonnegotiable grades or other similar conditions, the chief is authorized to require additional fire protection as specified in Section 1001.9.
>
> 3. When there are not more than two Group R, Division 3, or Group U Occupancies, the requirements of Sections 902.2.1 and 902.2.2 may be modified by the chief.

More than one fire apparatus road shall be provided when it is determined by the chief that access by a single road might be impaired by vehicle congestion, condition of terrain, climatic conditions or other factors that could limit access.

For high-piled combustible storage, see Section 8102.6.1.

For required access during construction, alteration or demolition of a building, see Section 8704.2.

**902.2.2 Specifications.**

**902.2.2.1 Dimensions.** Fire apparatus access roads shall have an unobstructed width of not less than 20 feet (6096 mm) and an unobstructed vertical clearance of not less than 13 feet 6 inches (4115 mm).

**EXCEPTION:** Vertical clearance may be reduced, provided such reduction does not impair access by fire apparatus and approved signs are installed and maintained indicating the established vertical clearance when approved.

Vertical clearances or widths shall be increased when, in the opinion of the chief, vertical clearances or widths are not adequate to provide fire apparatus access.

**902.2.2.2 Surface.** Fire apparatus access roads shall be designed and maintained to support the imposed loads of fire apparatus and shall be provided with a surface so as to provide all-weather driving capabilities.

**902.2.2.3 Turning radius.** The turning radius of a fire apparatus access road shall be as approved.

**902.2.2.4 Dead ends.** Dead-end fire apparatus access roads in excess of 150 feet (45 720 mm) in length shall be provided with approved provisions for the turning around of fire apparatus.

**902.2.2.5 Bridges.** When a bridge is required to be used as part of a fire apparatus access road, it shall be constructed and maintained in accordance with nationally recognized standards. See Article 90, Standard a.1.1. The bridge shall be designed for a live load sufficient to carry the imposed loads of fire apparatus.

Vehicle load limits shall be posted at both entrances to bridges when required by the chief.

**902.2.2.6 Grade.** The gradient for a fire apparatus access road shall not exceed the maximum approved.

**902.2.3 Marking.** See Section 901.4.

**902.2.4 Obstruction and control of fire apparatus access.**

**902.2.4.1 General.** The required width of a fire apparatus access road shall not be obstructed in any manner, including parking of vehicles. Minimum required widths and clearances established under Section 902.2.2.1 shall be maintained at all times.

Entrances to roads, trails or other accessways which have been closed with gates and barriers in accordance with Section 902.2.4.2 shall not be obstructed by parked vehicles.

**902.2.4.2 Closure of accessways.** The chief is authorized to require the installation and maintenance of gates or other approved barricades across roads, trails or other accessways, not including public streets, alleys or highways.

When required, gates and barricades shall be secured in an approved manner. Roads, trails and other accessways which have been closed and obstructed in the manner prescribed by Section 902.2.4.2 shall not be trespassed upon or used unless authorized by the owner and the chief.

**EXCEPTION:** Public officers acting within their scope of duty.

Locks, gates, doors, barricades, chains, enclosures, signs, tags or seals which have been installed by the fire department or by its order or under its control shall not be removed, unlocked, destroyed, tampered with or otherwise molested in any manner.

**EXCEPTION:** When authorized by the chief or performed by public officers acting within their scope of duty.

**902.3 Access to Building Openings.**

**902.3.1 Required access.** Exterior doors and openings required by this code or the Building Code shall be maintained readily accessible for emergency access by the fire department.

An approved access walkway leading from fire apparatus access roads to exterior openings required by this code or the Building Code shall be provided when required by the chief.

**902.3.2 Maintenance of exterior doors and openings.** Exterior doors or their function shall not be eliminated without prior approval by the chief. Exterior doors which have been rendered nonfunctional and which retain a functional door exterior appearance shall have a sign affixed to the exterior side of such door stating THIS DOOR BLOCKED. The sign shall consist of letters having principal stroke of not less than $^3/_4$ inch (19.1 mm) wide and at least 6 inches (152.4 mm) high on a contrasting background. Required fire department access doors shall not be obstructed or eliminated. See Section 1207 for exit and exit-access doors.

For access doors for high-piled combustible storage, see Section 8102.6.2.

**902.3.3 Shaftway marking.** Exterior windows in buildings used for manufacturing or for storage purposes which open directly on shaftways or other vertical means of communication between two or more floors shall be plainly marked with the word SHAFTWAY in red letters at least 6 inches (152.4 mm) high on a white background. Warning signs shall be easily discernible from the outside of the building. Door and window openings on such shaftways from the interior of the building shall be similarly marked with the word SHAFTWAY in a manner which is easily visible to anyone approaching the shaftway from the interior of the building, unless the construction of the partition surrounding the shaftway is of such distinctive nature as to make its purpose evident at a glance.

**902.4 Key Boxes.** When access to or within a structure or an area is unduly difficult because of secured openings or where immediate access is necessary for life-saving or firefighting purposes, the chief is authorized to require a key box to be installed in an accessible location. The key box shall be of an approved type and shall contain keys to gain necessary access as required by the chief.

## SECTION 903 — WATER SUPPLIES AND FIRE HYDRANTS

**903.1 General.** Water supplies and fire hydrants shall be in accordance with Sections 901 and 903.

**903.2 Required Water Supply for Fire Protection.** An approved water supply capable of supplying the required fire flow for fire protection shall be provided to all premises upon which facilities, buildings or portions of buildings are hereafter constructed or moved into or within the jurisdiction. When any portion of the facility or building protected is in excess of 150 feet (45 720 mm) from a water supply on a public street, as measured by an approved route around the exterior of the facility or building, on-site fire hydrants and mains capable of supplying the required fire flow shall be provided when required by the chief. See Section 903.4.

**903.3 Type of Water Supply.** Water supply is allowed to consist of reservoirs, pressure tanks, elevated tanks, water mains or other fixed systems capable of providing the required fire flow. In setting the requirements for fire flow, the chief may be guided by Appendix III-A.

**903.4 Fire Hydrant Systems.**

**903.4.1 General.**

**903.4.1.1 Applicability.** Fire hydrant systems and fire hydrants shall be in accordance with Section 903.4.

**903.4.1.2  Testing and maintenance.** Fire hydrant systems shall be subject to such periodic tests as required by the chief. Fire hydrant systems shall be maintained in an operative condition at all times and shall be repaired where defective. Additions, repairs, alterations and servicing shall be in accordance with approved standards.

**903.4.1.3  Tampering and obstruction.** See Sections 1001.6 and 1001.7.

**903.4.2  Required installations.** The location, number and type of fire hydrants connected to a water supply capable of delivering the required fire flow shall be provided on the public street or on the site of the premises or both to be protected as required and approved. See Appendix III-B.

Fire hydrants shall be accessible to the fire department apparatus by roads meeting the requirements of Section 902.2.

**903.4.3  Protection, marking and obstruction of hydrants.** Fire hydrants subject to possible vehicular damage shall be adequately-protected with guard posts in accordance with Section 8001.11.3. For marking, see Section 901.4.3. For obstruction, see Section 1001.7.

**903.4.4  Maintenance and use of hydrants.** See Sections 1001.5 and 1001.6.2.

EXHIBIT F

# EXHIBIT G

# ARTICLE 10 — FIRE-PROTECTION SYSTEMS AND EQUIPMENT

## SECTION 1001— GENERAL

**1001.1 Scope.** Fire-protection systems and equipment shall be in accordance with Article 10. See also Appendix II-C.

Fire-protection equipment and systems shall be installed and maintained in buildings under construction in accordance with Article 87.

**1001.2 Definitions.** For definitions of ALARM CONTROL UNIT, ALARM-INITIATING DEVICE, ALARM SIGNAL, ALARM-SIGNALING DEVICE, ALARM SYSTEM, ALARM ZONE, ANNUNCIATOR, AUTOMATIC FIRE-EXTINGUISHING SYSTEM, FACILITY, FIRE DEPARTMENT INLET CONNECTION, SMOKE DETECTOR and STANDPIPE SYSTEM, see Article 2.

*The following California section replaces the corresponding model code section for application specified by law for the Office of the State Fire Marshal.*

**1001.2.1 Definitions. [For SFM]** *For definitions used in the application of fire alarm systems, see the appropriate standard adopted in Chapter 35 of the California Building Code.*

**1001.3 Plans.** Complete plans and specifications for fire alarm systems; fire-extinguishing systems, including automatic sprinklers standpipe systems; clean agent systems and other special types of automatic fire-extinguishing systems; and other fire-protection systems and appurtenances thereto shall be submitted to the fire department for review and approval prior to system installation. Plans and specifications for fire alarm systems shall include, but not be limited to, a floor plan; location of all alarm-initiating and alarm-signaling devices; alarm control- and trouble-signaling equipment; annunciation; power connection; battery calculations; conductor type and sizes; voltage drop calculations; and manufacturer, model numbers and listing information for all equipment, devices and materials, *and State Fire Marshal listing number of all equipment, devices and materials requiring listing.*

**1001.4 Installation Acceptance Testing.** Fire alarm systems; fire hydrant systems; fire-extinguishing systems, standpipes, and other fire-protection systems and appurtenances thereto shall meet the approval of the fire department as to installation and location and shall be subject to such acceptance tests as required by the chief.

Condition of acceptance of halon and clean agent systems shall be satisfactory passage of a test conducted in accordance with nationally recognized standards prior to final acceptance of the system.

Fire alarm and detection systems shall be tested in accordance with *[For SFM] NFPA 72 as amended in Article 91 and California Code of Regulations Title 19.*

See Section 9003, *Standard n2.8,n2,9,n2.10,n2.11,n2.12.*

**1001.5 Maintenance, Inspection, Testing and Systems Out of Service.**

**1001.5.1 Maintenance.** Fire sprinkler systems, fire hydrant systems, standpipe systems, fire alarm systems, portable fire extinguishers, smoke and heat ventilators, smoke-removal systems, and other fire protective or extinguishing systems or appliances shall be maintained in an operative condition at all times, and shall be replaced or repaired where defective.

Fire-protection or fire-extinguishing systems coverage and spacing shall be maintained according to original installation standards. Such systems shall be extended, altered or augmented as necessary to maintain and continue protection whenever any building so equipped is altered, remodeled or added to. Additions, repairs, alterations and servicing shall be in accordance with recognized standards.

***1001.5.1.1 [For SFM].*** *A fire alarm system and its devices shall be under the supervision of a qualified person as defined in NFPA 72, as amended in Article 91, who shall cause proper tests to be made and shall have general charge of the system. Fire alarm system control equipment and the devices connected to the control equipment shall be tested in accordance with the appropriate standards in the California Building Code and the manufacturer's instructions.*

*EXCEPTION: Household fire-warning systems installed in Group R, Division 3 Occupancies may be tested by the owner.*

***1001.5.1.2 [For SFM]*** *A satisfactory agreement for periodic testing and maintenance of fire alarm systems and extinguishing systems shall be provided by qualified persons.*

*EXCEPTION: Household fire-warning systems installed in Group R, Division 3 Occupancies, when approved by the authority having jurisdiction.*

**1001.5.2 Inspection and testing.** The chief is authorized to require periodic inspection and testing for fire sprinkler systems, fire hydrant systems, standpipe systems, fire alarm systems, portable fire extinguishers, smoke and heat ventilators, smoke-removal systems and other fire-protection or fire-extinguishing systems or appliances.

Automatic fire-extinguishing systems shall be inspected and tested at least annually. See Appendix III-C. Fire alarm systems shall be inspected and tested at least at frequencies specified in *[For SFM] NFPA 72 as amended in Article 91.* Standpipe systems shall be inspected and tested at least every five years.

EXCEPTIONS: 1. Automatic fire-extinguishing equipment associated with commercial cooking operations when in compliance with Section 1005.

2. Systems in high-rise buildings when in compliance with Section 1001.5.4.

Reports of inspections and tests shall be maintained on the premises and made available to the chief when requested.

**1001.5.3 Systems out of service.** The chief shall be notified when any required fire-protection system is out of service and on restoration of service.

**1001.5.3.1 Problematic systems and systems out of service.** In the event of a failure of a fire-protection system or an excessive number of accidental activations, the chief is authorized to require the building owner or occupant to provide fire watch personnel until the system is repaired.

Such individuals shall be provided with at least one approved means for notification of the fire department and their only duty shall be to perform constant patrols of the protected premises and keep watch for fires.

**1001.5.4 Systems in high-rise buildings.** The owner of a high-rise building shall be responsible for assuring that the fire- and

life-safety systems required by the Building Code are maintained in an operable condition at all times. Unless otherwise required by the chief, quarterly tests of such systems shall be conducted by approved persons. A written record shall be maintained and shall be made available to the inspection authority.

**1001.5.5 Smoke-control systems.** Mechanical smoke-control systems, such as those in high-rise buildings, buildings containing atria, covered mall buildings and mechanical ventilation systems utilized in smokeproof enclosures and for smoke-removal systems utilized in high-piled combustible storage occupancies, shall be maintained in an operable condition at all times. Unless otherwise required by the chief, quarterly tests of such systems shall be conducted by approved persons. A written record shall be maintained and shall be made available to the inspection authority.

**1001.6 Tampering with Fire-protection Equipment, Barriers, Security Devices, Signs and Seals.**

**1001.6.1 Fire department property.** Apparatus, equipment and appurtenances belonging to or under the supervision and control of the fire department shall not be molested, tampered with, damaged or otherwise disturbed unless authorized by the chief.

**1001.6.2 Fire hydrants and fire appliances.** Fire hydrants and fire appliances required by this code to be installed or maintained shall not be removed, tampered with or otherwise disturbed except for the purpose of extinguishing fire, training, recharging or making necessary repairs, or when allowed by the fire department. When a fire appliance is removed as herein allowed, it shall be replaced or reinstalled as soon as the purpose for which it was removed has been accomplished.

**1001.6.3 Barriers, security devices, signs and seals.** Locks, gates, doors, barricades, chains, enclosures, signs, tags or seals which have been installed by the fire department or by its order or under its control shall not be removed, unlocked, destroyed, tampered with or otherwise molested in any manner. See also Sections 103.4.3.3 and 902.2.4.2.

> **EXCEPTION:** When authorized by the chief or performed by public officers acting within their scope of duty.

**1001.6.4 Fire alarms.** See Sections 1006.1.2 and 1302.

**1001.7 Obstruction and Impairment of Fire Hydrants and Fire-protection Equipment.**

**1001.7.1 General.** Posts, fences, vehicles, growth, trash, storage and other materials or things shall not be placed or kept near fire hydrants, fire department inlet connections or fire-protection system control valves in a manner that would prevent such equipment or fire hydrants from being immediately discernible. The fire department shall not be deterred or hindered from gaining immediate access to fire-protection equipment or hydrants.

**1001.7.2 Clear space around hydrants.** A 3-foot (914.4 mm) clear space shall be maintained around the circumference of fire hydrants except as otherwise required or approved.

**1001.7.3 Fire-extinguishing equipment.** Class II standpipe hose stations, Class I and Class III standpipe outlets, and portable fire extinguishers shall not be concealed, obstructed or impaired.

**1001.7.4 Fire alarm equipment.** Alarm-initiating devices, alarm *[For SFM]* notification appliances and annunciators shall not be concealed, obstructed or impaired.

**1001.8 Marking of Fire-protection Equipment and Fire Hydrants.** Fire-protection equipment and fire hydrants shall be clearly identified in an approved manner to prevent obstruction by parking and other obstructions. See also Section 901.4.3.

**1001.9 Special Hazards.** For occupancies of an especially hazardous nature or where special hazards exist in addition to the normal hazard of the occupancy, or where access for fire apparatus is unduly difficult, the chief is authorized to require additional safeguards consisting of additional fire appliance units, more than one type of appliance, or special systems suitable for the protection of the hazard involved. Such devices or appliances can consist of automatic fire alarm systems, automatic sprinkler or water spray systems, standpipe and hose, fixed or portable fire extinguishers, suitable fire blankets, breathing apparatus, manual or automatic covers, carbon dioxide, foam, halogenated or dry chemical or other special fire-extinguishing systems. Where such systems are provided, they shall be designed and installed in accordance with the applicable *SFM Adopted Standards.* See Article *[For SFM] See Article 91* and Section 103.3.

**1001.10 Fire Appliances.** The chief is authorized to designate the type and number of fire appliances to be installed and maintained in and upon all buildings and premises in the jurisdiction other than private dwellings. This designation shall be based on the relative severity of probable fire, including the rapidity with which it could spread. Such appliances shall be of a type suitable for the probable class of fire associated with such building or premises and shall have approval of the chief.

# SECTION 1002 — PORTABLE FIRE EXTINGUISHERS

**1002.1 General.** Portable fire extinguishers shall be installed in occupancies and locations as set forth in this code, *California Code of Regulations Title 19, Division 1, and Chapters 1 and 3* and as required by the authority having jurisdiction.

Portable fire extinguishers shall be in accordance with *[For SFM] the California Code of Regulations Title 19, Division 1, Chapter 3, Fire Extinguishers.*

**1002.2 Prohibited Types.** Vaporizing liquid extinguishers containing carbon tetrachloride or chlorobromomethane shall not be installed or used in any location for fire-protection use.

Soda-acid, foam, loaded stream, antifreeze and water fire extinguishers of the inverting types shall not be recharged or placed in service for fire-protection use.

**1002.3 Sale of Defective Fire Extinguishers.** Forms, types or kinds of fire extinguishers which are not approved or which are not in proper working order, or the contents of which do not meet the requirements of this code, shall not be sold or traded.

> **EXCEPTION:** The sale or trade of fire extinguishers to a person engaged in the business of selling or handling such extinguishers, and the sale or exchange of obsolete or damaged equipment for junk.

# SECTION 1003 — FIRE-EXTINGUISHING SYSTEMS

**1003.1 Installation Requirements.**

**1003.1.1 General.** Fire-extinguishing systems shall be installed in accordance with the Building Code and Section 1003.

Fire hose threads used in connection with fire-extinguishing systems shall be national standard hose thread or as approved.

The location of fire department hose connections shall be approved.

In buildings used for high-piled combustible storage, fire protection shall be in accordance with Article 81.

**1003.1.2 Standards.** Fire-extinguishing systems shall comply with the Building Code. (See UBC Standard 9-1.)

**EXCEPTIONS: 1.** Automatic fire-extinguishing systems not covered by the Building Code shall be approved and installed in accordance with approved standards.

2. Automatic sprinkler systems may be connected to the domestic water-supply main when approved by the building official, provided the domestic water supply is of adequate pressure, capacity and sizing for the combined domestic and sprinkler requirements. In such case, the sprinkler system connection shall be made between the public water main or meter and the building shutoff valve, and there shall not be intervening valves or connections. The fire department connection may be omitted when approved.

3. Automatic sprinkler systems in Group R Occupancies four stories or less may be in accordance with the Building Code requirements for residential sprinkler systems. (See UBC Standard 9-3.)

**1003.2 Required Installations.**

**1003.2.1 General.** An automatic fire-extinguishing system shall be installed in the occupancies and locations as set forth in Section 1003.2.

For uses on special hazards and hazardous materials, see Section 1001.9 and Articles 79, 80 and 81.

**1003.2.2 All occupancies except Group R, Division 3 and Group U Occupancies.** Except for Group R, Division 3 and Group U Occupancies, an automatic sprinkler system shall be installed:

1. In every story or basement of all buildings when the floor area exceeds 1,500 square feet (139.4 m$^2$) and there is not provided at least 20 square feet (1.86 m$^2$) of opening entirely above the adjoining ground level in each 50 lineal feet (15 240 mm) or fraction thereof of exterior wall in the story or basement on at least one side of the building. Openings shall have a minimum dimension of not less than 30 inches (762 mm). Such openings shall be accessible to the fire department from the exterior and shall not be obstructed in a manner that firefighting or rescue cannot be accomplished from the exterior.

When openings in a story are provided on only one side and the opposite wall of such story is more than 75 feet (22 860 mm) from such openings, the story shall be provided with an approved automatic sprinkler system, or openings as specified above shall be provided on at least two sides of an exterior wall of the story.

If any portion of a basement is located more than 75 feet (22 860 mm) from openings required in Section 1003.2.2, the basement shall be provided with an approved automatic sprinkler system.

2. At the top of rubbish and linen chutes and in their terminal rooms. Chutes extending through three or more floors shall have additional sprinkler heads installed within such chutes at alternate floors. Sprinkler heads shall be accessible for servicing.

3. In rooms where nitrate film is stored or handled. See also Article 33.

4. In protected combustible fiber storage vaults as defined in Article 2. See also Article 28.

5. Throughout all buildings with a floor level with an occupant load of 30 or more that is located 55 feet (16 764 mm) or more above the lowest level of fire department vehicle access.

**EXCEPTION: 1.** Airport control towers.

2. Open parking structures.

3. Group F, Division 2 Occupancies.

**1003.2.3 Group A Occupancies.**

**1003.2.3.1 Drinking establishments.** An automatic sprinkler system shall be installed in rooms used by the occupants for the consumption of alcoholic beverages and unseparated accessory uses where the total area of such unseparated rooms and assembly uses exceeds 5,000 square feet (465 m$^2$). For uses to be considered as separated, the separation shall not be less than as required for a one-hour occupancy separation. The area of other uses shall be included unless separated by at least a one-hour occupancy separation.

**1003.2.3.2 Basements.** An automatic sprinkler system shall be installed in basements classified as a Group A Occupancy when the basement is larger than 1,500 square feet (139 m$^2$) in floor area.

**1003.2.3.3 Exhibition and display rooms.** An automatic sprinkler system shall be installed in Group A Occupancies which have more than 12,000 square feet (1114.8 m$^2$) of floor area which can be used for exhibition or display purposes.

**1003.2.3.4 Stairs.** An automatic sprinkler system shall be installed in enclosed usable space below or over a stairway in Group A, Divisions 2, 2.1, 3 and 4 Occupancies.

**1003.2.3.5 Multitheater complexes.** An automatic sprinkler system shall be installed in every building containing a multitheater complex.

**1003.2.3.6 Amusement buildings.** An automatic sprinkler system shall be installed in all amusement buildings. The main water-flow switch shall be electrically supervised. The sprinkler main cutoff valve shall be supervised. When the amusement building is temporary, the sprinkler water-supply system may be of an approved temporary type.

**EXCEPTION:** An automatic sprinkler system need not be provided when the floor area of a temporary amusement building is less than 1,000 square feet (92.9 m$^2$) and the exit travel distance from any point is less than 50 feet (15 240 mm).

**1003.2.3.7 Stages.** All stages shall be sprinklered. Such sprinklers shall be provided throughout the stage and in dressing rooms, workshops, storerooms and other accessory spaces contiguous to such stages.

**EXCEPTIONS: 1.** Sprinklers are not required for stages 1,000 square feet (92.9 m$^2$) or less in area and 50 feet (15 240 mm) or less in height where curtains, scenery or other combustible hangings are not retractable vertically. Combustible hangings shall be limited to a single main curtain, borders, legs and a single backdrop.

2. Under stage areas less than 4 feet (1219 mm) in clear height used exclusively for chair or table storage and lined on the inside with $^5/_8$-inch (16 mm) Type X gypsum wallboard or an approved equal.

**1003.2.3.8 Smoke-protected assembly seating.** All areas enclosed with walls and ceilings in buildings or structures containing smoke-protected assembly seating shall be protected with an approved automatic sprinkler system.

**EXCEPTION:** Press boxes and storage facilities less than 1,000 square feet (92.9 m$^2$) in area and in conjunction with outdoor seating facilities where all means of egress in the seating area are essentially open to the outside.

**1003.2.4 Group E Occupancies.**

EXHIBIT G

**1003.2.4.1  General.** An automatic fire sprinkler system shall be installed throughout all buildings containing a Group E, Division 1 Occupancy.

> **EXCEPTIONS:** 1. When each room used for instruction has at least one exterior exit door at ground level and when rooms used for assembly purposes have at least one half of the required exits directly to the exterior ground level, a sprinkler system need not be provided.
>
> 2. When area separation walls, or occupancy separations having a fire-resistive rating of not less than two hours subdivide the building into separate compartments such that each compartment contains an aggregate floor area not greater than 20,000 square feet (1858 m$^2$), an automatic sprinkler system need not be provided.

**1003.2.4.2  Basements.** An automatic sprinkler system shall be installed in basements classified as Group E, Division 1 Occupancies.

**1003.2.4.3  Stairs.** An automatic fire sprinkler system shall be installed in enclosed usable space below or over a stairway in Group E, Division 1 Occupancies.

**1003.2.5  Group F Occupancies.**

**1003.2.5.1  Woodworking occupancies.** An automatic fire sprinkler system shall be installed in Group F woodworking occupancies over 2,500 square feet (232.3 m$^2$) in area that use equipment, machinery or appliances which generate finely divided combustible waste or which use finely divided combustible materials.

**1003.2.6  Group H Occupancies.**

**1003.2.6.1  General.** An automatic fire-extinguishing system shall be installed in Group H, Divisions 1, 2, 3 and 7 Occupancies.

**1003.2.6.2  Group H, Division 4 Occupancies.** An automatic fire-extinguishing system shall be installed in Group H, Division 4 Occupancies having a floor area of more than 3,000 square feet (279 m$^2$).

**1003.2.6.3  Group H, Semiconductor Fabrication Facilities.** An automatic fire-extinguishing system shall be installed throughout buildings containing semiconductor fabrication facilities classified as Group H, Division 6 Occupancies. The design of the sprinkler system shall not be less than that required under the occupancy hazard classifications as follows:

| LOCATION | OCCUPANCY HAZARD CLASSIFICATION |
|---|---|
| Fabrication areas | Ordinary Hazard Group 2 |
| Service corridors | Ordinary Hazard Group 2 |
| Storage rooms without dispensing | Ordinary Hazard Group 2 |
| Storage rooms with dispensing | Extra Hazard Group 2 |
| Corridors | Ordinary Hazard Group 2[1] |

[1]When the design area of the sprinkler system consists of a corridor protected by one row of sprinklers, the maximum number of sprinklers that needs to be calculated is 13.

**1003.2.7  Group I Occupancies.** An automatic sprinkler system shall be installed in Group I Occupancies. In Group I, Division 1.1 and Group I, Division 2 Occupancies, approved quick-response or residential sprinklers shall be installed throughout patient sleeping areas.

> **EXCEPTION:** In jails, prisons and reformatories, the piping system may be dry, provided a manually operated valve is installed at a continuously monitored location. Opening of the valve will cause the piping system to be charged. Sprinkler heads in such systems shall be equipped with fusible elements or the system shall be designed as required for deluge systems in the Fire Code (See Section 9003, Standard n.2.9).

**1003.2.8  Group M Occupancies.** An automatic fire sprinkler system shall be installed in rooms classed as Group M Occupancies where the floor area exceeds 12,000 square feet (1114.8 m$^2$) on any floor or 24,000 square feet (2229.6 m$^2$) on all floors or in Group M Occupancies more than three stories in height. The area of mezzanines shall be included in determining the areas where sprinklers are required.

**1003.2.9  Group R, Division 1 Occupancies.** An automatic sprinkler system shall be installed throughout every apartment house three or more stories in height or containing 5 or more dwelling units, every congregate residence three or more stories in height or having an occupant load of 11 or more, and every hotel three or more stories in height or containing 6 or more guest rooms. Residential or quick-response standard sprinklers shall be used in the dwelling units and guest room portions of the building. *[For SFM] The requirements of this subsection shall not mandate the retroactive installation of an automatic sprinkler system to an existing R1 occupancy.*

*1003.2.10  Sound stages and solid-ceiling sets and platforms. An automatic sprinkler system shall be installed in all permanent sound stages and in all interior solid-ceiling sets over 6000 square feet (55.7 m$^2$) in area and under platforms over 600 square feet (55.7 m$^2$) in area which exceed 3 feet (914 mm) in height.*

> *EXCEPTIONS:  1.  When heat detectors are installed beneath solid-ceiling sets over 600 square feet (55.7 m$^2$) in area and under platforms (when provided) over 600 square feet (55.7 m$^2$) in area which exceed 3 feet (914 mm) in height.*
>
> *The detectors shall be spaced 30 feet (9144 mm) on center or as required by the manufacturer's installation instructions.  The detectors shall be connected to an approved and listed central proprietary or remote station service or a local alarm which will give an audible signal at a constantly attended location.  Such system shall be installed in accordance with Article 10.*
>
> *2.  Sets with solid-ceilings over 600 square feet (55.7 m$^2$) in area designed to allow the ceiling to be positioned to allow for the operation of the automatic fire sprinkler system after filming has been completed for the day.*

**1003.3** Sprinkler System Monitoring and Alarms.

**1003.3.1  Where required.** All valves controlling the water supply for automatic sprinkler systems and water-flow switches on all sprinkler systems shall be electrically monitored for integrity where the number of sprinklers is:

1.  Twenty or more in Group I, Divisions 1.1 and 1.2 Occupancies.

2.  One hundred or more in all other occupancies.

Valve monitoring and water-flow alarm and trouble signals shall be distinctly different and shall be automatically transmitted to an approved central station, remote station or proprietary monitoring station as defined by *[For SFM] NFPA 72 as amended in Article 10* or, when approved  shall sound an audible signal at a constantly attended location.

**EXCEPTION:** Underground key or hub valves in roadway boxes provided by the municipality or public utility need not be monitored.

**1003.3.2 Alarms.** An approved audible sprinkler flow alarm shall be provided on the exterior of the building in an approved location. A single approved audible sprinkler flow alarm shall be provided in the interior of the building in a normally occupied location. Actuation of the alarm shall be as set forth in the Fire Code (See Section 9003, Standard n.2.9).

**EXCEPTION:** The separate interior alarm is not required when the sprinkler water flow switch activates the building fire alarm system notification appliances.

**1003.4 Permissible Sprinkler Omissions.** Subject to the approval of the building official and with the concurrence of the chief, sprinklers may be omitted in rooms or areas as follows:

1. When sprinklers are considered undesirable because of the nature of the contents or in rooms or areas which are of noncombustible construction with wholly noncombustible contents and which are not exposed by other areas. Sprinklers shall not be omitted from any room merely because it is damp, of fire-resistive construction or contains electrical equipment.

2. Sprinklers shall not be installed when the application of water or flame and water to the contents may constitute a serious life or fire hazard, as in the manufacture or storage of quantities of aluminum powder, calcium carbide, calcium phosphide, metallic sodium and potassium, quicklime, magnesium powder and sodium peroxide.

3. Safe deposit or other vaults of fire-resistive construction, when used for the storage of records, files and other documents, when stored in metal cabinets.

4. Communication equipment areas under the exclusive control of a public communication utility agency, provided:

   4.1 The equipment areas are separated from the remainder of the building by one-hour fire-resistive occupancy separation; and

   4.2 Such areas are used exclusively for such equipment; and

   4.3 An approved automatic smoke-detection system is installed in such areas and is supervised by an approved central, proprietary or remote station service or a local alarm which will give an audible signal at a constantly attended location; and

   4.4 Other approved fire-protection equipment such as portable fire extinguishers or Class II standpipes are installed in such areas.

5. Other approved automatic fire-extinguishing systems may be installed to protect special hazards or occupancies in lieu of automatic sprinklers.

## SECTION 1004 — STANDPIPES

**1004.1** Installation Requirements.

**1004.1.1 General.** Standpipe systems shall be installed in accordance with Section 1004 (See Section 9003, Standard n2.12).

Fire hose threads used in connection with fire-extinguishing systems shall be national standard hose thread or as approved.

The location of fire department hose connections shall be approved.

In buildings used for high-piled combustible storage, fire protection shall be in accordance with Article 81.

**1004.1.2 Standards.** Standpipe systems shall comply with the Fire Code. (See Section 9003, Standard n2.12).

**1004.2 Required Installations.** Standpipe systems shall be provided as set forth in Table 1004-A.

**1004.3 Location of Class I Standpipe Hose Connections.** There shall be a Class I standpipe outlet connection at every floor-level landing of every required stairway above or below grade and on each side of the wall adjacent to the exit opening of a horizontal exit. Outlets at stairways shall be located within the exit enclosure or, in the case of pressurized enclosures, within the vestibule or exterior balcony, giving access to the stairway.

Risers and laterals of Class I standpipe systems not located within an enclosed stairway or pressurized enclosure shall be protected by a degree of fire resistance equal to that required for vertical enclosures in the building in which they are located.

**EXCEPTION:** In buildings equipped with an approved automatic sprinkler system, risers and laterals which are not located within an enclosed stairway or pressurized enclosure need not be enclosed within fire-resistive construction.

There shall be at least one outlet above the roof line when the roof has a slope of less than 4 units vertical in 12 units horizontal (33.3% slope).

In buildings where more than one standpipe is provided, the standpipes shall be interconnected at the bottom.

**1004.4 Location of Class II Standpipe Hose Connections.** Class II standpipe outlets shall be accessible and shall be located so that all portions of the building are within 30 feet (9144 mm) of a nozzle attached to 100 feet (30 480 mm) of hose.

In Group A, Divisions 1 and 2.1 Occupancies with occupant loads of more than 1,000, outlets shall be located on each side of any stage, on each side of the rear of the auditorium and on each side of the balcony.

Fire-resistant protection of risers and laterals of Class II standpipe systems is not required.

**1004.5 Location of Class III Standpipe Hose Connections.** Class III standpipe systems shall have outlets located as required for Class I standpipes in Section 1004.3 and shall have Class II outlets as required in Section 1004.4.

Risers and laterals of Class III standpipe systems shall be protected as required for Class I systems.

**EXCEPTIONS:** 1. In buildings equipped with an approved automatic sprinkler system, risers and laterals which are not located within an enclosed stairway or pressurized enclosure need not be enclosed within fire-resistive construction.

2. Laterals for Class II outlets on Class III systems need not be protected.

In buildings where more than one Class III standpipe is provided, the standpipes shall be interconnected at the bottom.

## SECTION 1005 — PROTECTION OF COMMERCIAL COOKING OPERATIONS

**1005.1 Ventilating Hood and Duct Systems.** A ventilating hood and duct system shall be provided in accordance with the Mechanical Code for commercial-type food heat-processing equipment that produces grease-laden vapors.

**1005.2 Fire-extinguishing System.**

**1005.2.1 Where required.** Approved automatic fire-extinguishing systems shall be provided for the protection of commercial-type cooking equipment.

> **EXCEPTION:** The requirement for protection does not include steam kettles and steam tables or equipment which as used does not create grease-laden vapors.

**1005.2.2 Type of system.** Protection of new commercial-type cooking equipment shall be by means of an automatic fire-extinguishing system complying with UL 300 that is listed and labeled for its intended use.

Systems shall be installed in accordance with the Mechanical Code, their listing and the manufacturer's instruction. Other systems shall be of an approved design and shall be of one of the following types:

1. Automatic sprinkler system.

2. Dry-chemical extinguishing system.

3. Carbon dioxide extinguishing system.

4. Wet-chemical extinguishing system.

**1005.2.3 Extent of protection.**

**1005.2.3.1 General.** The automatic fire-extinguishing system used to protect ventilating hoods and ducts and cooking appliances shall be installed to include cooking surfaces, deep fat fryers, griddles, upright broilers, charbroilers, range tops and grills. Protection shall also be provided for the enclosed plenum space within the hood above filters and exhaust ducts serving the hood.

**1005.2.3.2 Carbon dioxide systems.** When carbon dioxide systems are used, there shall be a nozzle at the top of the ventilating duct. Additional nozzles that are symmetrically arranged to give uniform distribution shall be installed within vertical ducts exceeding 20 feet (6096 mm) and horizontal ducts exceeding 50 feet (15 240 mm). Dampers shall be installed at either the top or the bottom of the duct and shall be arranged to operate automatically upon activation of the fire-extinguishing system. When the damper is installed at the top of the duct, the top nozzle shall be immediately below the damper. Carbon dioxide automatic fire-extinguishing systems shall be sufficiently sized to protect all hazards venting through a common duct simultaneously.

**1005.2.4 Automatic power, fuel and ventilation shutoff.**

**1005.2.4.1 General.** Automatic fire-extinguishing systems shall be interconnected to the fuel or current supply for cooking equipment. The interconnection shall be arranged to automatically shut off all cooking equipment and electrical receptacles which are located under the hood when the system is actuated.

Shutoff valves or switches shall be of a type that require manual operation to reset.

**1005.2.4.2 Carbon dioxide systems.** Commercial-type cooking equipment protected by an automatic carbon dioxide extinguishing system shall be arranged to shut off the ventilation system upon activation.

**1005.2.5 Special provisions for automatic sprinkler systems.** Commercial-type cooking equipment protected by automatic sprinkler systems shall be supplied from a separate, readily accessible indicating-type control valve that is identified.

Sprinklers used for the protection of fryers shall be listed for that application and installed in accordance with their listing.

**1005.2.6 Manual system operation.** A readily accessible manual activation device installed at an approved location shall be provided for dry chemical, wet chemical and carbon dioxide systems. The activation device is allowed to be mechanically or electrically operated. If electrical power is used, the system shall be connected to a standby power system and a visual means shall be provided to show that the extinguishing system is energized. Instructions for operating the fire-extinguishing system shall be posted adjacent to manual activation devices.

**1005.2.7 Portable fire extinguishers.** A fire extinguisher listed and labeled for Class K fires shall be installed within 30 feet (9144 mm) of commercial food heat-processing equipment, as measured along an unobstructed path of travel, in accordance with *[For SFM] California Code of Regulations, Title 19, Division 1, Chapter 3.*

> **EXCEPTION:** Approved extinguishers utilizing other extinguishing agents that are compatible for use in the control of cooking grease fires.

**1005.2.8 Operations and maintenance.** The ventilation system in connection with hoods shall be operated at the required rate of air movement, and classified grease filters shall be in place when equipment under a kitchen grease hood is used.

If grease extractors are installed, they shall be operated when the commercial-type cooking equipment is used.

Hoods, grease-removal devices, fans, ducts and other appurtenances shall be cleaned at intervals necessary to prevent the accumulation of grease. Cleanings shall be recorded, and records shall state the extent, time and date of cleaning. Such records shall be maintained on the premises.

Extinguishing systems shall be serviced at least every six months or after activation of the system. Inspection shall be by qualified individuals, and a Certificate of Inspection shall be forwarded to the chief upon completion.

Fusible links and automatic sprinkler heads shall be replaced at least annually, and other protection devices shall be serviced or replaced in accordance with the manufacturer's instructions.

> **EXCEPTION:** Frangible bulbs need not be replaced annually.

## SECTION 1006 — FIRE ALARM SYSTEMS

**1006.1 General.**

**1006.1.1 Applicability.** Installation and maintenance of fire alarm systems shall be in accordance with Section 1006.

**1006.1.2 Problematic systems and systems out of service.** See Section 1001.5.3.

**1006.2 Required Installations.**

**1006.2.1 General.**

**1006.2.1.1 When required.** An approved manual, automatic or manual and automatic fire alarm system shall be provided in accordance with Section 1006.2.

**1006.2.1.2 Use of area separation walls to define separate local buildings.** For the purposes of Section 1006, area separation walls shall not define separate buildings.

*1006.2.1.3 [For SFM] Where smoke detection systems are required by other sections of this code, when approved by the authority having jurisdiction, approved head detectors may be provided in lieu of smoke detectors in rooms and areas such as furnace rooms, boiler rooms, closets, unusable space under floor,*

C
A
A
*bathrooms, attached garages, attics, kitchens, laundry rooms and in areas of similar use, where ambient conditions would cause actuation of, or prohibit the installation of smoke detectors.*

**1006.2.2 Group A Occupancies.**

**1006.2.2.1 General.** Group A, Divisions 1, 2 and 2.1 Occupancies shall be provided with a manual fire alarm system in accordance with Section 1006.2.2

> **EXCEPTIONS:** 1. Manual fire alarm boxes are not required when an approved automatic fire-extinguishing system is installed which will immediately activate the prerecorded announcement upon water flow.
>
> 2. Group A Occupancy portions of Group E Occupancies are allowed to have alarms as required for the Group E Occupancy.

See also Section 1006.2.12.

C
A
**1006.2.2.2 System initiation in Group A Occupancies with an occupancy load of 1,000 or more.** Activation of the fire alarm in Group A Occupancies with an occupancy load of 1,000 or more shall immediately initiate an approved prerecorded message announcement using an approved voice communication system in accordance with *[For SFM] NFPA 72 as amended in Article 91* that is audible above the ambient noise level of the occupancy.

> **EXCEPTION:** When approved, the prerecorded announcement is allowed to be manually deactivated for a period of time, not to exceed three minutes, for the sole purpose of allowing a live voice announcement from an approved, constantly attended station.

**1006.2.2.3 Emergency power.** Voice communication systems shall be provided with an approved emergency power source.

**1006.2.3 Group B Occupancies.** See Section 1006.2.12.

L C
L A
L C
L A
L C
L A
**1006.2.13 *[For SFM] Group C Occupancies.*** *Every building and structure used or intended for sleeping purposes shall be provided with an automatic smoke-detector system.*

> *EXCEPTION: Buildings and structures in existence and in operation prior to January 11, 1985.*

L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
L C
L A
**1006.2.14 *[For SFM] Automatic Smoke Detection system egress control devices.*** *Smoke detectors shall be installed in accordance with this section when required for use with special egress-control devices.*

**1006.2.14.1 *[For SFM]*** *In other than Group I Occupancies, for single-story buildings smoke detectors shall be installed at ceilings throughout all occupied areas and mechanical/electrical spaces. For multiple-story buildings smoke detectors shall be installed throughout all occupied areas and mechanical/electrical spaces for the story where special egress-control devices are installed. Additional detectors are required on adjacent stories where occupants of those stories utilize the same exit egress.*

**1006.2.14.2 *[For SFM]*** *For Group I Occupancies, smoke detectors shall be installed at ceilings throughout all occupied areas and mechanical/electrical spaces of smoke-compartments where special egress-control devices are installed. Additional detectors are required in adjacent smoke-compartments where occupants of those compartments utilize the same exit egress.*

**1006.2.4 Group E Occupancies.**

**1006.2.4.1 General.** Group E Occupancies shall be provided with fire alarm systems in accordance with Section 1006.2.4. Group E, Division 1 Occupancies and Group E, Division 3 Occupancies having an occupant load of 50 or more shall be provided

with an approved manual fire alarm system. When automatic sprinkler systems or smoke detectors provided in accordance with Section 1006.2.4.2 are installed, such systems or detectors shall be connected to the building fire alarm system, and the building fire alarm system shall be both automatic and manual. See also Section 1006.2.12.

C L
A L
C L
A L
C L
A L
C L
A L
C L
A L
C L
A L
*1006.2.4.1.1 [For SFM] When more than one fire alarm control unit is used at the school campus, they shall be interconnected and shall operate all indicating devices.*

> *EXCEPTION: Interconnection of fire alarm control units is not required when:*
>
> *1. Buildings that are separated a minimum of 20 feet (6096 mm) and in accordance with the California Building Code,*
>
> *2. There is a method of communication between each classroom and the school administrative office approved by the fire authority having jurisdiction.*

*1006.2.4.1.2 [For SFM] School Fire Alarms. Except as provided in Section 1006.2.4.1, every building used for educational purposes, regardless of occupancy classification, shall be provided with an approved fire alarm system. This provision shall apply to, but shall not necessarily be limited to, every elementary school, high school, community college and university.*

C L
A L
C L
A L
> *EXCEPTION: Privately owned trade or vocational schools or any firm or company which provides educational facilities and instructions for its employees.*

**1006.2.4.2 Smoke detectors.**

**1006.2.4.2.1 Increased travel distance.** Smoke detectors shall be installed when required by the Building Code for increases in travel distance to exits.

**1006.2.4.2.2 Travel through adjoining rooms.** Smoke detectors shall be installed when required by the Building Code to allow the only means of egress from a room to be through adjoining or intervening rooms.

**1006.2.4.3 Exterior alarm-signaling device.** An alarm [For SFM] notification appliance shall be mounted on the exterior of the building.

**1006.2.5 Group F Occupancies.** See Section 1006.2.12.

**1006.2.6 Group H Occupancies.**

**1006.2.6.1 General.** Group H Occupancies shall be provided with fire alarm systems in accordance with Section 1006.2.6. See also Section 1006.2.12.

**1006.2.6.2 Organic coatings.** Organic coating manufacturing uses shall be provided with a manual fire alarm system. See Article 50.

**1006.2.6.3 Group H, Semiconductor Fabrication Facilities.** Semiconductor fabrication facilities classified as Group H Occupancies shall be provided with a manual fire alarm system. See Article 51.

**1006.2.6.4 Rooms used for storage, dispensing, use and handling of hazardous materials.** When required by Article 80, rooms or areas used for storage, dispensing, use or handling of highly toxic compressed gases, liquid and solid oxidizers, and Class I, II, III or IV organic peroxides shall be provided with an automatic smoke-detection system.

**1006.2.7 Group I Occupancies.**

EXHIBIT G

**1006.2.7.1  Divisions 1.1, 1.2 and 2 Occupancies.**

**1006.2.7.1.1  System requirements.** Group I, Divisions 1.1, 1.2 and 2 Occupancies shall be provided with an approved manual and automatic fire alarm system in accordance with Section 1006.2.7.1. See also Section 1006.2.12.  Smoke detectors shall be provided in accordance with the Building Code as follows:

1. At automatic-closing doors in smoke barriers and one-hour fire-resistive occupancy separations. (See UBC Sections 308.2.2.1 and 308.8).

2 .In waiting areas which are open to corridors. (See UBC Sections 1007.5).

*3.  In patient sleeping rooms.  (See California Building Code Section 308.10a.)*

When actuated, alarm-initiating devices shall activate an alarm signal which is audible throughout the building.

>    **EXCEPTION:** Visual alarm-signaling devices are allowed to substitute for audible devices in patient use areas.

**1006.2.7.1.2  Patient room smoke detectors.** Smoke detectors shall be installed in patient sleeping rooms of hospital and nursing homes. Actuation of such detectors shall cause a visual display on the corridor side of the room in which the detector is located and shall cause an audible and visual alarm at the respective nurses' station. *[For SFM] Operation of the smoke detector shall not include any alarm verification feature.*

>    **EXCEPTION:** In rooms equipped with automatic door closers having integral smoke detectors on the room side, the integral detector may substitute for the room smoke detector, provided it performs the required alerting functions.

***1006.2.7.1.3  Existing Group I Occupancies.**  In projects requiring OSHPD approval, facilities not equipped with an automatic sprinkler system throughout shall be equipped with an automatic fire alarm system which responds to the products of combustion other than heat.*

>    *EXCEPTION: Heat detectors may be used in closets, unusable space under floor areas, storage rooms, bathrooms, kitchens, laundry rooms and rooms of similar use.*

**1006.2.7.2  Division 3 Occupancies.**

**1006.2.7.2.1  General.** Group I, Division 3 Occupancies shall be provided with a manual and automatic fire alarm system installed for alerting staff in accordance with Section 1006.2.7.2. See also Section 1006.2.12.

>    *EXCEPTION:  [For SFM]: Heat detectors may be used in closets, unusable space under floor areas, storage rooms, bathrooms  and rooms of similar use.*

**1006.2.7.2.2  System initiation.** Actuation of an automatic fire-extinguishing system, a manual fire alarm box or a fire detector shall initiate an approved fire alarm signal which automatically notifies staff. Presignal systems shall not be used.

**1006.2.7.2.3  Manual fire alarm boxes.**

1. **General.** Manual fire alarm boxes need not be located in accordance with Section 1006.3.3.1 when they are provided at staff-attended locations having direct supervision over areas where manual fire alarm boxes have been omitted.

2. **Locking of manual fire alarm boxes.** Manual fire alarm boxes are allowed to be locked in areas occupied by detainees, provided that staff members are present within the subject area and have keys readily available to operate the manual fire alarm boxes.

**1006.2.7.2.4  Smoke detection.** An approved automatic smoke-detection system shall be installed throughout resident housing areas, including sleeping areas and contiguous day rooms, group activity spaces and other common spaces normally accessible to residents.

>    **EXCEPTION:** Other approved smoke-detection arrangements providing equivalent protection, such as placing detectors in exhaust ducts from cells or behind protective grilles, are allowed when necessary to prevent damage or tampering.

**1006.2.7.2.5  Zoning and annunciation.** Alarm and trouble signals shall be annunciated at an approved constantly attended location. Such signals shall indicate the zone of origin.

Separate zones shall be provided for individual fire-protection systems, buildings, floors, cell complexes and sections of floors compartmented by smoke-stop partitions.

**1006.2.7.2.6  Monitoring.** The fire alarm system shall be monitored by an approved central, proprietary or remote station service or by transmission of a local alarm which will give audible and visual signals at an approved constantly attended location.

**1006.2.8  Group M Occupancies.** See Section 1006.2.12.

**1006.2.9  Group R Occupancies.**

**1006.2.9.1  New Group R Occupancies.**

**1006.2.9.1.1  General.** Group R Occupancies shall be provided with fire alarm systems in accordance with Section 1006.2.9 and the *California* Building Code. Group R, Division 1 Occupancies shall be provided with a manual and automatic fire alarm system in apartment houses three or more stories in height or containing 16 or more dwelling units, in hotels three or more stories in height or containing 20 or more guest rooms, and in congregate residences three or more stories in height or having an occupant load of 20 or more. See also Section 1006.2.12.

>    **EXCEPTIONS:** 1.A manual fire alarm system need not be provided in buildings not over two stories in height when all individual dwelling units and contiguous attic and crawl spaces are separated from each other and public or common areas by at least one-hour fire-resistive occupancy separations and each individual dwelling unit or guest room has an exit directly to a public way, exit court or yard.
>
>    2. A separate fire alarm system need not be provided in buildings which are protected throughout by an approved supervised fire sprinkler system conforming with the Building Code and having a local alarm to notify all occupants.

***1006.2.9.1.1.1 [For SFM]* Group R, Division 2.1 and 2.3 Occupancies.** Group R, Division 2.1 and 2.3 Occupancy shall be provided with an approved manual and automatic fire alarm system in accordance with Section 1006.2.9 and the California  Building Code.

*System smoke detectors shall be installed in exit corridors and common areas.  Upon actuation, these smoke detectors shall activate the fire alarm notification appliances throughout the building, including those located in guestrooms and dwelling units.*

*Single-station smoke detectors shall be installed in guestrooms and dwelling units in accordance with the California Building Code, Section 310.9.  Upon actuation, these smoke detectors shall only annunciate within such guestroom and dwelling unit and shall not activate the fire alarm system notification appliances that are located throughout the building.*

EXHIBIT G

*System smoke detectors and trouble conditions alarms shall be annunciated at a location that is constantly attended within the building.*

> **EXCEPTION:** *Buildings housing nonambulatory clients on the first story only, and which are protected throughout by the following:*
>
> *1. An approved and supervised automatic sprinkler system, as specified in the California Building Code, which upon activation will initiate the fire alarm system to notify all occupants.*
>
> *2. A manual fire alarm system in accordance with this section and the California Building Code.*

**1006.2.9.1.2 Manual fire alarm boxes.** Manual fire alarm boxes are not required for interior corridors having smoke detectors as specified in Section 1006.2.9.1.3.

**1006.2.9.1.3 Smoke detectors.** Smoke detectors shall be provided in all common areas and interior corridors *[For SFM]* of Group R, Division 1 occupancies with an occupant load of 10 or more.

**1006.2.9.1.4 Heat detectors.** Heat detectors shall be provided in all common areas such as recreational rooms, laundry rooms, furnace rooms, and similar areas *[For SFM]* of Group R, Division 1.

**1006.2.9.1.5 Visual *signaling devices.*** Guest rooms *[For SFM]* required by the California Building Code, Section 1111B.4.5, for persons with hearing impairments, shall be provided with *visual* and audible *fire alarm notification* appliances, activated by both the in-room smoke *alarm* and the building fire alarm system. It is permitted to use separate appliances to meet this requirement.

**1006.2.9.1.6 Single-station smoke *alarms.*** Approved single-station smoke *[For SFM]* alarms or multiple-station smoke *alarms* shall be installed in dwelling units, congregate residences and hotel and lodging house guest rooms. [*For SFM] and in sleeping rooms of Group R, Division 2.1.1,.2.2.1, 2.3.1, and 6 Occupancies* in accordance with the *California* Building Code.

Single-station smoke *alarms or multiple* station smoke *alarms* shall not be connected to a fire alarm system. See also Section 1006.2.9.1.5.

> **EXCEPTION:** 1. Connection of such detectors for annunciation.
>
> *2. [For SFM] A fire alarm system with smoke detectors located in accordance with the California Building Code may be installed in lieu of smoke alarms. Upon actuation of the detector, only those notification appliances in the dwelling unit or guest room where the detector is actuated shall activate.*

**1006.2.9.2** Existing Group R Occupancies.

*1006.2.9.2.1 [For SFM] Group R, Division 2.1 and 2.3 Occupancies. Group R, Division 2.1 and 2.3 Occupancies shall be provided with a manual and automatic fire alarm system in accordance with Section 1006.2.9 and the California Building Code.*

*System smoke detectors shall be installed in exit corridors and common areas. Upon actuation, these smoke detectors shall activate the fire alarm notification appliances throughout the building including those located in guestrooms and dwelling units.*

*Single-station smoke detectors shall be installed in guestrooms and dwelling units in accordance with the California Building Code, Section 310.9. Upon actuation these smoke detectors shall*

*only annunciate within such questroom and dwelling unit and shall not activate the fire alarm system notification appliances that are located throughout the building.*

*System smoke detectors and trouble conditions alarms shall be annunciated at a location that is constantly attended within the building.*

> **EXCEPTION**: *Buildings housing nonambulatory clients on the first story only, and which are protected throughout by the following:*
>
> *1. An approved and supervised automatic sprinkler system, as specified in the California Building Code, which upon activation will initiate the fire alarm system to notify all occupants.*
>
> *2. A manual fire alarm system in accordance with this section and the California Building Code.*

*1006.2.9.2.2 [For SFM] Group R, Division 2.2 Occupancies. Group R, Division 2.2 Occupancies shall be provided with an approved manual fire alarm system in accordance with Section 1006.2.9 and the California Building Code.*

*1006.2.9.2.3 [For SFM] Group R, Division 2.1.1. and 2.2.1 Occupancies. In addition to smoke alarms required by Section 1006.2.9.1.6, Group R, Division 2.1.1 and 2.2.1 Occupancies shall be provided with one manual pull station at a location approved by the authority having jurisdiction. Such pull station shall actuate a distinctive fire alarm signal, which shall be audible throughout the facility. These devices need not be interconnected to any other fire alarm device, electrically supervised or provided with emergency power.*

*1006.2.9.3 Smoke Alarms in Existing Group R Occupancies.*

*1006.2.9.3.1 General. Existing Group R Occupancies not already provided with single-station smoke [For SFM] alarms shall be provided with approved single-station smoke alarms. Installation shall be in accordance with Section 1006.2.9.3.2.*

*1006.2.9.3.2 Installation. Approved single-station smoke [For SFM] alarms shall be installed in existing dwelling units, congregate residences, and hotel and lodging houseguest rooms.*

*1006.2.9.3.3 Locations within existing Group R Occupancies. In dwelling units, [For SFM] smoke alarms shall be mounted on the ceiling or wall at a point centrally located in the corridor or area giving access to each separate sleeping area. Where sleeping rooms are on an upper level, the detector shall be placed at the center of the ceiling directly above the stairway. Smoke alarms shall also be installed in the basement of dwelling units having a stairway, which opens, from the basement into the dwelling. In hotel, lodging house and congregate residence sleeping rooms, smoke alarms shall be located on the ceiling or wall of each sleeping room.*

**1006.2.10 Group S Occupancies.** See Section 1006.2.12.

**1006.2.11 Group U Occupancies.** No requirements.

**1006.2.12 Special uses and conditions.**

**1006.2.12.1 Amusement buildings.**

**1006.2.12.1.1 General.** An approved smoke-detection system shall be provided in amusement buildings in accordance with Section 1006.2.12.1.

> **EXCEPTION:** In areas where ambient conditions will cause a smoke-detection system to alarm, an approved alternate type of automatic detector shall be installed.

EXHIBIT G

**1006.2.12.1.2  Alarm system.** Activation of any single smoke detector, the automatic sprinkler system or other automatic fire-detection device shall immediately sound an alarm in the building at a constantly supervised location from which the manual operation of systems noted in Section 1006.2.12.1.3 can be initiated.

**1006.2.12.1.3  System response.** The activation of two or more smoke detectors, a single smoke detector monitored by an alarm verification zone, the automatic sprinkler system or other approved fire-detection device shall automatically:

1. Stop confusing sounds and other visual effects,

2. Activate approved directional exit marking, and

3. Cause illumination of the means of egress with light of not less than 1 footcandle (10.8 lx) at the walking surface.

**1006.2.12.1.4  Public address system.** The public address system is also allowed to serve as an alarm.

**1006.2.12.2  High-rise buildings.**

**1006.2.12.2.1  General.** Group B office buildings and Group R, Division 1 Occupancies, each having floors used for human occupancy located more than 75 feet (22 860 mm) above the lowest level of fire department vehicle access, shall be provided with an automatic fire alarm system and a communication system in accordance with Section 1006.2.12.2.

**1006.2.12.2.2  Automatic fire alarm system.** Smoke detectors shall be provided in accordance with Section 1006.2.12.2.2. Smoke detectors shall be connected to an automatic fire alarm system. The actuation of any detector required by Section 1006.2.12.2.2 shall operate the emergency voice alarm-signaling system and shall place into operation all equipment necessary to prevent the recirculation of smoke. Smoke detectors shall be located as follows:

1. In every mechanical equipment, electrical, transformer, telephone equipment, elevator machine or similar room, and in elevator lobbies. Elevator lobby detectors shall be connected to an alarm verification zone or be listed as a releasing device;

2. Smoke detectors for the control of air conditioning and ventilating systems shall be located as required by NFPA 90A, chapter 4, and installed per UFC Standard 10-2, and

3. For Group R, Division 1 Occupancies, in all interior corridors serving as a means of egress for an occupant load of 10 or more.

**1006.2.12.2.3  Emergency voice alarm-signaling system.** The operation of any automatic fire detector, sprinkler or water-flow device shall automatically sound an alert tone followed by voice instructions giving appropriate information and directions on a general or selective basis to the following terminal areas:

1. Elevators,

2. Elevator lobbies,

3. Corridors,

4. Exit stairways,

5. Rooms and tenant spaces exceeding 1,000 square feet (93 m²) in area,

6. Dwelling units in apartment houses,

7. Hotel guest rooms or suites, and

8. Areas of refuge. (As defined in the Building Code.)

A manual override for emergency voice communication shall be provided for all paging zones.

The emergency voice alarm-signaling system shall be designed and installed in accordance with the *[For SFM] California* Building Code and NFPA 72 as amended in Article 91.

**1006.2.12.2.4  Fire department communication system.** A two-way, approved fire department communication system shall be provided for fire department use. It shall operate between the central control station and elevators, elevator lobbies, emergency and standby power rooms and at entries into enclosed stairways.

**1006.2.12.3  Buildings with atriums.** Actuation of an atrium smoke-control system required by the Building Code shall initiate an audible fire alarm signal in designated portions of the building.

**1006.2.12.4  High-piled combustible storage uses.** When required by Article 81, high-piled combustible storage uses shall be provided with an automatic fire-detection system.

**1006.2.12.5  *[For SFM] Automatic smoke detection system egress control devices.*** *Smoke detectors shall be installed in accordance with this section when required for use with special egress control devices.*

*1006.2.12.5.1  [For SFM]* In other than Group I Occupancies, for single-story buildings smoke detectors shall be installed at ceilings throughout all occupied areas and mechanical/electrical spaces. For multiple story buildings smoke detectors shall be installed throughout all occupied areas and mechanical/electrical spaces for the story where special egress-control devices are installed. Additional detectors are required on adjacent stories where occupants of those stories utilize the same exit egress.

*1006.2.12.5.2  [For SFM]* For Group 1 Occupancies, smoke detectors shall be installed at ceilings throughout all occupied areas and mechanical/electrical spaces of smoke-compartments where special egress-control devices are installed. Additional detectors are required in adjacent smoke-compartments where occupants of those compartments utilize the same exit egress.

**1006.2.12.6  Corridors in office uses.** When required by the Building Code for corridors in lieu of one-hour construction, smoke detectors shall be installed within office corridors in accordance with their listing. The actuation of any detector shall activate alarms audible in all areas served by the corridor.

**1006.2.12.7  Aerosol storage uses.** When required by Article 88, aerosol storage rooms and general purpose warehouses containing aerosols shall be provided with an approved manual alarm system.

**1006.2.12.8  Smoke-control systems.** An approved automatic smoke-detection system shall be provided when required by the Building Code for automatic control of a smoke-control system.

**1006.2.12.9  Lumber, plywood and veneer mills.** Lumber, plywood and veneer mills shall be provided with a manual fire alarm system. See Section 3004.5.2.

**1006.2.13  *[For SFM] Group C Occupancies.*** *Every building or structure used or intended for sleeping purposes shall be provided with an automatic smoke-detector system.*

**EXCEPTION:** *Buildings and structures in existence and in operation prior to January 11, 1985.*

**1006.3  General System Design and Installation Requirements.**

**1006.3.1  *Design standards.*** *Fire alarm systems, automatic fire detectors, Emergency Voice Alarm Communication Systems and*

notification devices shall be designed, installed and maintained in accordance with [For SFM] the appropriate standards of NFPA 72 as amended in Article 91 of the California Building Code, California Mechanical Code and the California Electrical Code.

**1006.3.2 Equipment.** Systems and components shall be [For SFM] California State Fire Marshal listed and approved for the purpose for which they are installed.

**1006.3.3 System layout and operation.**

**1006.3.3.1 Manual fire alarm boxes.** When a manual fire alarm system is required, manual fire alarm boxes shall be distributed throughout so they are readily accessible, unobstructed, and are located in the normal path of exit travel from the area and as follows:

1. At every exit from every level.

2. Additional fire alarm boxes shall be located so that travel distance to the nearest box does not exceed 200 feet (60 960 mm).

When fire alarm systems are not monitored, an approved permanent sign that reads LOCAL ALARM ONLY—CALL FIRE DEPARTMENT shall be installed adjacent to each manual fire alarm box.

> **EXCEPTION 1:** Separate signs need not be provided when the manufacturer has permanently provided this information on the manual fire alarm box.

> **EXCEPTION 2: [For SFM]** When the individual dwelling units are served by a single stairway, additional boxes at other than the ground floor may be omitted.

**1006.3.3.1.1 [For SFM] Height** Manual fire alarm boxes shall be a minimum of 42 inches (1066 mm) and a maximum of 48 inches (1219 mm), measured vertically from the floor level to the operable part of each manual fire alarm box.

**1006.3.3.2 Control units, annunciator panels and access keys.** The alarm control unit, remote annunciator panel and access keys to locked fire alarm equipment shall be installed and maintained in an approved location.

**1006.3.3.3 Alarm initiation and signal.**

**1006.3.3.3.1 General.** When actuated, fire alarm-initiating devices shall activate an alarm signal which is audible throughout the building or in designated portions of the building when approved.

> **EXCEPTION:** Single-station [For SFM] smoke alarms and multiple-station smoke alarms in dwelling units, rooms used for sleeping purposes in hotel and lodging houses, and patient sleeping rooms in hospitals and nursing homes.

**1006.3.3.3.2 Audible Alarm Signal.** The audible signal shall be the standard fire alarm evacuation signal, ANSI S34.1 Audible Emergency Evacuation Signal, "three pulse temporal pattern", as described in NFPA 72 as amended in Article 91.

**EXCEPTION**: This alarm signal is not required for:

1. Live voice message announcements.

2. Patient and inmate areas of Group I, Division 1.1 and 3 Occupancies.

**1006.3.3.3.3 Audibility** The alarm signal shall be a distinctive sound which is not used for any other purpose other than the fire alarm. Alarm-signaling devices shall produce a sound that exceeds the prevailing equivalent sound level in the room or space by 15 decibels minimum, or exceeds any maximum sound level with a duration of 60 seconds minimum by 5 decibels minimum, whichever is louder. Sound levels for alarm signals shall be 110 decibels maximum.

**1006.3.3.3.4 Visual alarms.** Alarm systems shall include both audible and visual alarms. Alarm devices shall be located in hotel guest rooms as required by the California Building Code [For SFM]NFPA72 as amended in Article 91.

**1006.3.3.4 Connections to other systems.** A fire alarm system shall not be used for any purpose other than fire warning unless approved [For SFM] by the authority having jurisdiction.

**1006.3.3.5 Monitoring Integrity**. Conductors and connections which interconnect equipment, devices and appliances shall be monitored for integrity, as set forth in [For SFM] NFPA 72 as amended in Article 91.

**1006.3.3.6 Systems Status.**

**1006.3.3.6.1 General.** When required by the [For SFM] authority having jurisdiction, fire alarm supervisry and trouble signals shall be reported to an approved central, proprietary or remote supervising station or at the protected premise at a constantly attended location in accordance with the requirements of [For SFM] NFPA 72 as amended in Article 91 for recording and disposition of signals.

> **EXCEPTION**: Group R occupancies which do not have required fire alarm systems.

**1006.3.3.6.2 Automatic telephone dialing devices.** Automatic telephone dialing devices used to transmit an emergency alarm shall not be connected to any fire department telephone number unless approved.

**1006.3.3.7 Annunciation.** Fire alarm systems shall be divided into alarm zones when required by the [For SFM] authority having jurisdiction. When two or more alarm zones are required, visible annunciation shall be provided in an approved location by the [For SFM] authority-having jurisdiction to assist in determining the fire location. The annunciation of all zones and device identification shall be on electrically supervised initiation circuits to the main fire alarm control unit. Alarm, supervisory and trouble signals shall be annunciated in the main control unit by means of an audible signal and a visual display. Such annunciation shall indicate the building, floor, zone or other designated area from which the alarm or trouble signal originated. Visible annunciation shall be provided in a location approved by the authority having jurisdiction. For the purposes of annunciation, zoning shall be in accordance with the following:

1. When the fire-protective signaling system serves more than one building, each building shall be considered as a separate zone.

2. Each floor of a building shall be considered as a separate zone.

3. Each section of floor of a building that is separated by area separation walls or by horizontal exits shall be considered as a separate zone.

4. Annunciation shall be further divided into zones where deemed necessary by the authority having jurisdiction.

5. Identification of the type of alarm, intitiating devices such as manual, automatic, sprinkler waterflow, sprinkler supervisory switches, etc. shall be separately indicated on electrically supervised limiting circuits to the main fire alarm control unit.

> **EXCEPTION**: In Group R, Division 3 Occupancies.

1006.3.4
1006.3.4.3

**1006.3.4  Acceptance test and certification.**

**1006.3.4.1  Acceptance test.** Upon completion of the installation, a satisfactory test of the entire system shall be made in the presence of the *authority having jurisdiction*. All functions of the system or alteration shall be tested.

**1006.3.4.2  Certification.** The permittee shall provide *[For SFM] the Certification of Completion in accordance with NFPA*

*72* to the *authority having jurisdiction* that the system has been installed in accordance with the approved plans and specifications.

**1006.3.4.3  Instructions.** When required by the *authority having jurisdiction*, operating, testing and maintenance instructions and "as-built" drawings and equipment specifications shall be provided at an approved location.

### TABLE 1004-A—STANDPIPE REQUIRED SYSTEMS

| OCCUPANCY | NONSPRINKLERED BUILDING[1] | | SPRINKLERED BUILDING[2,3] | |
|---|---|---|---|---|
| 304.8 for mm<br>0.0929 for m² | Standpipe Class | Hose Requirement | Standpipe Class | Hose Requirement |
| 1. Occupancies exceeding 150 ft. in height and more than one story | III | Yes | I | No |
| 2. Occupancies 4 stories or more but less than 150 ft. in height, except Group R, Division 3[6] | [I and II[4]]<br>(or III) | 5<br>Yes | I | No |
| 3. Group A Occupancies with occupant load exceeding 1,000[7] | II | Yes | No requirement | No |
| 4. Group A, Division 2.1 Occupancies over 5,000 square feet in area used for exhibition | II | Yes | II | Yes |
| 5. Groups I; H; B; S; M; F, Division 1 Occupancies less than 4 stories in height but greater than 20,000 square feet per floor[6] | II[4] | Yes | No requirement | No |
| 6. Stages more than 1,000 square feet in area | II | No | III | No |

[1]Except as otherwise specified in Item 4 of this table, Class II standpipes need not be provided in basements having an automatic fire-extinguishing system throughout.

[2]The standpipe system may be combined with the automatic sprinkler system.

[3]Portions of otherwise sprinkled buildings which are not protected by automatic sprinklers shall have Class II standpipes installed as required for the unsprinklered portions.

[4] In open structures where Class II standpipes may be damaged by freezing, the building official may authorize the use of Class I standpipes which are located as required for Class II standpipes.

[5]Hose is required for Class II standpipes only.

[6]For the purposes of this table, occupied roofs of parking structures shall be considered an additional story. In parking structures, a tier is a story.

[7]Class II standpipes need not be provided in assembly areas used solely for worship.

EXHIBIT G

1

2

**UNITED STATES DISTRICT COURT**

3

**SOUTHERN DISTRICT OF CALIFORNIA**

4

5

UNITED STATES OF AMERICA,                  )        Civil No. 07 CV 00886-W (NLS)

6                                                        )
                                    Plaintiff, )

7                                                        )        CERTIFICATE OF SERVICE
                    v.                                   )

8                                                        )
                                                         )

9   14.30 ACRES OF LAND, more or less, situated in San )
    Diego County, State of California; TIMOTHY LICHTY )

10  and SHERYL LEE LICHTY CO-TRUSTEES OF THE )
    TIM AND SHERRY LICHTY FAMILY TRUST DATED )

11  OCTOBER 24, 1991; AND OTHER INTERESTED )
    PARTIES,                                             )

12                                                       )
                                    Defendants. )

13  _____ )

14          IT IS HEREBY CERTIFIED that:

15          I, the undersigned, am a citizen of the United States and am at least eighteen years of age.  My
    business address is 402 West Broadway, Suite 400, San Diego, CA 92101.  I am not a party to the

16  above-entitled action.  I have caused service of:

17  DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE
    TESTIMONY AND REPORT OF DEFENDANTS' LAND USE EXPERT, THURE STEDT;

18  EXHIBITS

19  on the following parties by electronically filing the foregoing with the Clerk of the District Court using
    the ECF System which electronically notifies them:

20
    KAREN P. HEWITT

21  UNITED STATES ATTORNEY
    Thomas C. Stahl, Esq.

22  Chief, Civil Division
    Christopher Latham, Esq.

23  Attorneys for the Plaintiff
    Office of the U.S. Attorney

24  880 Front Street, Room 6293
    San Diego CA  92101

25
    I declare under penalty of perjury that the foregoing is true and correct.

26  Executed on October 21, 2009, at San Diego, California.
                                                    /s/ Michael E. Quinton

27                                                  _____

28                                                  MICHAEL E. QUINTON
                                                    Attorney for the Defendants
                                                    quinton@quintonpetix.com

                                                                                    7-cv-00886